IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 24-4665

———————————

UNITED STATES OF AMERICA,

*Appellee*,

v.

DENNIS ZELEDON HERNANDEZ,

*Appellant*.

———————————

Appeal from the United States District Court
for the Eastern District of Virginia
at Richmond
*The Honorable Roderick C. Young, District Judge*

———————————

BRIEF OF THE UNITED STATES

———————————

Erik S. Siebert                    Robert S. Day
United States Attorney             Daniel J. Honold
                                   Assistant United States Attorneys
                                   2100 Jamieson Avenue
                                   Alexandria, Virginia 22314
                                   (703) 299-3700

*Attorneys for the United States of America*

# Table of Contents

Page

Table of Authorities ........................................................................... iv

Introduction ........................................................................................ 1

Issues Presented ................................................................................. 2

Statement of the Case ........................................................................ 3

    A.    ICE removal operations are governed by an elaborate set of statutory and regulatory standards .......................................... 3

    B.    Defendant is caught unlawfully crossing the border, triggering the removal process. ................................................................ 4

    C.    Zeledon is ordered removed after failing to appear for his asylum hearing. ........................................................................ 5

    D.    ICE officers arrest, detain, and process Zeledon for removal to El Salvador. ........................................................................... 5

    E.    Zeledon escapes from ICE custody. ............................................ 7

    F.    The district court denies Zeledon's motion to dismiss his § 1505 obstruction charge. ........................................................... 8

    G.    After a bench trial and sentencing, Zeledon succeeds in reopening his immigration-court proceedings. ........................... 11

Summary of Argument ....................................................................... 12

Argument ............................................................................................ 14

I.    ICE removal operations are proceedings under § 1505. .............. 15

    A.    Caselaw establishes § 1505's broad scope. ............................... 15

1. Courts have repeatedly affirmed § 1505's application to agency investigations. .................................................................18

2. Courts have also applied § 1505 to agency enforcement operations. ......................................................................................20

B. The text of § 1505 covers agency investigation and enforcement operations. ..................................................................................24

1. The ordinary meaning of "proceeding" is broad..........................24

2. Section 1505 employs other expansive terms. ...............................25

3. Statutory history further supports a broad application of § 1505...................................................................................................27

4. Related statutory provisions cover "official proceedings," unlike § 1505.......................................................................................29

C. ICE removal operations involve investigative and enforcement components.................................................................................................34

1. ICE investigations include the authority to administer oaths, issue subpoenas, and issue and execute warrants. .......................35

2. ICE removal operations implicate a series of complex investigative and discretionary actions. .........................................37

3. The record further supports that ICE removal operations are agency proceedings. ......................................................................41

II. Zeledon's immigration-court proceedings were pending when he escaped..............................................................................................................43

A. The ordinary meaning of "pending" applies. ......................................43

B. ICE removal operations are part and parcel of immigration-court proceedings. ...............................................................................................48

C.      The Ninth and Seventh Circuits have confirmed that § 1505 "proceedings" cover post-adjudication actions. ...................................50

III.    Alternatively, Zeledon obstructed his First Motion to Reopen proceedings when he escaped. .................................................................53

Conclusion ........................................................................................................56

Statement Regarding Oral Argument ......................................................57

Certificate of Compliance .........................................................................57

Addendum ...................................................................................................... A-1

## Table of Authorities

**Page**

### Cases

*Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442 (1977).....................................................................................45

*Balogun v. Sessions*, 330 F. Supp. 3d 1211 (C.D. Cal. 2018) ................................10

*Fischer v. United States*, 603 U.S. 480 (2024) ................................................. 32, 33

*Gallardo By & Through Vassallo v. Marstiller*, 596 U.S. 420 (2022)....................29

*Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022)........................................38

*Gomez-Perez v. Potter*, 553 U.S. 474 (2008) .........................................................29

*Guzman Chavez v. Hott*, 940 F.3d 867 (4th Cir. 2019) ..........................................40

*Johnson v. Guzman Chavez*, 594 U.S. 523 (2021) ..................................................40

*Kousisis v. United States*, 145 S. Ct. 1382 (2025)..................................................30

*Marinello v. United States*, 584 U.S. 1 (2018) ...................................... 23, 26, 27

*Newbrough v. Piedmont Reg'l Jail Auth.*, 2012 WL 169988 (E.D. Va. Jan. 19, 2012) ...........................................................................38

*Ocasio v. United States*, 578 U.S. 282 (2016) ........................................................34

*Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947 (4th Cir. 2025)................................................................... 24, 26, 44, 47

*Rice v. United States*, 356 F.2d 709 (8th Cir. 1966).......................................... passim

*Stone v. I.N.S.*, 514 U.S. 386 (1995) .......................................................................28

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560 (2012) .....................................45

*United States v. Aguilar*, 515 U.S. 593 (1995) ................................................. 50, 54

*United States v. Batchelder*, 442 U.S. 114 (1979)...................................................8

*United States v. Brewbaker*, 87 F.4th 563 (4th Cir. 2023) .....................................14

*United States v. Browning, Inc.*, 572 F.2d 720 (10th Cir. 1978)..................... 17, 19

*United States v. Engle*, 676 F.3d 405 (4th Cir. 2012).............................................14

*United States v. Fruchtman*, 421 F.2d 1019 (6th Cir. 1970) ............................ 17, 18

*United States v. Fulbright*, 105 F.3d 443 (9th Cir. 1997)......................................55

iv

*United States v. Gonzales*, 520 U.S. 1 (1997)..........................................26

*United States v. Hansen*, 599 U.S. 762 (2023) .....................................44

*United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007)......................55

*United States v. Higgins*, 511 F. Supp. 453 (W.D. Ky. 1981)................49

*United States v. Hopper*, 177 F.3d 824 (9th Cir. 1999)....................... 12, 20, 50, 51

*United States v. Johnson*, 605 F.2d 729 (4th Cir. 1979).................... 14, 54

*United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994) ............................ 17, 19, 22

*United States v. Kirst*, 54 F.4th 610 (9th Cir. 2022)......................... passim

*United States v. Leo*, 941 F.2d 181 (3d Cir. 1991) .................................... 16, 18, 41

*United States v. Lucas*, 101 F.4th 1158 (9th Cir. 2024) ..........................20

*United States v. Mitchell*, 877 F.2d 294 (4th Cir. 1989)........................9, 17

*United States v. Perraud*, 672 F. Supp. 2d 1328 (S.D. Fla. 2009) .................. 22, 47

*United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991)................................50

*United States v. Pugh*, 404 F. App'x 21 (6th Cir. 2010) ..........................47

*United States v. Rainey*, 757 F.3d 234 (5th Cir. 2014).............................. 16, 26, 46

*United States v. Reed*, 75 F.4th 396 (4th Cir. 2023)................................23

*United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991) ........................17

*United States v. Senffner*, 280 F.3d 755 (7th Cir. 2002)................................ passim

*United States v. Seriani*, 129 F.3d 118 (4th Cir. 1997) ..........................54

*United States v. Sutherland*, 921 F.3d 421 (4th Cir. 2019) ............................ 30, 31

*United States v. Vixie*, 532 F.2d 1277 (9th Cir. 1976)..............................17

*United States v. Weaver*, 659 F.3d 353 (4th Cir. 2011)..........................14

*William v. Gonzales*, 499 F.3d 329 (4th Cir. 2007)..............................54

*Yates v. United States*, 574 U.S. 528 (2015)........................................31

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ................................................39

## Statutes and Regulations

18 U.S.C. § 751 ................................................................ 8, 11, 47

18 U.S.C. § 1502 ...................................................................... 33

18 U.S.C. § 1503 ......................................................... 33, 46, 55

18 U.S.C. § 1505 .............................................................. passim

18 U.S.C. § 1510 ...................................................................... 33

18 U.S.C. § 1512 .............................................................. passim

18 U.S.C. § 1513 .............................................................. passim

18 U.S.C. § 1515 ......................................................... 29, 30, 31

18 U.S.C. § 1516 ...................................................................... 33

18 U.S.C. § 1518 ...................................................................... 33

26 U.S.C. § 7212 ................................................................. 22, 27

42 U.S.C. § 1320a-7b ............................................................... 44

8 C.F.R. § 1003.23 ...................................................................... 6

8 C.F.R. § 1003.38 .................................................................7, 54

8 C.F.R. § 1003.39 .................................................................... 54

8 C.F.R. § 235.3 ....................................................................3, 38

8 C.F.R. § 241.1 ........................................................................ 49

8 C.F.R. § 241.13 ...................................................................... 40

8 C.F.R. § 241.14 ...................................................................... 40

8 C.F.R. § 241.15 .............................................................. 3, 13, 39

8 C.F.R. § 241.2 ......................................................... 5, 6, 13, 36

8 C.F.R. § 241.3 ........................................................................ 36

8 C.F.R. § 241.4 ........................................................................ 40

8 C.F.R. § 287.4 ....................................................................3, 35

8 C.F.R. § 287.5 ....................................................................3, 35

8 C.F.R. § 287.8 ........................................................................ 37

8 U.S.C. § 1103 ........................................................................ 49

8 U.S.C. § 1225 .............................................................. 3, 13, 35, 36

8 U.S.C. § 1229a ..................................................................46

8 U.S.C. § 1231 ........................................................... passim

8 U.S.C. § 1253 ........................................................ 8, 31, 32

8 U.S.C. § 1324 ..................................................................44

**Other Authorities**

134 Cong. Rec. S17371 (daily ed. Nov. 10, 1988) ...............33

American Heritage Dictionary (Second College ed. 1982) ...................25

Black's Law Dictionary (11th ed. 2019) ........................ 10, 48

Black's Law Dictionary (6th ed. 1990) .......................... 49, 50

Black's Law Dictionary (3rd ed. 1933) .................... 13, 49, 50

Oxford English Dictionary 1407 (1933) ........................ 25, 50

Oxford English Dictionary 545 (1989) .................... 25, 47, 50

Pub. L. No. 76-401, 54 Stat. 13 (1940) ...............................28

Pub. L. No. 97-291, 96 Stat. 1248 (1982) ................ 25, 28, 29

Webster's New International Dictionary 34 (2d ed. 1957) ...................26

Webster's Third New International Dictionary 97 (1976)) ...................26

## Introduction

Defendant, Dennis Zeledon Hernandez ("Zeledon"), obstructed pending administrative proceedings when he escaped from federal immigration custody in July 2023.  Zeledon had entered the country unlawfully and failed to appear at his immigration-court hearing, resulting in an order of removal *in absentia*.  Years later, he was arrested and transferred to the custody of U.S. Immigration and Customs Enforcement ("ICE") pending his removal from the United States.  But the day before his scheduled transfer to another facility, Zeledon scaled a fence using bedsheets as a rope and ran across the roof of a building at the facility before jumping into a parking lot and running away.

Zeledon remained a fugitive on the run for five days.  Law enforcement eventually located and arrested Zeledon in Durham, North Carolina, over 200 miles away from the facility he escaped.  Zeledon was convicted of obstructing pending agency proceedings under 18 U.S.C. § 1505 after the district court denied his motion to dismiss.

On appeal, Zeledon challenges the denial of his motion to dismiss.  Zeledon does not dispute that escaping from a detention facility is obstructive.  Instead, Zeledon claims that his conduct falls between the cracks of "pending proceedings" covered by § 1505.  He acknowledges that ICE removal operations were pending when he escaped, but argues that the ICE operations are not agency "proceedings"

1

under the statute.  Likewise, Zeledon concedes that immigration-court proceedings are "proceedings" under § 1505, but he asserts those proceedings were not "pending" when he escaped.

Both claims lack merit.  ICE removal operations qualify as "proceedings" under § 1505, as the term is defined by ample caselaw and other authority, because the operations include investigatory and enforcement components that are prescribed by law and comprise a series of steps and stages with a targeted objective.  And immigration-court proceedings remain pending until either the noncitizen is removed from the United States, or he obtains relief from removal from appropriate authorities, neither of which had happened when Zeledon escaped.  Alternatively, Zeledon's immigration-court proceedings were pending at the time of his escape because the time to appeal his first Motion to Reopen had not yet lapsed.  Any one of these three grounds is enough to affirm the district court's denial of Zeledon's motion to dismiss.

Because § 1505 applies to Zeledon's conduct, the Court should affirm the conviction.

## Issues Presented

1.    Do ICE removal operations qualify as "any pending proceeding" that is "being had before any department or agency of the United States" for purposes of 18 U.S.C. § 1505?

2

2.    Were Zeledon's immigration-court proceedings "pending" when he escaped from ICE custody?

**Statement of the Case**

**A.    ICE removal operations are governed by an elaborate set of statutory and regulatory standards.**

ICE removal operations involve a series of complex investigative and discretionary functions focused on enforcing immigration courts' removal orders. As discussed in further detail below, ICE removal operations include investigating the whereabouts of removable noncitizens, *see* 8 C.F.R. § 287.5, providing medical care, food service, and safe housing, *see* 8 U.S.C. § 1231(f)(1); 8 C.F.R. § 235.3(e), assessing noncitizens' safety- and medical-risk factors to determine the location and manner of detention pending removal, *see* 8 U.S.C. § 1231(g)(1), and engaging foreign officials through diplomatic channels to ensure their acceptance and repatriation of the individual, *see* 8 C.F.R. § 241.15, among other discretionary and decision-making functions. During each of these steps, ICE has authority to issue subpoenas, administer oaths, and execute warrants, *see* 8 U.S.C. § 1225(d)(3)-(4)(A); 8 C.F.R. §§ 287.4, 287.5(a)(2), which are particularly useful authorities during the investigation stage of removal operations.

As set forth below, Zeledon obstructed these and other administrative proceedings when he escaped from ICE custody.

**B.    Defendant is caught unlawfully crossing the border, triggering the removal process.**

In July 2016, a U.S. Customs and Border Patrol agent encountered Zeledon in the Rio Grande Valley and determined that he had unlawfully entered the United States from Mexico.  JA239.  The agent arrested Zeledon and transported him to a nearby Border Patrol station for further processing.  JA239.

Zeledon provided a sworn statement acknowledging that he had entered the United States illegally and claiming fear of returning to El Salvador.  JA239.  An asylum officer interviewed Zeledon and found that he had made a preliminary showing of potential eligibility for asylum, which meant he was not subject to expedited removal.  JA239-240; *see* 8 C.F.R. § 208.30.

Several weeks after Zeledon's initial encounter with Border Patrol and while still in ICE custody, ICE issued a Notice to Appear.  JA240.  The Notice to Appear alleged that Zeledon entered the United States unlawfully and directed Zeledon to appear at a future hearing in immigration court to address his status and asylum claim.  JA240.

Zeledon remained in ICE custody until a bond hearing in September 2016.  JA228.  There, an immigration judge released Zeledon and ordered him to appear for future hearings.  JA228.

**C.** **Zeledon is ordered removed after failing to appear for his asylum hearing.**

Zeledon's immigration-court hearing was scheduled for December 2019. Beforehand, Zeledon called an immigration-court hotline that informed him of where and when the hearing would take place. JA229. Despite knowing about the hearing, Zeledon failed to appear and abandoned his asylum claim. JA229. As a result, the immigration court issued a removal order *in absentia*. JA248.

Between December 2019 and May 2023, Zeledon lived in the United States as a fugitive subject to a removal order. JA229. At no point during this period did he seek relief from or contact the immigration court or other immigration officials. JA229.

**D.** **ICE officers arrest, detain, and process Zeledon for removal to El Salvador.**

In May 2023, Zeledon was arrested in York, Virginia, for driving under the influence, carrying a concealed weapon, and child neglect. JA229. Upon Zeledon's release from state custody, ICE officials took Zeledon into custody pursuant to a Warrant of Removal. JA229; 8 C.F.R. § 241.2. ICE officials transferred Zeledon to the Caroline Detention Facility ("CDF"), an ICE detention center located in Bowling Green, Virginia, on May 17, 2023. JA229.

When Zeledon arrived, CDF officials conducted a "Detainee Initial Risk & Needs Assessment," which gauged Zeledon's potential for medical emergency, such

5

as whether Zeledon was on medication, intoxicated, or epileptic, among other risk factors pertaining to his physical and mental health. JA283; *see* 8 U.S.C. § 1231(f)(1); 8 C.F.R. § 241.2.

To effectuate Zeledon's removal, ICE planned to move him from CDF to an ICE staging facility in Alexandria, Louisiana, on May 23, 2023. JA230. At the time, ICE detainees scheduled for removal to El Salvador were typically sent to Louisiana for several days before their final deportation. JA230. On May 23, 2023, Zeledon's immigration lawyer contacted ICE officials requesting they delay Zeledon's transfer to Louisiana because the lawyer planned to seek emergency relief from the immigration court. JA230; JA252. ICE agreed to delay Zeledon's transfer as a courtesy. JA230.

By the morning of May 30, 2023, the lawyer had not yet filed anything, so ICE officials flew Zeledon to Louisiana. JA230. Later that day, however, Zeledon's lawyer filed a motion to reopen his immigration proceedings ("First Motion to Reopen").[1] The filing of the First Motion to Reopen automatically stayed Zeledon's removal until an immigration court ruled on the motion. 8 C.F.R. § 1003.23(b)(1)(v). ICE officials then decided to transfer Zeledon from Louisiana

---

[1] The lawyer styled the filing as a "Motion to Rescind," JA230, but it was more appropriately captioned a motion to reopen, *see* 8 C.F.R. § 1003.23; *see also* Doc. 33-2 (Second Motion to Reopen).

back to CDF, where he arrived on June 6, 2023, while his First Motion to Reopen was pending. JA230.

Back at CDF, Zeledon destroyed property and possessed contraband, leading CDF's Facility Disciplinary Panel to conduct a hearing. JA284. The Disciplinary Panel imposed a two-week sanction restricting Zeledon's privileges including access to the commissary and tablets. JA284.

The immigration court denied the First Motion to Reopen on June 13, 2023, finding that Zeledon's objections were untimely. JA230. Zeledon had 30 days to appeal the decision to the Board of Immigration Appeals. 8 C.F.R. § 1003.38(b). ICE officials then scheduled Zeledon to be transferred back to Louisiana on July 3, 2023, where he would stay until his planned removal to El Salvador on July 12, 2023. JA230.

### E.     Zeledon escapes from ICE custody.

The day before he was scheduled to return to Louisiana, Zeledon escaped from CDF. He ran across a field, scaled a fence using sheets he had tied to serve as a rope, and climbed onto the roof of one of CDF's buildings. JA231. He ran across the roof to a side facing a public parking lot, jumped to the ground, and escaped into the woods. JA231. ICE immediately began searching for Zeledon under ICE's administrative-arrest authority, but he successfully evaded apprehension. *See* JA17.

The following day, a United States Magistrate Judge signed a Criminal

7

Complaint charging Zeledon with escape, in violation of 18 U.S.C. § 751, and failure to comply with a removal order, in violation of 8 U.S.C. § 1253.  JA14.

Five days after the escape, federal law enforcement arrested Zeledon in Durham, North Carolina, nearly 200 miles away from CDF.  JA231.  Over 100 members of law enforcement, including state, local, and federal officials, participated in the fugitive search.  JA231.

### F.    The district court denies Zeledon's motion to dismiss his § 1505 obstruction charge.

A federal grand jury issued a two-count indictment charging Zeledon with obstruction of agency proceedings, in violation of 18 U.S.C. § 1505, and escape, in violation of 18 U.S.C. § 751(a).  JA18.  The § 1505 count alleged that Zeledon corruptly endeavored to obstruct two proceedings: (a) "removal proceedings being conducted by DHS and ICE," *i.e.*, ICE removal operations; and (b) an immigration-court proceeding.  JA19.[2]

---

[2] Zeledon lodges several accusations at the United States for not charging failure to comply, in violation of 8 U.S.C. § 1253, in the indictment.  *See* Def. Br. 17-18. He asserts the "government apparently made the strategic choice" to "deprive Mr. Zeledon of the opportunity to obtain judicial review of his order of removal."  *Id*. That is wrong for at least two reasons.  First, defendant had multiple opportunities to seek judicial review of his removal order, and in fact, he filed such an attack in district court below.  *See* JA8 (ECF No. 59) (seeking dismissal of the § 1505 charge because of a purported defect in Zeledon's removal proceedings).  Second, § 1505 carries higher maximum penalties than 8 U.S.C. § 1253; the government's charging decisions appropriately account for "penalties available upon conviction."  *United States v. Batchelder*, 442 U.S. 114, 125 (1979).

Zeledon moved to dismiss the § 1505 charge for failing to state an offense. JA21.[3]  He argued that ICE removal operations do not qualify as a "proceeding" under § 1505.  In support, Zeledon cited a dictionary definition for the term "administrative proceeding" and relied on authority interpreting 18 U.S.C. § 1512. JA23-24.  Zeledon also argued that the immigration-court proceedings alleged in the indictment were not pending when he escaped.  JA22-23.

The district court denied the motion and rejected Zeledon's attempt to narrow the scope of "proceedings" under § 1505. JA104-119.  The court relied on the Fourth Circuit's decision in *United States v. Mitchell*, 877 F.2d 294, 300 (4th Cir. 1989), which recognized that courts "have uniformly held" that the term "proceeding" in § 1505 "should be construed broadly to effectuate the statute's purposes."  JA108. The district court further explained that "'[p]roceeding' is a comprehensive term meaning the action of proceeding—a particular step or series of steps, adopted for accomplishing something . . . including all steps and stages in such an action." JA108 (quoting *Rice v. United States*, 356 F.2d 709, 712 (8th Cir. 1966)).

The district court concluded that the indictment properly alleged Zeledon obstructed his immigration-court proceedings when he escaped. JA110-115.  It held

---

[3] Zeledon filed other motions that the district court denied, including a Double Jeopardy challenge, JA25, an attempt to assert a duress defense at trial, JA120, and a second motion to dismiss the § 1505 charge on separate grounds, JA8 (ECF No. 59).  Zeledon does not challenge any of these denials on appeal.

that "the execution of an EOIR [Executive Office for Immigration Review] order is a 'proceeding' of an EOIR Immigration Court action." JA110. Among other sources, the court looked to dictionary definitions of "proceeding" that include "the execution" of an order and define the term as "any act done by authority of a court of law." JA111-112 (quoting Black's Law Dictionary (11th ed. 2019) and Oxford English Dictionary). Accordingly, the court determined that ICE's removal operations were part of the immigration-court proceedings, and therefore, Zeledon obstructed the latter when he escaped.

Although not central to its analysis, the court also recognized that ICE's removal operations likely qualify as standalone proceedings under § 1505. *See* JA113-114. The court noted that even "ministerial" agency actions may qualify as § 1505 "proceedings." JA113. Nevertheless, the court rejected the contention that "ICE's execution of a removal order is purely ministerial" because ICE has "special" "*discretion* to decide whether and when to carry out a removal order." JA113 n.6 (quoting *Balogun v. Sessions*, 330 F. Supp. 3d 1211, 1212 (C.D. Cal. 2018)). The requisite exercise of "prosecutorial *discretion*" in "*executing removal orders*" signals that ICE removal operations qualify as standalone agency proceedings. JA113 n.6. The district court concluded that the indictment "sufficiently alleges a 'pending' § 1505 'proceeding,'" and denied Zeledon's motion to dismiss. JA115.

10

**G.    After a bench trial and sentencing, Zeledon succeeds in reopening his immigration-court proceedings.**

The parties proceeded to a bench trial at which the district court found Zeledon guilty of the § 1505 offense.  JA9 (ECF No. 75).  At the close of the government's case, Zeledon moved for judgment of acquittal of the obstruction charge under Federal Rule of Criminal Procedure 29, which the district court denied.  JA346-347.[4]

At sentencing, the court imposed an 18-month term of imprisonment.  JA12 (ECF No. 99).  Upon completion of his criminal sentence, Zeledon transferred back to ICE custody in early December 2024.  *See* JA352.

The day before his sentencing hearing, Zeledon filed another motion to reopen (the "Second Motion to Reopen") in immigration court.  This time, the immigration court granted the motion.  *See* Doc. 33-2.[5]  As of this filing, Zeledon's immigration proceedings remain pending, and he continues to be held in ICE custody while he seeks relief from removal from the United States.  *See* https://acis.eoir.justice.gov/en/ (search A-Number 209-285-456) (last visited July 2, 2025).

---

[4] The court later granted Zeledon's Rule 29 motion with respect to the escape charge based on its determination that 18 U.S.C. § 751 does not apply to noncitizens who escape from federal custody during their "removal period" under 8 U.S.C. § 1231(a)(1).  JA354.

[5] The government has filed a motion for leave to supplement this response brief with this information.  Doc. 33-1.

## Summary of Argument

Zeledon obstructed at least two pending agency proceedings when he escaped from ICE custody: ICE removal operations and immigration-court proceedings. Either suffices to affirm the district court's denial of his motion to dismiss.

As to ICE removal operations, § 1505 broadly covers obstruction of "*any* pending proceeding" before "*any* department or agency."  Courts of Appeals have uniformly ruled that the statute covers agency investigations, particularly when those investigations are supported by an agency's authority to issue subpoenas, administer oaths, and execute warrants. *See, e.g.*, *United States v. Kirst*, 54 F.4th 610, 621 (9th Cir. 2022).  And at least two Courts of Appeals have applied § 1505 to an agency's efforts to enforce orders issued by an adjudicative body.  *See United States v. Hopper*, 177 F.3d 824, 831 (9th Cir. 1999); *United States v. Senffner*, 280 F.3d 755, 760-61 (7th Cir. 2002).

Section 1505's text, structure, and context all confirm that its provisions apply to a broad array of agency proceedings.  This conclusion flows from dictionary definitions of the statute's terms, as well as § 1505's history and relationship to nearby obstruction provisions.  At bottom, the ordinary meaning of § 1505's terms reflect that the statute covers any step or series of steps conducted in a manner prescribed by law that an agency adopts for accomplishing a targeted event or objective.  ICE removal operations and immigration-court proceedings both fit

12

comfortably within the scope of these terms.

ICE adheres to a series of complex statutory and regulatory requirements when it undertakes the removal of a noncitizen from the country. *See generally, e.g.*, 8 U.S.C § 1231; 8 CFR §§ 241.1-241.15. ICE has authority to administer oaths, issue subpoenas, and issue and execute warrants while carrying out removal operations. *See* 8 U.S.C. § 1225(d)(3)-(4)(a); 8 C.F.R. § 241.2. The series of steps and stages constituting ICE removal operations demonstrate that the operations qualify as standalone agency proceedings under § 1505. Because these proceedings were indisputably pending when Zeledon escaped from an ICE detention facility, he violated § 1505.

Zeledon also obstructed his immigration-court proceedings, which remain pending until Zeledon is deported or receives permission to remain in the country. Caselaw and dictionaries defining legal proceedings to include "the execution of judgment," *proceeding*, Black's Law Dictionary 1430 (3rd ed. 1933), support the conclusion that immigration-court proceedings do not cease to be pending simply because the court has issued an order. The district court properly rejected Zeledon's efforts to dismiss the § 1505 charge on that basis.

Even if the issuance of a removal order were the last step in a pending proceeding, Zeledon obstructed his immigration-court proceedings regarding his First Motion to Reopen. Those proceedings had not yet become final when Zeledon

13

escaped. His escape therefore obstructed pending immigration-court proceedings. *United States v. Johnson*, 605 F.2d 729, 729 (4th Cir. 1979).

## Argument

As an initial matter, Zeledon appears to be challenging the denial of his motion to dismiss. Though his opening brief does not specify what decision he believes was erroneous, his arguments are purely legal in nature and track the arguments in his motion to dismiss. *Compare* Def. Br. 27-57 *with* JA21-25; *see United States v. Weaver*, 659 F.3d 353, 355 n.* (4th Cir. 2011) (collecting cases reviewing decisions on motions to dismiss). To succeed on a motion to dismiss under Federal Rule of Criminal Procedure 12, Zeledon was required to demonstrate that "the allegations in the indictment—even if proven—would not satisfy the elements of the charged offense." *United States v. Brewbaker*, 87 F.4th 563, 579 (4th Cir. 2023).[6] This Court conducts the same review of the indictment on appeal. *Id.* Questions of statutory construction are reviewed de novo. *Weaver*, 659 F.3d at 355. Further, the Court may affirm the denial of a motion to dismiss "on any ground appearing in the record." *Engle*, 676 F.3d at 415 n.5.

---

[6] If construed as a challenge to the sufficiency of the evidence, this Court would review de novo the district court's denial of Zeledon's motion for judgment of acquittal, construing the evidence in the light most favorable to the government, drawing all inferences in favor of guilt, and solely asking whether any reasonable factfinder could have found Zeledon guilty of violating § 1505. *United States v. Engle*, 676 F.3d 405, 419 (4th Cir. 2012).

14

Here, the indictment sufficiently alleged a violation of § 1505 because that statute, properly construed, includes ICE removal operations and immigration-court proceedings.

## I.     ICE removal operations are proceedings under § 1505.

As used in § 1505, the term "proceeding" means any step or series of steps conducted in a manner prescribed by law that an agency adopts for accomplishing a targeted event or objective.  This definition is grounded in a deep well of caselaw establishing § 1505's broad scope and applying the statute to agency investigations and enforcement operations, not just adjudicatory proceedings.  And the caselaw illustrates that this definition flows from the ordinary meaning of § 1505's text.

ICE removal operations qualify as § 1505 proceedings because the operations involve a series of targeted steps—including investigations supported by ICE's use of subpoenas, oaths, and warrants, among other actions requiring decision-making and discretion—all of which are prescribed by law, to remove individuals from the United States.

### A.     Caselaw establishes § 1505's broad scope.

Section 1505 provides in relevant part:

> Whoever corruptly . . . endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States . . . [s]hall be fined not more than $5,000 or imprisoned not more than five years, or both.

15

The seminal case analyzing § 1505 is *Rice v. United States*, 356 F.2d 709 (8th Cir. 1966). In *Rice*, the defendants, union members, assaulted non-union workers who had filed a complaint with the National Labor Relations Board ("NLRB"). *Id.* at 711. As a result, the workers withdrew their complaint before the NLRB had completed its preliminary investigation or issued a formal complaint. *Id*.

The Eighth Circuit rejected the argument that § 1505 did not apply because no proceeding was yet pending before the NLRB when the defendants assaulted the workers. The court construed "proceeding" under § 1505 as "a comprehensive term meaning the action of proceeding—a particular step or series of steps, adopted for accomplishing something." *Id.* at 712. Accordingly, the court held that "proceeding" "simply mean[s] proceeding in the manner and form prescribed for conducting business before the department or agency, including all steps and stages in such an action from its inception to its conclusion." *Id*. The court also noted that "proceedings frequently embrace both investigative and adjudicative proceedings." *Id*. at 713. In short, the court held that "proceeding" is "a term of very broad scope." *Id*. at 715.

Courts of Appeals have uniformly adopted the broad construction established by *Rice*. *See United States v. Leo*, 941 F.2d 181, 199 (3d Cir. 1991) ("[g]iven the broad meaning of the word 'proceeding' . . ."); *United States v. Rainey*, 757 F.3d 234, 245 (5th Cir. 2014) (Section 1505 "should be broadly construed"); *United*

16

*States v. Fruchtman*, 421 F.2d 1019, 1021 (6th Cir. 1970) ("'proceeding' is a term of broad scope"); *United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir. 1976) (an "administrative investigation is a 'proceeding' within the meaning" of § 1505); *United States v. Browning, Inc.*, 572 F.2d 720, 723 (10th Cir. 1978) (the term "proceeding" in § 1505 is "broad"); *see also United States v. Schwartz*, 924 F.2d 410, 423 (2d Cir. 1991) (the "term 'any proceeding' as used in § 1505 has been defined broadly"); *United States v. Senffner*, 280 F.3d 755, 761 (7th Cir. 2002) ("proceeding" is "a term that is defined rather broadly [] for the purpose of section 1505"); *United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (an agency's "inquiries, albeit preliminary, constitute a 'proceeding' within the meaning of § 1505").

This Court joined the consensus decades ago.  In *United States v. Mitchell*, 877 F.2d 294 (4th Cir. 1989), the Court looked to authority analyzing § 1505's agency "proceeding" language in addressing a challenge to the other provision of § 1505 involving obstruction of congressional committees.  The Court observed that numerous "decisions have uniformly held that th[e] term ['proceeding'] should be construed broadly to effectuate the statute's purposes." *Id.* at 300.  *Mitchell* quoted *Rice* in defining "'[p]roceeding' [as] a comprehensive term meaning the action of proceeding[,] including all steps and stages in such an action from its inception to its conclusion." *Id.*

17

Zeledon, by stark contrast, claims "the phrase 'pending proceeding' . . . has a narrow meaning" largely confined to formal adjudicatory proceedings. Def. Br. 23; *see also* Def. Br. 41 (seeking to "confirm[] the narrow meaning of 'proceeding' in § 1505"). This argument runs headlong into the wall of precedent establishing a broad application of "proceeding" under § 1505 and applying the term to agencies' actions other than formal adjudications. Indeed, the term covers both agency investigations and agency enforcement efforts.

### 1. Courts have repeatedly affirmed § 1505's application to agency investigations.

Every Court of Appeals to address the question of whether agency investigations qualify as "proceedings" under § 1505 has answered in the affirmative.

Take for example *United States v. Leo*, 941 F.2d 181 (3d Cir. 1991). There, a government contractor was charged with obstructing an investigatory audit by the Defense Contract Audit Agency. The contractor argued that the agency lacked rulemaking or adjudicatory authority, and therefore, the investigatory audit was not a "proceeding" under § 1505.

The court rejected that position because the term "proceedings" in § 1505 is not limited to proceedings "that are juridical or administrative in nature." *Leo*, 941 F.2d at 199 (quoting *Fruchtman*, 421 F.2d at 1021). Given the "growth and expansion of agency activities" over time, the term "'proceeding' [] is much more

18

inclusive and [] no longer limits itself to formal activities in a court of law." *Id*. (quoting *Browning*, 572 F.2d at 724). With this foundation, the *Leo* court held that an agency's "investigation or search for the true facts" conducted pursuant to agency regulations qualifies as a "proceeding" under § 1505. *Id*.

Similarly, in *United States v. Kirst*, 54 F.4th 610, 619 (9th Cir. 2022), the court held that an investigation of an airplane crash by the National Transportation Safety Board ("NTSB") qualified as a proceeding under § 1505, even though the NTSB *lacked* adjudicative authority. *Kirst* concluded that even "preliminary" administrative investigations are protected by § 1505. *Id*. at 621.

*Kirst* and other courts have recognized that useful indicia of an agency "proceeding" in the investigatory context include an agency's authority to administer oaths, issue subpoenas, and execute warrants. *Id*. (The "NTSB has authority to issue subpoenas and to compel testimony under oath. . . . We therefore conclude that the NTSB investigation of Kirst's plane crash was a 'proceeding' within the meaning of § 1505."); *see also Kelley*, 36 F.3d at 1127 (affirming § 1505's application to agencies "with the power to enhance their investigations through the issuance of subpoenas or warrants"). The Ninth Circuit adopted a clear test: because the NTSB had authority to issue subpoenas and compel testimony, "that is enough," and the investigation qualified as a § 1505 proceeding. *Kirst*, 54 F.4th at 621 (citing *Kelley*, 36 F.3d at 1127).

19

> ## 2. Courts have also applied § 1505 to agency enforcement operations.

Agency enforcement efforts also constitute proceedings under § 1505. Enforcement efforts do not cease to be agency proceedings simply because the agency is carrying out an adjudicative body's order. Instead, when an agency's effort to enforce an administrative or court order involves a series of steps adopted to accomplish a specified objective, the efforts are proceedings under § 1505.

A pair of § 1505 cases have squarely held that agencies' enforcement efforts constitute "proceedings" under the statute: *United States v. Hopper*, 177 F.3d 824 (9th Cir. 1999), *overruled on other ground by United States v. Lucas*, 101 F.4th 1158 (9th Cir. 2024), and *United States v. Senffner*, 280 F.3d 755 (7th Cir. 2002).

In *Hopper*, the Ninth Circuit held that the IRS's efforts to enforce a judgment lien qualified as a proceeding under § 1505. 177 F.3d at 831. After summary judgment, a district court had issued a judgment lien in favor of the IRS. *Id*. at 829. In response, the defendants attempted to pay the judgment using a fraudulent document labeled as a "warrant." *Id*. Because of this conduct, the defendants were convicted under § 1505 for obstructing an IRS proceeding. *Id.* at 830.

On appeal, the defendants in *Hopper* argued that they did not "obstruct a pending proceeding before the IRS." *Id*. at 830. They acknowledged that their submission of the fraudulent warrant "may have obstructed a judgment of the federal courts," but not a pending proceeding before the IRS. *Id*. The Ninth Circuit rejected

the argument, noting that if the defendants' scheme had succeeded, "the phony warrant would have precluded collection of the tax debt and the enforcement of the IRS tax liens." *Id.* The court ruled that "the collection proceeding before the IRS continued" "until the debt behind those liens was satisfied." *Id.* In other words, the court had no concern that IRS enforcement action—which took place pursuant to the authority of a final court order—qualified as a standalone agency proceeding under § 1505.

Similarly, in *Senffner*, the Seventh Circuit affirmed a § 1505 conviction where the defendant concealed assets from the Securities and Exchange Commission ("SEC") that were subject to a district court's temporary restraining order ("TRO"). 280 F.3d at 759. The defendant argued that the SEC "had no independent authority to freeze or distribute assets, or to impose civil penalties, but needed to obtain an order from the federal district court." *Id.* at 760. Like the defendant in *Hopper*, the defendant conceded that he obstructed the district court, but not the SEC. *Id.* The Seventh Circuit responded by concluding the defendant's "argument is without merit; he obstructed both." *Id.*

*Senffner* considered the fact that the SEC opened an internal agency investigation before seeking a TRO in district court. *Id.* And the purpose of the SEC's investigation "was not solely to investigate [the defendant's] violations [of securities law] for the sake of exposing them, but also to identify and recover []

funds." *Id*. The Seventh Circuit observed that the SEC's proceeding "did not end by virtue of filing the lawsuit." *Id*. "To the contrary, the SEC prosecution of the lawsuit was a natural extension of that proceeding, and its efforts to recover and return the funds were necessary to achieve its goal." *Id*. The court held that by attempting to conceal assets, the defendant obstructed "the SEC's initial investigation *and* enforcement of securities law violations (*an SEC proceeding*)." *Id*. (emphasis added).

The court recognized that the "SEC's tracing of the funds" after the TRO was issued "constitutes a proceeding." *Id*. at 761. Because the tracing of funds required investigation, and an SEC investigation is a "proceeding" for purposes of § 1505, the defendant's conviction was proper. *Id*. (citing *Kelley*, 36 F.3d at 1127 and *Schwartz*, 924 F.2d at 423); *see also United States v. Perraud*, 672 F. Supp. 2d 1328, 1339-40 (S.D. Fla. 2009) (concluding that "any interference with the activities of the receiver," which was appointed by a federal court at the request of the SEC, "constitutes an obstruction of an SEC proceeding").

*Hopper* and *Senffner* teach that an agency's enforcement efforts, including those seeking to effectuate a final order, qualify as proceedings under § 1505.

This conclusion draws additional support from caselaw interpreting an analogous obstruction statute, 26 U.S.C. § 7212(a). Section 7212(a) prohibits obstruction of "the due administration of [the Tax Code]." Unlike § 1505, § 7212(a)

22

does not include an additional modifier akin to "administration of the law *under which any pending proceeding* is being had." 18 U.S.C. § 1505. Instead, § 7212(a) simply applies to obstruction of Tax Code administration. The Supreme Court in *Marinello v. United States* concluded that the phrase "the due administration" in § 7212(a) applies to "a particular administrative *proceeding*, such as an investigation, an audit, or other targeted administrative action." 584 U.S. 1, 13 (2018) (emphasis added). *Marinello* limited § 7212 by carving out "routine administrative procedures that are near-universally applied to all taxpayers, such as the ordinary processing of income tax returns." *Id.* at 4.[7]

Following *Marinello*, the Fourth Circuit recognized IRS "*enforcement efforts* were a 'particular administrative *proceeding*'" when the enforcement efforts were targeted at a taxpayer who the IRS had determined owes a debt. *United States v. Reed*, 75 F.4th 396, 403 (4th Cir. 2023) (emphases added) (quoting *Marinello*).

*Marinello* and *Reed* demonstrate that § 7212 tracks the operation of § 1505. Both statutes require obstruction of a particular agency proceeding. And as *Hopper*, *Senffner*, and *Reed* each makes clear, such proceedings include enforcement efforts to effectuate a prior administrative order.

---

[7] The Supreme Court recognized that under its holding, § 7212 covers a similar scope of IRS proceedings already covered by § 1505. *See* 584 U.S. at 9 ("as the dissent notes, . . . reading" § 7212 to apply to targeted administrative actions "potentially overlaps with" § 1505).

23

**B.** **The text of § 1505 covers agency investigation and enforcement operations.**

The caselaw analyzed and applied above resolves this appeal:  ICE removal operations qualify as § 1505 proceedings because they implicate agency investigations and enforcement operations targeted at a particular individual and adopted for a particular goal.  Zeledon steadfastly avoids this authority contrary to his position and instead devotes the bulk of his argument to writing on a blank slate, principally relying on dictionaries and statutory history in his attempt to limit the scope of § 1505.

But, consistent with the circuit authority cited above, applying the tools of statutory construction demonstrates that § 1505 applies to ICE removal operations.

### 1. The ordinary meaning of "proceeding" is broad.

"This court generally gives undefined terms their ordinary or natural meanings." *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 953 (4th Cir. 2025) ("*Pharmaceutical Coalition*").  Dictionary definitions, together with an assessment of the terms of § 1505 and related statutory provisions, demonstrate that the ordinary meaning of "proceeding" includes administrative investigations and enforcement efforts such as ICE removal operations.

A common definition of the term "proceeding" is a "sequence of events

occurring at a particular place or occasion."[8]  *Proceeding*, American Heritage Dictionary 987 (Second College ed. 1982).[9]  Similarly, another definition includes "[t]he carrying on of an action or series of actions" and "a course of action; conduct, behavior."  *Proceeding*, 8 Oxford English Dictionary 1407 (1933); *Proceeding*, 12 Oxford English Dictionary 545 (1989).  These definitions echo the holding in *Rice*, which also looked to dictionaries and "the meaning of the term in common parlance" in defining "proceeding" as "a particular step or series of steps, adopted for accomplishing something."  356 F.2d at 712.

Because administrative investigations and enforcement operations constitute "a sequence of events," or the "carrying on of a series of actions," they qualify as a "proceeding" under the term's plain meaning.

## 2.    Section 1505 employs other expansive terms.

The language surrounding the term "proceeding" in § 1505 offers additional support for applying the statute to investigations and enforcement efforts.  Notably, the statute twice employs the qualifier "any" in setting its parameters.  As the Fifth

---

[8] Although the statute was originally enacted in 1940, Congress significantly revised § 1505 in 1982.  *See* Victim and Witness Protection Act, Pub. L. No. 97-291, 96 Stat. 1248 (1982).  Even so, dictionary definitions from both time periods do not meaningfully differ.

[9] Copies of the quoted dictionary definitions referenced herein are attached as an addendum to this brief.

Circuit has observed in assessing § 1505, the "modifier 'any' . . . suggests inclusion rather than exclusion." *Rainey*, 757 F.3d at 242. Unsurprisingly, courts approach the term "any" the same way in other contexts. *See United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'") (quoting Webster's Third New International Dictionary 97 (1976)); *Pharmaceutical Coalition*, 126 F.4th at 960 ("any" is a "term[] of enlargement"). The statute's repeated emphasis of covering "*any* pending proceeding" conducted by "*any* department or agency" makes clear that Congress intended for § 1505 to apply to an expansive scope of agency actions.

That § 1505 prohibits obstruction of "the due and proper administration of the law" further establishes its broad intended scope. In *Marinello*, the Supreme Court noted in interpreting the tax obstruction statute that the "word 'administration'" can "refer to every 'act or process of administering' including every act of 'managing' or 'conducting' any 'office,' or 'performing the executive duties of' any 'institution, business, or the like.'" 584 U.S. at 7 (quoting Webster's New International Dictionary 34 (2d ed. 1957)). What's more, § 1505 focuses on "administration *of the law*," which further underscores the statute's coverage of any targeted agency actions prescribed by statute and regulations. The breadth of activities encompassed by the "administration of the law" again signals that § 1505 should not be artificially confined to adjudicatory proceedings as Zeledon in part urges.

26

To be sure, § 1505 limits obstruction of the "due and proper administration of the law" to agency activities involving "any pending proceeding." In this regard, § 1505 is not a general obstruction statute covering all governmental functions, and it does not apply to "continuous, ubiquitous," or "routine, day-to-day work" of all federal agencies. *Marinello*, 584 U.S. at 13. Instead, the statute covers obstruction of a "specific, targeted" action, *id.* at 7, comprising a series of steps adopted to accomplish a specified objective, *see Rice*, 356 F.2d at 712. This limitation aligns with the Supreme Court's holding in *Marinello*, which held that § 7212(a) "does not cover routine administrative procedures that are near-universally applied to all taxpayers, such as the ordinary processing of income tax returns." 584 U.S. at 4. Rather, § 7212(a) "refers to specific interference with targeted governmental tax-related proceedings, such as a particular investigation or audit." *Id.* Similarly, § 1505 applies to the targeted removal proceedings at issue here.

### 3. Statutory history further supports a broad application of § 1505.

Congress's revisions to § 1505 over time also underscore the statute's broad scope that includes agency investigations and enforcement operations. The statute was originally enacted in 1940, and it read in relevant part:

> [W]hoever corruptly . . . shall endeavor to influence, intimidate, or impede any witness in any proceeding pending before any department, independent establishment, board, commission, or other agency of the United States . . . or who corruptly . . . [shall] endeavor to

27

> influence, obstruct, or impede . . . the due and proper
> administration of the law under which such proceeding is
> being had before such department, independent
> establishment, board, commission, or other agency of the
> United States . . .

Pub. L. No. 76-401, 54 Stat. at 13 (1940). The original enactment of the statute

contained much of the same catchall language that exists in § 1505 today. In

addition, the original statute criminalized intimidating witnesses set to testify in

administrative proceedings. The most relevant revision came in 1982, when

Congress stripped the witness intimidation provision from § 1505 and moved it to

18 U.S.C. § 1512, leaving behind only the general language prohibiting obstruction

of "any pending proceeding" in § 1505. Pub. L. No. 97-291, 96 Stat. 1248 (1982).

Zeledon argues that the witness intimidation provision in the original version

of the statute supports his conclusion that "proceeding" under § 1505 "must be a

type of decision-making process similar to those in which a witness might appear."

Def. Br. 46. But the 1982 revision undermines Zeledon's theory.

"When Congress acts to amend a statute, we presume it intends its amendment

to have real and substantial effect." *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995). So,

to the extent the witness intimidation provision had any effect on how to interpret

the broader obstruction provision in the prior version of § 1505, that effect was lost

in 1982. In fact, the persuasive force now cuts in the opposite direction. Congress

clearly knew how to limit § 1505 to administrative hearings where witnesses might

testify.  But instead, Congress removed any ambiguity about the scope of § 1505 when it revised the statute in 1982 to remove any potentially limiting reference to witness intimidation.

### 4. Related statutory provisions cover "official proceedings," unlike § 1505.

Section 1505's reference to "any pending proceeding" stands in contrast to the nearby provisions of §§ 1512 and 1513, which cover obstruction of "official proceedings."  The term "official proceeding" has a definition set forth in 18 U.S.C. § 1515(a)(1) that applies *only* to §§ 1512 and 1513.  In other words, Congress carefully chose to use the qualifier "*official* proceeding" in §§ 1512, 1513, and 1515, while at the same time employing the broader term "*any* pending proceeding" in § 1505.

The "Court must give effect to, not nullify, Congress' choice to include limiting language in some provisions but not others."  *Gallardo By & Through Vassallo v. Marstiller*, 596 U.S. 420, 422 (2022).  This rule is "strongest" when "the relevant statutory provisions were considered simultaneously when the language raising the implication was inserted."  *Gomez-Perez v. Potter*, 553 U.S. 474, 486 (2008) (citation modified).

Congress introduced the term "official proceeding" in §§ 1512, 1513, and 1515 in 1982 in the same bill that substantially revised § 1505 as described above.  *See* Pub. L. No. 97-291, 96 Stat. 1248 (1982).  Thus, the different language between

§§ 1512, 1513, and 1515, on the one hand, and § 1505, on the other hand, is no accident.  Rather, it is the result of a considered and intentional legislative process that must be given effect.

Courts analyzing the term "official proceeding" under § 1512 have concluded that the term "implies some formal convocation of the agency in which parties are directed to appear."  *United States v. Sutherland*, 921 F.3d 421, 425 (4th Cir. 2019) (citation modified).  No court has adopted this definition in the context of § 1505.  For good reason, given the stark differences between the statutory provisions.

On the flip side, courts have rejected the argument that "official proceeding" should be treated as broadly as § 1505.  In *United States v. Guertin*, the court noted that the definition of "official proceeding" in § 1515 "provides an express basis for treating the term 'proceeding' differently in § 1512(c)(2) than one might in § 1505." 581 F. Supp. 3d 90, 99 (D.D.C. 2022), *overruled on other grounds by Kousisis v. United States*, 145 S. Ct. 1382 (2025)).  Even "more to the point," the court added, "the two provisions *are* textually distinct—§ 1505 contains none of the [] indicia limiting its applicability to formal tribunals."  *Guertin*, 581 F. Supp. 3d at 99.

As the district court below correctly recognized, "cases interpreting § 1512 are no help here because 18 U.S.C. § 1512 covers only obstruction of '*official* proceedings,' whereas 18 U.S.C. § 1505 covers '*any* pending proceeding.'"  JA113. Zeledon's repeated attempt to rely on cases interpreting § 1512, *see* Def. Br. 38-39,

is unavailing.

Yet much of defendant's argument attempts to graft the meaning of "official proceeding" onto § 1505. He repeatedly urges the Court to limit § 1505 proceedings to "a tribunal or other formal convocation of an agency," Def. Br. 3, 24, 37, which largely tracks "official proceedings" under § 1512. *See Sutherland*, 921 F.3d at 425. But adopting that approach would render § 1505 a nullity. If Zeledon were correct, every case pursued under § 1505 could be pursued under §1512 and the latter would swallow the former. This violates the canon against surplusage, which "is strongest when an interpretation would render superfluous" "an entire provision passed in proximity as part of the same Act." *Yates v. United States*, 574 U.S. 528, 543 (2015). That is exactly the case here: Congress simultaneously considered §§ 1512, 1513, 1515, and 1505, revising or enacting each provision in the same bill in 1982. The anti-surplusage canon militates in favor of applying a broader scope to proceedings under § 1505 than under § 1512 and its related provisions.

Zeledon's invocation of the canon against superfluity is not persuasive. First, he argues that applying § 1505 to ICE removal operations would overlap with 8 U.S.C. § 1253, which proscribes a noncitizen's failure to comply with a removal order. Def. Br. 45. Of course, § 1253 was not enacted alongside § 1505, and so the canon against surplusage is weaker in this context. *Yates*, 574 U.S. at 543. Nevertheless, the *mens rea* required to prove most offenses under § 1253 is "willful,"

31

whereas § 1505 requires a "corrupt" state of mind. Section 1253 therefore has an independent function because it captures a broader range of culpable mental states. Section 1505 also exists in its own lane because not every individual who obstructs ICE removal operations must have an order of removal outstanding as required under § 1253. Thus, Zeledon is wrong in claiming that the government's "reading of § 1505 would render § 1253 superfluous." Def. Br. 45.

Second, Zeledon claims that affording the ordinary meaning of terms to § 1505 would render superfluous several other obstruction statutes. Def. Br. 42-44. He relies heavily on the Supreme Court's decision in *Fischer v. United States*, 603 U.S. 480 (2024), in asserting that, if "the government were correct, then § 1505 would largely obviate the need for" a list of other statutes.[10] Def. Br. 43. Among the list, Zeledon claims that § 1512 would be rendered a nullity under the government's reading. He makes this claim even though *Fischer* itself expressly recognized that § 1505 and § 1512 have independent functions:

> Nothing in the text or statutory history suggests that [§ 1512](c)(2) is designed to impose up to 20 years' imprisonment on essentially all defendants who commit obstruction of justice in any way and who might be subject

---

[10] Zeledon's heavy reliance on *Fischer* is misplaced. *Fischer* dealt with a challenge to § 1512(c)(2), which is a catchall provision preceded immediately by a series of specific, targeted provisions. *Fischer*'s rationale focused on how the targeted provisions within § 1512 influence the meaning of the catchall in subsection (c)(2). That statutory scheme is entirely absent from § 1505, which includes only one relevant obstruction provision.

> to lesser penalties under more specific obstruction statutes.
> *See, e.g.*, §§ 1503(b)(3), 1505.

*Fischer*, 603 U.S. at 497.  Section 1505 carries a maximum penalty of five years'
imprisonment, while § 1512 carries up to 20 years and § 1513 carries up to 30 years.
It makes sense that Congress would provide significantly harsher punishments for
obstructing "official proceedings" than for obstructing "any proceeding."

Zeledon breezily cites other statutory provisions he claims would become
superfluous under the government's approach, Def. Br. 43, but a close analysis of
those code sections reveals meaningful distinctions among the statutes.  For
example, he cites 18 U.S.C. §§ 1510 and 1518, both of which proscribe "willful"
efforts to prevent a person from reporting a crime to a criminal investigator.
Substantial daylight exists between § 1505 and §§ 1510, 1518 because the latter
provisions incorporate a lower *mens rea* and do not require proof of a "pending
proceeding," *i.e.*, a targeted administrative action as opposed to a routine, day-to-
day undertaking of an agency.  Likewise, 18 U.S.C. § 1502 is different from 1505
because it penalizes "knowingly and willfully" obstructing a federal extradition
agent as a misdemeanor offense.  And § 1516 *extends* protections afforded to agency
officials under § 1505 to "Federal auditors."  *See* 134 Cong. Rec. S17371 (daily ed.
Nov. 10, 1988) provides Federal auditors with the "same protection for obstruction
that the investigator, administrative proceedings, and the grand jury have in sections
1503, 1505, 1510, and 1512").  Other than §§ 1512 and 1513, none of the additional

33

obstruction provisions invoked by defendant were considered alongside § 1505, thus diminishing the role of the anti-surplusage canon in any event.

For these reasons, the anti-superfluity argument strongly favors a broad reading of § 1505 such that the statute does not become subsumed by "official proceedings" covered by §§ 1512 and 1513.

*    *    *

As § 1505's text, history, and structure demonstrate, the statute covers agency investigations and enforcement efforts including ICE removal operations.[11]

### C.    ICE removal operations involve investigative and enforcement components.

ICE removal operations—which Zeledon concedes were pending against him when he escaped—qualify as standalone agency proceedings under § 1505.  That is true for at least two reasons.  First, ICE removal operations require immigration officials to conduct an investigation into locating and arresting noncitizens subject to removal orders.  ICE has authority to issue subpoenas, administer oaths, and execute arrest warrants, each of which demonstrate that these investigative activities qualify as proceedings under § 1505.

---

[11] Because the plain meaning of the terms in § 1505 is clear, Zeledon's reliance on the rule of lenity is misplaced.  *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (rule of lenity "applies only when a criminal statute contains a grievous ambiguity or uncertainty").

Second, ICE removal operations as a whole comprise a long series of steps and stages conducted pursuant to statutes and regulations and adopted for the specific goal of removing a given individual from the United States. Many of these steps and stages involve embedded investigations and exercise of discretion, further reinforcing the nature of the enforcement operations as proceedings under § 1505.

> 1.     **ICE investigations include the authority to administer oaths, issue subpoenas, and issue and execute warrants.**

Congress has given ICE tools to enhance its investigations aimed at enforcing the immigration laws. Those tools apply to ICE fugitive investigations, which require ICE officers to locate noncitizens who, like Zeledon since 2019, remain in the United States in violation of an immigration court's removal order. ICE fugitive investigations are a component of the agency's removal operations.

ICE officers have authority to issue subpoenas compelling the "testimony of witnesses before [ICE] officers," and to issue subpoenas requiring the "production of books, papers, and documents." 8 U.S.C. § 1225(d)(4)(A); *see also* 8 C.F.R. § 287.4. Congress has also authorized ICE officers to administer oaths and "take and consider evidence." 8 U.S.C. § 1225(d)(3); *see also* 8 C.F.R. § 287.5(a)(2).

ICE officials need not seek approval from a court or other neutral arbiter before administering an oath or issuing a subpoena. These authorities apply to "any matter which is material and relevant to the enforcement of" the immigration laws,

including removal operations and fugitive investigations. 8 U.S.C. § 1225(d)(3)-
(4)(A).

For example, an ICE Deportation Officer assigned to a Fugitive Operations
unit could issue a subpoena to a cellphone-service provider seeking call-detail
records associated with a fugitive's cell phone. The call-detail records could help
identify a witness who is in frequent contact with the fugitive. The Deportation
Officer could then visit the witness, who, after being administered an oath, may
testify as to the whereabouts of the fugitive. Each of these enhanced investigative
steps would be authorized by statute. *Id*. Naturally, all these steps would occur after
the final order of removal issued.

Next, upon locating and successfully arresting a fugitive, ICE officials have
authority to issue *and* execute a "warrant of removal" effectuating the noncitizen's
removal from the United States. 8 C.F.R. § 241.2(a), (b). Pursuant to the warrant
of removal, noncitizens "will be taken into custody" of ICE pending removal. 8
C.F.R. § 241.3.

ICE's authorities to administer oaths, issue subpoenas, and execute warrants
during removal operations constitute exactly the type of administrative
investigations that courts have repeatedly held qualify as proceedings under § 1505.
Indeed, as the Ninth Circuit held in *Kirst*, when an agency action is supported by
"both subpoena power and the power to compel testimony under oath," then "*that is*

36

*enough*." 54 F.4th at 621.

The same outcome should apply here. ICE removal operations, which involve the power to administer oaths, issue subpoenas, and issue and execute warrants, are agency proceedings under § 1505.

### 2. ICE removal operations implicate a series of complex investigative and discretionary actions.

Once ICE finds noncitizens subject to removal orders, ICE's removal operations require complex coordination, management, and diplomatic efforts to detain and remove them from the United States. During the removal period, ICE officials adhere to an elaborate statutory and regulatory scheme to carry out removal orders. ICE officers work closely with ICE Homeland Security Investigations Office of International Operations, the U.S. Department of State, and foreign authorities to successfully execute removal operations. This series of legally prescribed steps and stages, a subset of which are summarized below, further shows that ICE removal operations are agency "proceedings" under § 1505.

*First*, when arresting a noncitizen, ICE officers must follow a detailed series of guidelines intended to protect the safety of the community, the noncitizen, and the officers involved. *See generally* 8 C.F.R. § 287.8. These standards govern the use of non-deadly and deadly force, interrogations, and vehicular pursuit, among other topics. *Id*.

*Second*, upon arrest, ICE officials must conduct an assessment to determine if

the noncitizen "requires personal care because of the alien's mental or physical condition." 8 U.S.C. § 1231(f)(1); *see* JA283 (ICE conducted such an assessment of Zeledon). And in such a case, ICE officials "may employ a suitable person for that purpose who shall accompany and care for the alien until the alien arrives at the final destination." 8 U.S.C. § 1231(f)(1).

*Third*, ICE officials must decide where to detain noncitizens. *See* 8 U.S.C. § 1231(g)(1) (officials "shall arrange for appropriate places of detention for aliens detained pending removal"). This authority "gives both responsibility and broad discretion to the Secretary to choose the place of detention for deportable aliens." *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) (citation modified). And courts have recognized that ICE may decide where to detain a given noncitizen based on "designation and classification decisions" that inherently involve a "discretionary function." *Newbrough v. Piedmont Reg'l Jail Auth.*, 2012 WL 169988, at *4 (E.D. Va. Jan. 19, 2012) (unpublished).

*Fourth*, ICE officials must ensure the manner of detention provides adequate housing, food, safety, and medical care. "Under no circumstances shall an alien be detained in facilities not meeting the four mandatory criteria for usage[:] (1) 24-Hour supervision, (2) Conformance with safety and emergency codes, (3) Food service, and (4) Availability of emergency medical care." 8 C.F.R. § 235.3(e).

*Fifth*, and especially important, ICE officials must work with foreign

38

countries to obtain their acceptance of the returned noncitizens from the United States. *See* 8 C.F.R. § 241.15(b) (ICE officials "retain[] discretion to determine . . . what constitutes sufficient acceptance" by a foreign country to repatriate an alien from the United States).[12]  Often this process goes smoothly, other times it does not, but regardless it requires ICE officials to exercise diplomatic relations with foreign counterparts. *See Zadvydas v. Davis*, 533 U.S. 678, 712–13 (2001) (Kennedy, J., dissenting) ("the repatriation process may often take years to negotiate, involving difficult issues of establishing citizenship and the like").  Indeed, in *Zadvyadas*, U.S. immigration officials attempted to remove the noncitizen to Germany, Lithuania, and the Dominican Republic, a process that took years and ultimately resulted in each of those countries refusing to accept the noncitizen's return.  533 U.S. at 684.

*Sixth*, ICE officials must physically execute the removal, including by chartering and scheduling flights both domestically and internationally.  For example, individuals subject to removal to certain South American countries are typically sent from local ICE detention facilities around the country to ICE's staging location in Louisiana before removal to their home country.  JA230.

---

[12] As a default rule, ICE removes noncitizens to the country designated by the immigration court in the respective removal order.  8 C.F.R. § 1240.12(d).  If, however, ICE officials are unable to remove the noncitizen to the specified country—for example, because the designated country refuses to accept the noncitizen—then ICE has authority to remove the person "to any other country" permitted by 8 U.S.C. § 1231(b).  8 C.F.R. § 1240.12(d).

*Seventh*, if ICE is unable to effectuate an individual's removal from the United States within a 90-day period, a labyrinth of additional rules and regulations kick in to ensure noncitizens are not inappropriately held in indefinite detention. *See* 8 U.S.C. § 1231(a)(6); 8 C.F.R. §§ 241.4, 241.13, 241.14. Those rules allow ICE officials to make a "discretionary extension of detention in certain cases, including those in which the government determines that a noncitizen is a 'risk to the community or unlikely to comply with the order of removal.'" *Guzman Chavez v. Hott*, 940 F.3d 867, 874 (4th Cir. 2019) (quoting 8 U.S.C. § 1231(a)(6)), *rev'd on other grounds sub nom. Johnson v. Guzman Chavez*, 594 U.S. 523 (2021).

*     *     *

From the investigation leading to the arrest, to the management and operation of detention facilities, and through the physical removal of the noncitizen (if successful)—ICE removal operations comprise a long series of steps, decisions, and exercises of discretion targeted at removing a given individual from the country. ICE removal operations therefore qualify as agency proceedings and are protected by § 1505.

As these steps illustrate, agency enforcement efforts do not fall outside the ordinary meaning of the terms of § 1505 simply because an adjudicative body has already resolved one set of questions in the proceeding. An administrative order may leave key decisions to the discretion and judgment of the officials responsible

for enforcing the order.  In this case, the removal order answered the "who" and "what" (Zeledon shall be removed from the United States), but it deferred to ICE to decide the "how," "when," and "where."  In this regard, the defendant's focus on limiting § 1505 to "include[] only the steps in a decision-making process," Def. Br. 3, in fact favors the government because ICE's removal operations included a decision-making process regarding how, when, and where to deport Zeledon.

### 3. The record further supports that ICE removal operations are agency proceedings.

Courts typically limit their inquiry into whether an agency action falls within § 1505 to the statutes and regulations authorizing the relevant administrative process. *See, e.g.*, *Kirst*, 54 F.4th at 621; *Leo*, 941 F.2d at 199.  This Court can do the same here by considering the statutes and rules cited above.  Nevertheless, evidence in the record below underscores that ICE's operations are "proceedings" for purposes of § 1505.

Here, ICE's fugitive investigation of Zeledon began when he failed to appear for his immigration court hearing in December 2019 and then lived as a fugitive in the United States subject to a removal order.  *See* JA229.  It continued when, after his May 2023 arrest, he later escaped from CDF.  For several hours after Zeledon escaped, federal immigration officials were the only members of law enforcement who had authority to arrest Zeledon.  *See* JA17; JA249.  And even after the United States obtained a criminal arrest warrant, ICE officials remained motivated to

41

effectuate Zeledon's arrest for purposes of enforcing the immigration laws.  ICE renewed its fugitive investigation to locate Zeledon immediately after he escaped from CDF.  And that investigation continued until Zeledon was apprehended five days later.

As Zeledon has conceded, his violation of § 1505 was a continuing offense until he was rearrested five days after his escape.  JA122.  That means that not only did Zeledon obstruct his removal proceedings when he escaped, he continued to do so as he fled and hid and did not turn himself into authorities.  And because ICE fugitive investigations include the authority to administer oaths and issue subpoenas and warrants, the investigations are proceedings within the scope of § 1505.  *Kirst*, 54 F.4th at 621.

Other record evidence bolsters the conclusion that ICE's efforts to remove Zeledon from the United States qualified as a proceeding under § 1505.  For example, CDF officials conducted a detailed risk assessment when Zeledon arrived at the facility.  JA283.  They evaluated Zeledon's potential for medical emergency as well as his suicide potential and risk of sexual victimization or abusiveness.  JA283.  CDF officials also empaneled a Disciplinary Panel when Zeledon destroyed property at the facility, which conducted a hearing and imposed sanctions.  JA284.  And when Zeledon's lawyer informed ICE officials that he would soon file a Motion to Reopen, ICE officials exercised discretion to delay Zeledon's transportation from

42

CDF as a courtesy.  JA230.  These series of decisions and agency actions, taken together, qualify as proceedings under § 1505.

## II. Zeledon's immigration-court proceedings were pending when he escaped.

In addition to obstructing standalone ICE proceedings, Zeledon also obstructed his immigration-court proceedings when he escaped from CDF.  Zeledon does not dispute that immigration-court proceedings are "proceedings" under § 1505.  As explained below, Zeledon's immigration-court proceedings remain pending until either (a) he is removed from the United States, or (b) he obtains relief from removal from appropriate authorities such as an immigration judge.  The Court should affirm Zeledon's § 1505 conviction on these grounds.

### A. The ordinary meaning of "pending" applies.

Statutory context compels adoption of the ordinary, common meaning of each of § 1505's terms, including "pending."  Nothing in the language of the statute suggests that its terms incorporate a specialized, legalistic meaning.  Zeledon disagrees.  He claims the terms "pending" and "being had before" as used in the statute are "terms of art" in the "legal tradition" and therefore must be afforded legalistic definitions.  Def. Br. 34, 37-40.  On that premise, Zeledon cites legal dictionaries to assert "pending" excludes "any actions after final judgment is rendered," Def. Br. 34, and "being had before" requires a "formal convocation of an agency," Def. Br. 37-38.

43

The premise is flawed. There is no evidence that Congress intended the terms in § 1505 to incorporate a specialized legal definition related to judicial proceedings. And as such, there is no reason to stray from applying an ordinary meaning of these terms in favor of a technical meaning.

In determining whether a term carries a "specialized or ordinary meaning," courts look to the "statutory context" of the provision at issue. *Pharmaceutical Coalition*, 126 F.4th at 954. In *Pharmaceutical Coalition*, this Court rejected a party's contention that the term "induce" in the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2), incorporates its specialized criminal law meaning. *Id*. The Court reached this conclusion even though the Supreme Court has concluded that the term "induce," as used in 8 U.S.C. § 1324(a)(1)(A)(iv), does incorporate the "specialized, criminal-law" meaning of the term. *See United States v. Hansen*, 599 U.S. 762, 774 (2023). After analyzing the full structure and context of the Anti-Kickback Statute, the Fourth Circuit concluded that the provision employed the term "induce" in a meaningfully different way than 8 U.S.C. § 1324(a)(1)(A)(iv). *Pharmaceutical Coalition*, 126 F.4th at 954-58.

*Pharmaceutical Coalition* observed that specialized meanings may be adopted when applying the ordinary meaning of a term would create constitutional problems. *Id*. at 956. And it employed other canons of statutory construction, including the canon against superfluity, in concluding that the statute covers

44

"inducement in the ordinary sense." *Id*. at 958.   But Zeledon has identified no constitutional problems arising from employing the ordinary meaning of the term "pending."   His preference for more technical definitions of the term does not outweigh the well-established principle that statutory terms are to be given their ordinary meaning absent a clear indication to the contrary.  *See, e.g.*, *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012).  This Court should reach the same outcome when assessing the terms of § 1505.

Zeledon's proposed specialized definitions of "pending" and "before," which focus on "final judgments" and "tribunals," Def. Br. 34, 38, are rooted in the judicial context.[13]  But federal agencies' powers to administer programs and conduct enforcement are fundamentally different, and in many ways broader, than the judicial powers of courts.  For example, fewer rights attach to individuals subject to administrative proceedings compared to parties in judicial actions.  *See, e.g.*, *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 455 (1977) (no right to a jury trial in certain administrative adjudicatory proceedings).  It makes little sense to apply definitions from the judicial context to § 1505, which, by its own terms, covers all federal executive *and* legislative proceedings, but *not* judicial proceedings.   Indeed, Congress has enacted separate statutes to cover

---

[13] The full phrase, "*being had* before," confirms the requirement that the proceeding is "pending."

obstruction of judicial proceedings. *See, e.g.*, 18 U.S.C. §§ 1503, 1512, 1513. Just like administrative powers more generally, the term "proceeding" in the administrative setting is broader than in the judicial sense of the term. The overall statutory context therefore favors application of the ordinary meaning of these terms.

The Fifth Circuit in *Rainey* rejected an argument strikingly similar to the one Zeledon pursues. There, the defendant had obstructed a congressional subcommittee, and not a formal committee under House Rules. *Rainey*, 57 F.3d at 242. The defendant advocated for a "technical" definition of the term "committee" as used in § 1505. *Id.* The court rebuffed this contention, reasoning that "words in statutes should be given their ordinary, popular meaning unless Congress clearly meant the words in some more technical sense." *Id*. (citation omitted). Because "nothing in the statute itself reflects congressional intention to import a technical meaning to the phrase 'any committee,'" the court applied the common, non-technical meaning of the phrase. *Id*. This Court should do the same in interpreting "pending."

In a similar vein, Zeledon contends the rules governing when immigration-court proceedings end should control because those regulations treat the adjudicatory period separately from the post-adjudication removal period. Def. Br. 51-52 (citing 8 U.S.C. § 1229a). He claims it "makes no sense" to treat the term "proceeding" differently in the context of § 1229a and § 1505. *Id.* On the contrary, regulations

46

setting forth how an adjudicative body operates do not inform the meaning of the term "proceeding" in § 1505, because § 1505 operates in its own "statutory context justify[ing] differing interpretations." *United States v. Pugh*, 404 F. App'x 21, 26 n.5 (6th Cir. 2010); *see also United States v. Perraud*, 672 F. Supp. 2d 1328, 1340–41 (S.D. Fla. 2009) (SEC regulations defining "administrative proceeding" "do not purport to define 'proceeding' for purposes of Section 1505"); *Pharmaceutical Coalition*, 126 F.4th at 954-58 (applying ordinary meaning of a term under one statute despite the Supreme Court adopting specialized meaning of the same term in a different statute). The district court here followed this approach in concluding that "§§ 1505 and 751(a) use the term 'proceeding' differently," when it dismissed the escape charge post-trial. JA379.

Even so, Zeledon also recognizes the term "proceeding" in § 1505 should be afforded its "ordinary meaning." Def. Br. 3. This concession is in deep tension with his suggestion to apply a technical meaning to § 1505's adjacent modifier, "pending." Rather, this Court should afford ordinary meaning to all terms in § 1505. That includes "proceeding" as well as "pending," which simply means "during" or "throughout the continuance of," *pending*, 11 Oxford English Dictionary 468 (1989), and "before," which commonly means "in front of" or "claiming the attention of," *before*, 2 Oxford English Dictionary 63 (1989).

47

**B.    ICE removal operations are part and parcel of immigration-court proceedings.**

The district court correctly determined that ICE's execution of an immigration court's removal order qualifies as a "proceeding" of the immigration-court action. JA110. Because the court was focused on immigration-*court* proceedings, it looked in part to legal dictionaries defining the term in the court context. JA110-111. Specifically, the court quoted a legal definition stating that the term means "an act done by the authority or direction of the court," and includes "the judgment [and] *the execution.*" JA111 (quoting *Proceeding*, Black's Law Dictionary (11th ed. 2019)). The district court also relied on the Oxford English Dictionary defining the term as "any act done by authority of a court of law." JA111-112.

From there, the district court observed that "there can be no dispute that DHS's and ICE's execution of the EOIR removal order—which ordered that the defendant 'shall be removed to El Salvador,' [*see* JA248]—is 'an act done *by the authority or direction of the [immigration] court.*'" JA111. The district court properly concluded that "the execution of an EOIR removal order is thus a 'step or stage in an [immigration-court] action,' and consequently, a § 1505 'proceeding.'"

JA112 (quoting *Rice v. United States*, 356 F.2d 709, 712 (8th Cir. 1966)).[14]

Along the way, the district court rejected Zeledon's reliance on the definition of the term "administrative proceeding" as inapposite because that phrase is not found in the statute. JA112. Zeledon makes the same attempt on appeal, Def. Br. 3, which this Court should likewise reject.

Additional authority supports the district court's rationale. For example, definitions from around the time the statute was enacted (and substantially revised) do not meaningfully differ from the definitions relied on by the district court. The 1933 edition of Black's Law Dictionary defined "proceeding" as the "regular and orderly progress in form of law; including all possible steps in an action from commencement to the *execution of judgment*." Black's Law Dictionary 1430 (3d ed. 1933) (emphasis added); *see also* Black's Law Dictionary 1204 (6th ed. 1990) (substantially identical definition). The term "[m]ay be used to describe any act done by authority of a court of law and every step required to be taken by either

_____

[14] The district court also recognized that ICE's execution of the removal order "comfortably qualifies as an" agency action relating "to some matter within the scope of rulemaking power vested in DHS by law." JA112 (citation omitted) (quoting *United States v. Higgins*, 511 F. Supp. 453, 455 (W.D. Ky. 1981)). *Higgins* held that "proceedings" within the scope of § 1505 "involve[] an agency with rulemaking or adjudicative authority in addition to investigative functions." 511 F. Supp. at 455. The court below correctly noted that 8 U.S.C. § 1103(a)(3) vests rulemaking authority in DHS, which the agency has used to issue a variety of regulations "governing the apprehension, detention, and deportation of non-citizens ordered removed." JA112 (citing 8 C.F.R. §§ 241.1–241.19).

party." *Proceeding*, Black's Law Dictionary 1204 (6th ed. 1990); *see also Proceeding*, Black's Law Dictionary 1430 (3rd ed. 1933) (substantially the same); *Proceeding*, 8 Oxford English Dictionary 1407 (1933) ("any act done by authority of a court of law"); *Proceeding*, 12 Oxford English Dictionary 545 (1989) (same).

In addition, the textual analysis and canons of statutory interpretation outlined above, *see supra* Part I.B., reinforce the district court's holding. Particularly, § 1505's double deployment of the term "any" signals its application to an expansive scope of proceedings. And the statute's use of the phrase "due and proper administration of the law" similarly weighs in favor of the district court's rationale.

The district court appropriately concluded that ICE removal operations are part and parcel of immigration-court proceedings, and the latter does not conclude until the former is carried out.

### C.    The Ninth and Seventh Circuits have confirmed that § 1505 "proceedings" cover post-adjudication actions.

The decisions in *United States v. Hopper*, 177 F.3d 824 (9th Cir. 1999), and *United States v. Senffner*, 280 F.3d 755 (7th Cir. 2002), are again especially instructive.

Both decisions relied on the Supreme Court's reasoning in *United States v. Aguilar*, 515 U.S. 593, 595 (1995). *Aguilar* concerned § 1503, which is in many ways similar to § 1505, except it applies to obstruction of judicial proceedings. *See United States v. Poindexter*, 951 F.2d 369, 379 (D.C. Cir. 1991) (explaining that the

50

"terms of § 1505 were [originally] borrowed from a 1909 statute that has since become § 1503").  In *Aguilar*, the Supreme Court held that § 1503 requires that the obstructive act "must have the natural and probable effect of interfering with the due administration of justice."  515 U.S. at 599 (citation modified).  In other words, "the act must have a relationship in time, causation, or logic with the judicial proceedings."  *Id*.

The defendant in *Aguilar* lied to FBI agents without knowing a related grand jury investigation had been initiated.  The Supreme Court overturned the defendant's § 1503 conviction because the government failed to show that the defendant knew his false statements would be provided to the grand jury.  *Id*. at 600.  The Supreme Court indicated it would reach a different outcome had the government shown "that the [FBI] agents acted as an arm of the grand jury" or "that the grand jury had even summoned the testimony of" the FBI agents.  *Id*.

The Ninth Circuit in *Hopper* found *Aguilar* useful in understanding the scope of § 1505.  As a reminder, in *Hopper*, the defendants attempted to satisfy an IRS debt by submitting a fraudulent "warrant" to the U.S. Marshals.  177 F.3d at 828.  The Ninth Circuit held that the "actions taken by the [defendants] had the 'probable and natural' [e]ffect of obstructing a proceeding before the IRS."  *Id*. at 830 (quoting *Aguilar*).  The defendants "knew that if the phony warrant had been accepted by the U.S. Marshal, the 'natural and probable' effect would be to satisfy the delinquent

51

taxes and prevent collection of money owed to the IRS." *Id*.

Similarly in *Senffner*, the court observed that the enforcement action *began* with a purely administrative SEC investigation, which the SEC further pursued by seeking remedies in federal court. 280 F.3d at 760. The court held "that the SEC prosecution of the lawsuit was a natural extension of that proceeding," *i.e.*, the original SEC investigation. *Id*.

*Senffner* cited *Aguilar* in holding "whenever an entity acting for or at the direct request of an agency has been obstructed, the agency itself has also been obstructed." *Id*. It analogized the SEC to the FBI agents in *Aguilar*, who the Supreme Court recognized could "act[] as an arm of the grand jury." *Id*. Likewise, the SEC could act as an arm of the court, and when the defendant obstructed the SEC's enforcement efforts, he obstructed *both* the SEC and the court. The Seventh Circuit explained, "[t]he fact that an agency cannot perform a particular function itself or through its own labor is of no moment." *Id*. Instead, "the question is whether the agency proceeding affirmatively, by its specific actions, seeks to have the particular function performed as part of the proceeding." *Id*.

Here, ICE acted as an arm of the immigration court. The immigration court order directed that Zeledon "shall be removed to El Salvador." JA248. The fact that the immigration court "cannot perform" the removal "itself or through its own labor is of no moment." *Senffner*, 280 F.3d at 760. What matters is that the immigration

court "seeks to have" Zeledon's removal "as part of the proceeding." *Id.* Zeledon clearly understood that the "natural and probable" effect of his escape would be to frustrate and impede the immigration court's removal order. In this regard, and as *Senffner* and *Hopper* both show, Zeledon obstructed the immigration-court proceedings by fleeing execution of the court's order.

Indeed, Zeledon's immigration-court proceedings remain pending to this day. *See* Doc. 33-2. The fact that the immigration court granted Zeledon's Second Motion to Reopen illustrates the point: those proceedings do not end unless and until Zeledon is removed or receives relief from removal.

The district court thus properly determined that Zeledon's conduct fell within the scope of § 1505.

## III. Alternatively, Zeledon obstructed his First Motion to Reopen proceedings when he escaped.

When Zeledon escaped on July 2, 2023, the immigration court's denial of his First Motion to Reopen had not yet become final. Because of the lack of finality, the immigration-court proceedings focused on the motion to reopen remained pending. For this independent reason, this Court should conclude that Zeledon obstructed pending immigration-court proceedings.

Zeledon filed his First Motion to Reopen on May 30, 2023, while he was in ICE custody. JA230. The immigration court denied the motion on June 13, 2023. JA230. Zeledon had 30 days, or until July 13, 2023, to appeal the denial of his First

53

Motion to Reopen to the Board of Immigration Appeals. 8 C.F.R. § 1003.38(b).

The immigration court's order did not become final until the appeal period ran on July 13, 2023. 8 C.F.R. § 1003.39 ("the decision of the Immigration Judge becomes final upon waiver of appeal or upon expiration of the time to appeal if no appeal is taken whichever occurs first").[15] That means the immigration-court proceedings remained pending on July 2, 2023, when Zeledon escaped from CDF. Because the whole point of Zeledon's First Motion to Reopen was to address whether he should be removed from the United States, Zeledon's escape from CDF and subsequent efforts to flee from immigration authorities had the natural and probable effect of interfering with the pending immigration-court proceeding. *Aguilar*, 515 U.S. at 599.

Courts have reached this conclusion in the context of § 1503. In *United States v. Johnson*, 605 F.2d 729 (4th Cir. 1979), the Court held that "a criminal action remains pending in the district court until disposition is made of any direct appeal taken by the defendant assigning error that could result in a new trial." *Id*. at 731.

This Court again addressed this issue in *United States v. Seriani*, 129 F.3d 118 (4th Cir. 1997) (unpublished). There, the Court noted that the defendants "could have moved for a sentence reduction" under Federal Rule of Criminal Procedure 35

---

[15] If Zeledon had been removed during the appeal period, he could continue to litigate from abroad. *See William v. Gonzales*, 499 F.3d 329, 333 (4th Cir. 2007).

during a specific time period. *Id*. Even though no party had filed a Rule 35 motion at the time of the relevant obstructive acts, the Court indicated that because the obstruction took place during the allotted time to file such a motion, the conduct was covered by § 1503. *Id*. *Seriani* explained that "*Johnson* holds that such a possibility of modification of an earlier judgment creates a 'pending judicial proceeding' for the purposes of section 1503." *Id*.

And in *United States v. Fulbright*, 105 F.3d 443 (9th Cir. 1997), *overruled on other grounds by United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007), the Ninth Circuit addressed a challenge to obstruction of a bankruptcy court proceeding under § 1503. The Ninth Circuit held that the "bankruptcy 'proceeding' terminated with the lapse of the ten-day appeal period." *Id*. at 450. An obstructive act during the pending appeal period would be actionable under § 1503. *Id*.

The same rule should apply to § 1505. Zeledon obstructed his immigration-court proceedings because those proceedings had not reached a final decision and "a possibility of modification" remained. *Johnson*, *Seriani*, and *Fulbright* clarify that Zeledon's subjective intention whether to appeal the denial of his First Motion to Reopen is irrelevant. For purposes of deciding if the proceedings remain pending, the Court need only consider the date the appeal period would become final: July 13, 2023. Because Zeledon escaped on July 2, 2023, he obstructed the immigration-court proceedings with respect to the adjudication of his First Motion to Reopen.

55

## Conclusion

For these reasons, this Court should affirm Zeledon's conviction.

Respectfully submitted,

Erik S. Siebert
United States Attorney

/s/
_____
Robert S. Day
Daniel J. Honold
Assistant United States Attorneys

## Statement Regarding Oral Argument

The United States respectfully suggests that oral argument is not necessary in this case. The legal issues are not novel, and oral argument likely would not aid the Court in reaching its decision.

## Certificate of Compliance

I certify that this brief was written using 14-point Times New Roman typeface and Microsoft Word 2016.

I further certify that this brief does not exceed 13,000 words (and is specifically 12,961 words) as counted by Microsoft Word, excluding the table of contents, table of authorities, statement regarding oral argument, this certificate, the certificate of service, and any addendum.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

_____/s/_____
Robert S. Day
Assistant United States Attorney

**Addendum**

## Addendum Table of Contents

**Page**

A.    American Heritage Dictionary 987 (Second College ed. 1982)................. A-3

B.    8 Oxford English Dictionary 1407 (1933).................................................... A-6

C.    12 Oxford English Dictionary 545 (1989).................................................... A-9

D.    11 Oxford English Dictionary 468 (1989).................................................. A-12

E.    2 Oxford English Dictionary 63 (1989)...................................................... A-15

F.    Black's Law Dictionary 1430 (3d ed. 1933) ............................................. A-19

G.    Black's Law Dictionary 1204 (6th ed. 1990) ........................................... A-24



Second College Edition

*The*
American Heritage
Dictionary

Words that are believed to be registered trademarks
have been checked with authoritative sources. No in-
vestigation has been made of common-law trademark
rights in any word, because such investigation is im-
practicable. Words that are known to have current
registrations are shown with an initial capital and are
also identified as trademarks. The inclusion of any
word in this Dictionary is not, however, an expres-
sion of the Publisher's opinion as to whether or not it
is subject to proprietary rights. Indeed, no definition
in this Dictionary is to be regarded as affecting the
validity of any trademark.

Copyright © 1982 by Houghton Mifflin Company. All
rights reserved. No part of this work may be repro-
duced or transmitted in any form or by any means,
electronic or mechanical, including photocopying and
recording, or by any information storage or retrieval
system, except as may be expressly permitted by
1976 Copyright Act or in writing by the Publisher.

All correspondence and inquiries should be directed to
Reference Division, Houghton Mifflin Company
Two Park Street, Boston, MA 02108

**Library of Congress Cataloging in Publication Data**
Main entry under title:
American Heritage dictionary.
   Rev. ed. of: American Heritage dictionary of the
English language. New college ed. c1976.
   1. English language—Dictionaries.  I. Morris,
William, 1913–
PE1625.A54  1982      423      82-9346
ISBN 0-395-32943-4
ISBN 0-395-32944-2 (thumb index)
ISBN 0-395-33959-6 (deluxe edition)

Manufactured in the United States of America

**proa | processor**

**2.** Anterior; in front of: *procambium.* [< Gk. *pro-,* before, in front of.]

**pro·a** (prō'ə) *n.* A swift Malayan sailboat with a triangular sail and a single outrigger. [< Malay *pĕrāhú,* prob. Marathi *māḷe.*]

**pro·a·bor·tion** (prō'ə-bôr'shən) *adj.* Favoring or supporting required clinical abortions. **—pro·a·bor'tion·ist** *n.*

**pro·a·bol·ism** (prōb'ə-bə-liz'əm) *n.* **1.** *Philos.* The doctrine that probability is a sufficient basis for belief and action. **2.** *Rom. Cath. Ch.* The doctrine that when there is doubt as to the moral rectitude of an action, the opinion that favors liberty may be followed, provided that it is solidly probable, even though the contrary may be equally, or even more, probable.

**prob·a·bil·ist** *n.* **—prob·a·bil·lis'tic** *adj.*

**prob·a·bil·i·ty** (prŏb'ə-bĭl'ĭ-tē) *n., pl. -ties.* **1.** The quality or condition of being probable; likelihood. **2.** A probable situation, condition, or event. **3.** *Math.* A number expressing the likelihood of occurrence of a specific event, such as the ratio of the number of experimental results that would produce the event to the total number of results considered possible. **—idiom. in all probability.** Most probably; very likely.

**probability density** *n.* **1.** A function of a continuous random variable, the integral of which, over a given interval, gives the probability that the value of the variable will fall within the interval. **2.** The calculated value of a probability density.

**probability distribution** *n.* **1.** Probability density. **2.** A function of a discrete random variable yielding the probability that the variable will have a given value.

**probability theory** *n.* A branch of mathematics that studies the likelihood of occurrence of random events in order to predict the behavior of defined systems.

**prob·a·ble** (prŏb'ə-bəl) *adj.* **1.** Likely to happen or to be true. **2.** Relatively likely but not certain; plausible. **3.** *Theol.* Of or pertaining to moral opinions and actions for the lawfulness of which intrinsic reasons or extrinsic authority may be adduced; possible; provable. [ME, *provable* < OFr. < Lat. *probabilis* < *probare,* to prove.]

**probable cause** *n. Law.* Reasonable grounds for belief that an accused person is guilty as charged.

**prob·a·bly** (prŏb'ə-blē) *adv.* Most likely; presumably.

**pro·bang** (prō'băng') *n.* A long, slender, flexible rod having a tuft or sponge at the end, used to remove foreign bodies from the larynx or esophagus. [Alteration of obs. *provang.*]

**pro·bate** (prō'bāt') *n.* **1. a.** Legal establishment of the validity of a will. **b.** The process of legally establishing the validity of a will. **2.** The right to validate wills. **—*tr.v.* -bat·ed, -bat·ing, -bates.** To establish the validity of (a will). [ME *probacion* < OFr. < Lat. *probatum,* something proved < *probare,* to prove < *probus,* good.] **—pro·ba'tion·al, pro·ba'tion·ar·y** *adj.* **—pro·ba'tion·al·ly** *adv.*

**probate court** *n.* A court limited to the jurisdiction of probating wills and administering estates.

**pro·ba·tion** (prō-bā'shən) *n.* **1.** A trial period in which a person's fitness for membership in a working or social group is tested. **2.** *Law.* The action of suspending the sentence of one convicted of a minor offense and granting him provisional freedom on the promise of good behavior. **3.** A trial period in which a student is permitted to redeem failing grades or bad conduct. **4.** The status of a person on probation. [ME *probacion* < OFr. < Lat. *probatio,* trial < *probare,* to test < *probus,* good.] **—pro·ba'tion·al, pro·ba'tion·ar·y** *adj.*

**pro·ba·tion·er** (prō-bā'shə-nər) *n.* A person on probation.

**pro·ba·tive** (prō'bə-tĭv) *also* **pro·ba·to·ry** (-tôr'ē, -tōr'ē) *adj.* **1.** Serving to test, try, or prove. **2.** Furnishing evidence or proof. [ME *probatijfe* < Lat. *probativus* < *probare,* to prove < *probus,* good.]

**probe** (prōb) *n.* **1.** An object or device used to investigate an unknown configuration, condition, or region. **2.** A slender, flexible instrument used to explore a wound or bodily cavity. **3.** The act of exploring or searching with the aid of a probe. **4.** An investigation into the nature of something, esp. an investigation of unlawful practices. **—*v.* probed, prob·ing, probes.** **—*tr.* 1.** To explore with a probe. **2.** To examine or investigate; delve into. **—*intr.* 1.** To conduct an exploratory investigation; search. [< Med. Lat. *proba,* examination < Lat. *probare,* to test < *probus,* good.] **—prob'er** *n.*

**pro·ben·e·cid** (prō-bĕn'ĭ-sĭd) *n.* A derivative of benzoic acid, $C_{13}H_{19}NO_4S$, that is used medically as a drug in the treatment of gout. [PRO(PYL) + BEN(ZOIC) + (A)CID.]

**pro·bi·ty** (prō'bĭ-tē) *n.* Complete and confirmed integrity; uprightness. [OFr. *probite* < Lat. *probitas* < *probus,* honest.]

**prob·lem** (prŏb'ləm) *n.* **1.** A question or situation that presents uncertainty, perplexity, or difficulty. **2.** A person who is difficult to deal with. **3.** A question put forward for consideration, discussion, or solution. **—*modifier: a problem child, a problem play.*** [ME *probleme* < OFr. < Lat. *problema* < Gk. *problēma* < *proballein,* to throw out: *pro-,* forward + *ballein,* to throw.]

**prob·lem·at·i·cal** (prŏb'lə-măt'ĭ-kəl) *also* **prob·lem·at·ic** (-ĭk) *adj.* **1.** Posing a problem; difficult to solve. **2.** Open to doubt; debatable. **—prob'lem·at'i·cal·ly** *adv.*

**prob·lem·o·ri·ent·ed language** (prŏb'ləm-ôr'ē-ĕn'tĭd, -ōr'-)

*n.* A computer programming language designed for use in solving a particular set of problems.

**pro·bos·cid·i·an** (prō'bŏs-ĭd'ē-ən) *also* **pro·bos·ci·de·an** (prō'bŏs'ĭd'ē-ən) *adj.* Of or belonging to the Proboscidea, an order of mammals that is characterized by a trunk or proboscis and includes the elephant. **—*n.* An animal of the order Proboscidea.** [< NLat. *Proboscidea,* order name < Lat. *proboscis,* proboscis.]

**pro·bos·cis** (prō-bŏs'ĭs) *n., pl. -cis·es* or **-cides** (-ĭ-dēz'). **1.** A long, flexible snout or trunk, as of an elephant. **2.** The slender, tubular feeding and sucking structure of some insects and worms. **3.** A human nose, esp. a prominent one. [Lat. < Gk. *proboskis : pro-,* in front + *boskein,* to feed.]

**pro·bus·ing** (prō'bŭs'ĭng) *adj.* Favoring or supporting the busing of children to schools outside their neighborhoods as a means of achieving racial integration.

**pro·caine hydrochloride** (prō'kān') *n.* A white crystalline powder, $C_{13}H_{20}N_2O·HCl$, used as a local anesthetic in medicine and dentistry. [PRO·[1] + (CO)CAIN.]

**pro·cam·bi·um** (prō-kăm'bē-əm) *n.* A layer of undifferentiated plant cells from which the vascular tissue is formed. **—pro·cam'bi·al** *adj.*

**pro·carp** (prō'kärp') *n.* A specialized female sex organ in certain algae.

**pro·car·y·ote** *also* **pro·kar·y·ote** (prō-kăr'ē-ōt') *n.* A cellular organism, such as a bacterium or blue-green alga, whose nucleus lacks a limiting membrane. **—pro·car·y·ot·ic** (-ŏt'ĭk) *adj.* [Gk. *karuōtos,* having nuts.]

**pro·ce·du·ral** (prə-sē'jər-əl) *adj.* Of or concerning procedure, esp. of a court of law or parliamentary body. **—pro·ce·du·ral·ly** *adv.*

**pro·ce·dure** (prə-sē'jər) *n.* **1.** A manner of proceeding; way of performing or effecting something. **2.** An act composed of steps; course of action. **3.** A set of established forms or methods for conducting the affairs of a business, legislative body, or court of law. [Fr. *procédure* < OFr. < *procéder,* to proceed.]

**pro·ceed** (prō-sēd', prə-) *intr.v.* **-ceed·ed, -ceed·ing, -ceeds.** **1.** To go forward or onward, esp. after an interruption; continue. **2.** To undertake and carry on some action or process. **3.** To move on in an orderly manner. **4.** To issue forth; originate. **5.** To institute and conduct legal action: *proceeded against the defendant.* [ME *proceden* < OFr. *proceder* < Lat. *procedere : pro-,* forward + *cedere,* to go.] **—pro·ceed'er** *n.*

**pro·ceed·ing** (prō-sē'dĭng, prə-) *n.* **1.** A course of action; procedure. **2.** A continuing of an action. **3.** **proceedings.** A sequence of events occurring at a particular place or occasion. **4. proceedings.** A record of business carried on by a society or other organization; minutes. **5.** *Law.* **a. proceedings.** Legal action; litigation. **b.** The instituting or conducting of litigation.

**pro·ceeds** (prō'sēdz') *pl.n.* The amount of money derived from a commercial or fund-raising venture; yield.

**pro·ce·phal·ic** (prō'sə-făl'ĭk) *adj.* Anatomically located on or near the front of the head.

**pro·cess[1]** (prŏs'ĕs', prō'sĕs') *n., pl.* **pro·cess·es** (prŏs'ĕs'ĭz, prō'sĕs'-, prŏs'ĭ-sēz', prō'sĭ-). **1.** A system of operations in the production of something. **2.** A series of actions, changes, or functions that bring about an end or result. **3.** Course or passage of time. **4.** Ongoing movement; progression. **5.** *Law.* **a.** A summons or writ ordering a defendant to appear in court. **b.** The total quantity of summonses or writs issued in a particular proceeding. **c.** The entire course of a judicial proceeding. **6.** *Biol.* A part extending or projecting from an organ or organism; appendage. **7.** Any of various photomechanical or photoengraving methods. **—*tr.v.* -essed, -ess·ing, -ess·es.** **1.** To put through the steps of a prescribed procedure. **2.** To prepare, treat, or convert by subjecting to some special process. **3.** *Law.* To serve with a summons or writ. **4.** To institute legal proceedings against; prosecute. **5.** *Computer Sci.* To perform operations on data. **—*adj.* 1.** Prepared or converted by a special treatment: *process cheese.* **2.** Made by or used in photomechanical or photoengraving methods: *a process print.* [ME *proces* < OFr. < Lat. *processus,* advance < p.part. of *procedere,* to advance. **—see PROCEED.]**

**pro·cess[2]** (prə-sĕs') *intr.v.* **-cessed, -cess·ing, -cess·es.** To move along in or as if in a procession. [Back-formation < PROCESSION.]

**pro·ces·sion** (prə-sĕsh'ən) *n.* **1.** The act of proceeding, moving along, or issuing forth. **2. a.** A group of persons, vehicles, or objects moving along in an orderly and formal manner, usually in a long line. **b.** The movement of such a group. **3.** A continuous and orderly course: *the procession of the seasons.* **—*intr.v.* -sioned, -sion·ing, -sions.** To form or go in a procession. [ME < OFr. < Lat. *processio,* advance < *procedere,* to advance. **—see PROCEDE.]**

**pro·ces·sion·al** (prə-sĕsh'ə-nəl) *adj.* Of, pertaining to, or suitable for a procession. **—*n.* 1.** A book containing the ritual observed during a religious procession. **2.** A hymn sung when the clergy enter a church at the beginning of the service. **3.** Music intended to be played or sung during a procession. **—pro·ces'sion·al·ly** *adv.*

**pro·ces·sor** (prŏs'ĕs'ər) *n.* **1.** One that processes. **2.** A computer. **3.** A central processing unit. **4.** A computer program



**probe**
Space probe orbiting
Venus

Ref
PE
1625
.N532
1933a
v 8

# THE OXFORD ENGLISH

# DICTIONARY

BEING A CORRECTED RE-ISSUE

WITH AN

INTRODUCTION, SUPPLEMENT, AND BIBLIOGRAPHY

OF

# A NEW

# ENGLISH DICTIONARY

ON HISTORICAL PRINCIPLES

FOUNDED MAINLY ON THE MATERIALS COLLECTED BY

𝔗𝔥𝔢 𝔓𝔥𝔦𝔩𝔬𝔩𝔬𝔤𝔦𝔠𝔞𝔩 𝔖𝔬𝔠𝔦𝔢𝔱𝔶

## VOLUME VIII
### Poy–Ry

OXFORD

AT THE CLARENDON PRESS

U.S. DEPT. OF JUSTICE

MAY 27 1983

MAIN LIBRARY

*Oxford University Press, Walton Street, Oxford* OX2 6DP

OXFORD LONDON GLASGOW
NEW YORK TORONTO MELBOURNE WELLINGTON
KUALA LUMPUR SINGAPORE JAKARTA HONG KONG TOKYO
DELHI BOMBAY CALCUTTA MADRAS KARACHI
IBADAN NAIROBI DAR ES SALAAM CAPE TOWN

FIRST PUBLISHED 1933
REPRINTED 1961, 1970, 1978

PRINTED IN GREAT BRITAIN
AT THE UNIVERSITY PRESS, OXFORD
BY ERIC BUCKLEY
PRINTER TO THE UNIVERSITY

PROCEEDER.                    1407                    PROCERITIC.

**† 6.** *trans.* To proceed with, or cause to proceed; to carry on; *in futaree*, of legal proceedings. *Obs.*

**7.** *intr.* To go or come forth; to issue. **a.** lit. *from* (*† of*), *out of* a material thing or place; and in directly derived uses. In quot. 1703, of position or direction, to arise or spring *from*.

**b.** *spec.* To be the issue or descendant of; to be descended, spring *from* (a parent, ancestor, or stock). Now rare or *Obs.*

**c.** *fig.* and *gen.* To issue, spring, arise, originate, emanate, result, be derived (*from*, *† of* a source or cause). Formerly also with *other* constructions : To arise, come into being, come to pass, happen.

**d.** *spec.* To issue, proceed, be derived, as sound or language; to be uttered as speech.

**Proceeder** (prəˈsiːdəɹ). Also **6 proceedar.** [f. prec. vb. + -ER1.]  One who proceeds.

**1.** One who carries on some action, or acts in some particular way ; an agent, doer.

**b.** One who carries on a legal process.

**2.** One who is proceeding to a university degree. *† Obs.* (Cf. INCEPTOR 1.)

**3.** One who advances or makes progress.

**Proceeding** (prəˈsiːdɪŋ), vbl. sb. [f. as prec. + -ING1.]  The action of the verb PROC. sb.

**1.** The action of going onward; advance, onward movement or course.

**† b.** A company of people marching along in regular order on a festive occasion ; a procession.

**II. 145** From this Text the Preceding was thus ordered,

**2.** The carrying on of an action or series of actions ; action, course of action ; conduct, behaviour :  PROC. DURE 1.

**3.** A particular action or course of action ; a piece of conduct or behaviour ; a transaction :  PROCEDURE 1 b.  Most usually in *pl.* : Doings, actions, transactions.

**4.** A record or account of the proceedings of a society ; sometimes *pl.*, a record of the business done, with abstracts or reports of the less important papers not included in the *Transactions*.

**5.** *spec.* The instituting or carrying on of an action at law ; a legal action or process; any act done by authority of a court of law ; any step taken in a cause by either party.

**6.** The action of going on with something already begun ; continuance of action ; advance, progress ; advancement. Now rare.

**b.** The taking of a university degree ; graduation.

**c.** The action of coming forth or issuing from a place or source ; egress, emergence.

**Proceeding,** *ppl. a.* [f. as prec. + -ING2.]  That proceeds; in quot., progressing, advancing.

**Proceleusmatic** (ˌprəʊsɪluːsˈmætɪk), *a.* (*sb.*) [ad. late L. *proceleusmaticus*, a. Gr. προκελευσματικός, f. προκελεύειν to rouse to action beforehand.]

**1.** Serving for incitement ; animating, inspiriting.

**2.** *Pros.* **a.** *adj.* Epithet of a metrical foot of four short syllables; pertaining to or consisting of such feet. **b.** *sb.* A proceleusmatic foot.

**Procellarian** (prəˌsɛˈlɛərɪæn), *a.* and *sb.* *Ornith.* [f. modL. *Procellaria*, f. *procella* storm) + -AN.]  **A.** *adj.* Belonging to or resembling the genus *Procellaria* or family *Procellariidæ* of sea-birds.  **B.** *sb.* A bird of this genus or family, a petrel.  So **Procella'riid,** a bird of the family *Procellariidæ*, a petrel.

**† Procello,** *Obs. rare* -1. [a. OF. *procella* (mod. *procelle*) or ad. L. *procella*.] A storm.

**Procello** (prəʊˈsɛloʊ), *v.* *Obs.* nonce-wd. to incite.

**Procello'sity,** *Obs.* Glass-making. *† Obs.* Also **9 procellos** (*pl.*), **procellas** (error, **procelles**), **pracellas,** etc.  A tool used for moulding the form of a glass vessel or object while being rotated on the end of the punty.

**† Procer,** *Obs.* rare -1. [a. L. *procer*, used chiefly in *pl. proceres*.]  A chief man, noble, magnate.

**† Proceres,** *n. pl.* [L. *proceres* rare sing. *procer*), leading men, chiefs, nobles.]  Chief men, nobles, magnates.

**Procero'sity.** *Obs.* [f. L. *procer*-us + -OSITY.]  The long-extended or tall condition of some thing.

**Procerite** (prəʊˈsɛraɪt). *Zool.* [f. Gr. προ- + κέρας horn + -ITE.]  The many-jointed terminal segment (forming nestly the whole length) of the antenna in certain Crustacea, as lobsters.  Hence **Proceritic** (prəˌsɛˈrɪtɪk), *a.*, pertaining to the procerite.

PE
1625
.O87
1989
v. 12

# THE OXFORD ENGLISH DICTIONARY

### SECOND EDITION

*Prepared by*

J. A. SIMPSON *and* E. S. C. WEINER

### VOLUME XII

Poise–Quelt

CLARENDON PRESS · OXFORD

1989



DEPT. OF STATE
APR 1 1 1990
MAIN LIBRARY

Oxford University Press, Walton Street, Oxford OX2 6DP
Oxford New York Toronto
Delhi Bombay Calcutta Madras Karachi
Petaling Jaya Singapore Hong Kong Tokyo
Nairobi Dar es Salaam Cape Town
Melbourne Auckland
and associated companies in
Berlin Ibadan

Oxford is a trade mark of Oxford University Press

© Oxford University Press 1989

All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
electronic, mechanical, photocopying, recording, or otherwise, without
the prior permission of Oxford University Press

British Library Cataloguing in Publication Data
Oxford English dictionary.—2nd ed.
1. English language-Dictionaries
I. Simpson, J. A. (John Andrew), 1953–
II. Weiner, Edmund S. C., 1950–
423
ISBN 0-19-861224-9 (vol. XII)
ISBN 0-19-861186-2 (set)

Library of Congress Cataloging-in-Publication Data
The Oxford English dictionary.—2nd ed.
prepared by J. A. Simpson and E. S. C. Weiner
Bibliography: p.
ISBN 0-19-861224-9 (vol. XII)
ISBN 0-19-861186-2 (set)
1. English language—Dictionaries. I. Simpson, J. A.
II. Weiner, E. S. C. III. Oxford University Press.
PE1625.087 1989
423—dc19    88-5330

Data capture by ICC, Fort Washington, Pa.
Text-processing by Oxford University Press
Typesetting by Filmtype Services Ltd., Scarborough, N. Yorks.
Manufactured in the United States of America by
Rand McNally & Company, Taunton, Mass.

USCA4 Appeal: 24-4665    Doc: 34    Filed: 07/02/2025    Pg: 76 of 91

**PROCEEDING**

every man should and may be a judge of controuersyes. **1657** TRAPP *Comm.* 1 Tim. ii. 8 It is impossible to trip up the proceeders heels. *Hor. Ep.* II. i. 117 If his Muse carries on a just process. **1711** POPE *Rem.* (1804) 257 Be thou th' [brast] my ... *Hor. Satires* ... Pleader, 't abhorted Lawyer, true faustless.

**b.** who is proceeding to a university degree. (Cf. INCEPTION 1.)
*Pro Cent.* 1763 *Obs.* (Cf. INCEPTION 1.)

**proceeding** (prouˈsiːdɪŋ), *vbl. sb.* [f. as prec. + -ING.] The action of going onward; advance.

**1.** The action of going onward; advance, onward movement or course.

**b.** A company of people marching along in regular order on a festive occasion; a procession.

**2.** The carrying on of an action or series of actions; action, course of action; conduct, behaviour: = PROCEDURE 1.

**b.** A particular action or course of action; a piece of conduct or behaviour; a transaction: = PROCEDURE 1 b. Most usually in *pl.*: Doings, actions, transactions.

**c.** *pl.* A record or account of the doings of a society; sometimes *spec.* a record of the business done, with abstracts or reports of the less important papers not included in the *Transactions.*

**3.** *spec.* The instituting or carrying on of an action at law; a legal action or process; any act done by authority of a court of law; any step taken in a cause by either party.

**4.** The action of going on with something already begun; continuance of action; advancement, progress; advancement. Now *rare.*

---

**b.** The taking of a university degree; graduation.

**5.** The action of coming forth or issuing from a place or source; egress, emanation.

**proˈceeding, ppl. a.** [f. as prec. + -ING¹.] That proceeds, in quot., progressing, advancing.

**proceleusmatic** (prɒsɪljuːsˈmætɪk), *a. (sb.)* [ad. late L. *proceleumatic-us*, a. Gr. προκελευσματικός.] **1.** Serving for incitement; animating.

**2.** *Pros.* a. *adj.* Epithet of a metrical foot of four short syllables; pertaining to or consisting of such feet. b. *sb.* A proceleusmatic foot.

**procellarian** (prɒseˈlɛəriən), *a.* and *sb. Ornith.* [f. mod.L. *Procellaria* (f. *procella* storm) + -AN.] *a. adj.* Belonging to or resembling the genus *Procellaria* or family *Procellariidæ* of seabirds. B. *sb.* A bird of this genus or family, a petrel. So proceˈllarid, a bird of this family *Procellariidæ;* procelˈlarine (-ain) (erron. procellarine), *a.* belonging to the subfamily *Procellariinæ;* sb. a bird of this subfamily.

**proˈcelle.** *Obs. rare⁻¹.* [a. OF. *procelle* (15th c. in Godef.), ad. L. *procella.*] A storm.

**procello** (prouˈselo). *Glass-making.? Obs.* Also **9 procellos** (? *pl.*), **procellas** (erron. *puellas*, **priscillas**). [a. It. *porcellio:* cf. PROCER.] A tool used for modifying the form of a glass vessel or object while being rotated on the end of the punty (e.g. for pinching in the neck of a bottle).

**proˈcellous, a. Obs.** [= obs. F. *procelleux* (15th c. in Godef.), ad. L. *procellōs-us* stormy. Stormy.

**procephalic** (prɒsɪˈfælɪk), *a.* [f. Gr. πρό, PRO-⁴ + κεφαλή head + -IC. In sense 2, f. Gr. προκεφάλαιον 'long-headed', also in Procop.] **1.** *Zool.* Belonging to the fore part of the head; applied to certain lobes or processes in Crustacea and other Arthropoda: see quots.

**2.** *Anat. = PRO-₄.*

---

**PROCESS**

expansions the procephalic lobes. **1880** — *Crayfish* iv. anterior of the head (though they are really situated in the upper and front wall) ... called the *procephalic processes.*

**2.** *Anc. Pros.* Having a syllable too many at the beginning; applied to a dactylic hexameter having a syllable in excess in the first foot. [So προκέφαλοι in Hephaestion, AD. 150.]

**proception**, error in J., whence repeated in later Dicts., for *præreption* (in *Eikon Basilike*): see PREREPTION.

**†ˈprocer.** *Glass-making. Obs.* [app. of It. origin: cf. PROCELLO.] (See quot.)

**proˈcere, a. Obs.** [ad. L. *procēr-us* high, tall. Cf. sincere.] Tall, lofty, high; long.

**procerebrum:** see PRO-² 2.

**proˈceres** (prɒsɪˈriːz), *sb. pl.* [L. *procerēs* (rare sing. *procer*), leading men, chiefs, nobles.] Chief men, nobles, magnates.

**proceˈrite** (prouˈsɪərəɪt). *Zool.* [f. Gr. πρό, PRO-⁴ + κέρας horn + -ITE² 3.] The many-jointed terminal segment (forming nearly the whole length) of the antenna in certain Crustacea, as lobsters. Hence proceˈritic (prɒsəˈrɪtɪk) *a.,* pertaining to the procerite.

**proˈcerity** (prɒsˈɛrɪtɪ). Now *rare.* [ad. obs. F. *procerité* (15th c. in Godef.) or ad. L. *procēritātem* height, tallness: f. *procēr-us:* see PROCERE and -ITY.] Tallness, loftiness, height; length.

**proˈcerous** (prouˈsɪərəs), *a. Obs.* [f. L. *procēr-us* (see PROCERE) + -OUS.] = PROCERE.

**proˈcerus** (prouˈsɪərəs). *Anat.* [mod.L. *procēr-us:* see PROCERE.] = PROCERE.

**2.** *Ornith.* Belonging to the order *Proceres* or *Procēri,* the name given by Illiger 1811 to the *Ratitæ,* comprising the ostriches and allied birds.

**process** (ˈprɒses, ˈprouses), *sb.* Forms: 4–7 proces (also *pl.*), -cesse, (5 processe, -ses, -seys, -sis)se, -sensse, 5–6 prosses), 5 – process. [ME. *proces,* a. F. *procès* (13th c. in Godef.), ad. L. *prōcess-us* (u-stem) advance, progress, process, lapse of time, f. ppl. stem of *procēd-ere* to PROCEED. Orig. stressed *proˈcess,* still used by Milton and others in 17–18th cent.: see process.] **I.** A fact or state of going on or being carried on, as an action, or a series of actions or events; progress, course. Now chiefly in phr. *in process* = going on, being done; *in process of (construction, etc.)* = in course of; being (constructed, etc.).

**1. a.** The fact of going on or being carried forward; advance, progression; course.

PE
1625
.O87
1989
v.11

# THE OXFORD ENGLISH DICTIONARY

SECOND EDITION

*Prepared by*

J. A. SIMPSON *and* E. S. C. WEINER

VOLUME XI

Ow–Poisant

CLARENDON PRESS · OXFORD

1989

Oxford University Press, Walton Street, Oxford OX2 6DP

Oxford New York Toronto
Delhi Bombay Calcutta Madras Karachi
Petaling Jaya Singapore Hong Kong Tokyo
Nairobi Dar es Salaam Cape Town
Melbourne Auckland
and associated companies in
Berlin Ibadan

Oxford is a trade mark of Oxford University Press

© Oxford University Press 1989

All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
electronic, mechanical, photocopying, recording, or otherwise, without
the prior permission of Oxford University Press

British Library Cataloguing in Publication Data
Oxford English dictionary.—2nd ed.
1. English language–Dictionaries
I. Simpson, J. A. (John Andrew), 1953–
II. Weiner, Edmund S. C., 1950–
423
ISBN 0-19-861223-0 (vol. XI)
ISBN 0-19-861186-2 (set)

Library of Congress Cataloging-in-Publication Data
The Oxford English dictionary.—2nd ed.
prepared by J. A. Simpson and E. S. C. Weiner
Bibliography: p.
ISBN 0-19-861223-0 (vol. XI)
ISBN 0-19-861186-2 (set)
1. English language—Dictionaries.  I. Simpson, J. A.
II. Weiner, E. S. C.  III. Oxford University Press.
PE1625.087 1989
423—dc19          88-5330

Data capture by ICC, Fort Washington, Pa.
Text-processing by Oxford University Press
Typesetting by Filmtype Services Ltd., Scarborough, N. Yorks.
Manufactured in the United States of America by
Rand McNally & Company, Taunton, Mass.

**PENDENT**  468  **PENDLE**

2. Pendent position; droopingness, droop. *rare.*

1770 T. WHATELY *Mod. Gardening* 142. Two or three groupes of large trees, feathering down to the bottom, and by the pendency of their branches favouring the declivity. 1831 S. WARREN *Diary Physic.* vii. Her head covered with a velvet cap, over which drooped in mourny pendency, an ostrich feather.

**pendent, -ant** ('pendant), *a.* (prep.) [orig. penda(u)nt, *a.* F. *pendant*: see PENDANT *sb.* About 1600, this began to be written *pendent*, after L. *pendens, -entem*, and this has now become the more frequent spelling, though *pendant* is often used, esp. in senses associated with those of the *sb.*]

1. Hanging; suspended from or as from the point of attachment, with the point or end hanging downwards; dependent. Of a tree: having downhanging branches. Formerly often following its *sb.*, esp. in Heraldic use.

† *pattera pendants* (in O.F.): letters having seals attached. *c*1412 HOCCLEVE *De Reg. Princ.* 443 Gownes of scarlet,... with pendant sleeus downe On ye grounde. 1489 CAXTON *Godefroy* cxxi. 171 He sette letters pendantes ouertal his londes. 1486 *Bk. St. Albans* B3. The pendaunte federis. 1593 NASHE *Foure Lett. Confut.* Wks. (Grosart) II. 220 A roly long red peake... wherat a man might hang a lewell, it was so sharpe and pendant. 1598 SHAKS. *Merry W.* iv. vi. 42 Loose en-roab'd, With Ribonds-pendant, flaring 'bout her head. 1602 — *Ham.* iv. vii. 173 There on the pendant boughes, her Coronet weeds Clambring to hang. 1625 in Rymer *Foedera* (1726) XVIII. 237 One emrauld Pendent, one Iklewe Saphore, and three Pearle Pendent. 1727-41 CHAMBERS *Cycl.* s.v. *Barometer, Pendent Barometer* is a machine rather pretty, and curious, than useful. 1807 WORDSW. *Wh. Doe* iv. 37 The pendent woodbine. 1828 LYTTON *What will he do* i. v. The boat gently brushed aside their pendant boughs.

b. *pendent with*, hanging with, hung with.

1855 KANE *Grinnell Exp.* viii. (1856) 60 Their tunnel-like roofs were often pendant with icicles.

2. Overhanging; jutting or leaning over; also, descending in a steep slope; slanting; placed or hanging on a steep slope.

*c*1400 *Laud Troy Bk.* 4544 With swerdes gode that were trenchaunt Fauzt thei to-gedur by that hil pendaunt. 1535 BARCLAY *Egloges* iv. (1570) C3/b/1 A mountayne... With pendant cliffes of stones harde as flint. 1587 FLEMING *Contn. Holinshed* III. 1008/2 The whole countrie... is pendent towards the south and west parts. 1613-39 I. JONES in *Palladio's Archit.* (1742) II. 51 The top... is pendent, to throw the Rain-water off. 1644 EVELYN *Diary* 21 Oct., Another pendant tower tho' not so ligh. 1664 PHILIPS *Cyder* i. 109 On... that cloud-piercing hill Plinlimmon, from afar the traveller kens Astonish'd, how the goats their shrubby browze Graze pendant. 1847 EMERSON *Poems* (1857) 40 By the penden mountain's shade.

b. *fig.* Overhanging; impending. *rare.*

1605 EUGENIA in ACTON *Nutus of Desert* 1. 38 The clouds blackened, the tempest was pendent. 1877 TENNYSON *Harold* ii. ii, Having... lied like a lad That dreads the pendent scourge.

3. Hanging or floating unsupported in the air or in space; supported above the ground on arches, columns, etc. Now *rare* or *Obs.*

*c*1600 *Timon* iv. iii. (Shaks. Soc.) 67, I hearde from Pseudochous... that the moone was an ilande pendante in the air. 1601 HOLLAND *Pliny* xxxvi. xii. II. 578 The pendant gallery and walking place at Gnidos. 1603 INMAN. *Meas. for M.* III. i. 126 To be imprison'd in the viewlesse windes And blowne with restlesse vuolence round about The pendant world. *c*1790 IMISON *Sch. Art* i. 247 An inverted image of the object will... seem to hang pendant in the air. 1821 EUSTACE *Tour Italy* (1815) II. 15 Strabo... represents it as a pendent garden raised on lofty arches of white stone, planted with evergreen shrubs.

4. Hanging in the balance, remaining undecided or unsettled, pending.

1633 G. HERBERT *Temple, Lent* v. Those same pendant profits, which the spring And Easter intimate. 1830 SOUTHEY in *Q. Rev.* XLI. 412 Our then pendant alliance in America. 1832 — *Hist. Penins. War* III. 204 To wait the effect of a treaty then pendent with Spain. 1880 MUIRHEAD *Ulpian* ii. §2 So long as the condition is pendent he remains a slave of the heir's.

5. *Gram.* Of which the grammatical construction is left incomplete.

1849 W. FITZGERALD tr. *Whitaker's Disput.* 150 Though there be in the holy scriptures some pendent sentences, and inversions. 1859 tr. *Bengel's Gnomon* I. 526 The construction of the language is pendent. 1882 FARRAR *Camb. Grk. Test., Luke* xxi. 6 Ταῦτα ἃ θεωρεῖτε. It is what is called the 'pendent nominative'.

**‖pen'dente 'lite.** *Law.* [L. *pendente*, ablative of *pendens* hanging, pendent, *lite*, abl. of *lis* lawsuit; lit. 'with the lawsuit pending'.] While a suit is pending; during litigation: a Latin phrase of the Roman Law, often used in English context.

1726 J. AYLIFFE *Parergon Juris Canonici Anglicani* 235 Because he came *in Pendente lite*. 1736 W. P. WILLIAMS *Rep.* II. 580 The ordinary should have power to grant administration during absence, as well as... *pendente lite*. 1833 *Penny Cycl.* I. 340/1 The court will, generally speaking, allot alimony to the wife *pendente lite*, or during the continuance of the litigation. 1872 *Wharton's Law Lex.* (ed. 5) 710/1 Administration *pendente lite* is sometimes granted when an action is commenced in the Probate Court touching the validity of a will. 1964 R. W. HANSON tr. A. R. Wilkerson *Rights of Children* (1973) 240 This conflict may be revealed at the pre-trial hearing before the Family Court commissioner on *pendente lite* support orders, or at the time of trial before the court. 1972 *N.Y. Law Jrnl.* 10 Oct. 1/7

Judge Motley also refused to enjoin the defendant-... pendente lite from distributing its similarly-designed loudspeakers. 1973 *Ibid.* 31 Aug. 1/8/3 The court moved for an order for renewal of plaintiff's motion for alimony in pendente lite is denied, no sufficiently persuasive ground in support of same having been demonstrated.

**pendentive** (pen'dentiv), *sb.* (*a.*) [ad. F. *pendentif, -ive* (1567 in Hatz.-Darm.), f. L. *pendent-em* hanging: see -IVE.]

1. *Arch.* Each of the spherical triangles (or triangular segments) formed by the intersection of a hemispherical dome (or in extended use, a of a conical surface) by two pairs of opposite arches (conical surface) by two pairs of opposite arches, springing from the four supporting columns; the segments constituting that part of a groined vault resting on a single impost.

1727-41 CHAMBERS *Cycl.* s.v. The pendentives are usually of brick, or soft stone. 1823 P. NICHOLSON *Pract. Build.* 148 Pendentives are either spherical, spheroidal, or conical. 1840 *Penny Cycl.* XVII. 402/2. 1842-76 GWILT *Archit.* §2001 To cover the ceiling of a square room with conical pendentives. 1849 FREEMAN *Archit.* 168 Four columns... served to support the cupola... Being raised on a square ground plan, the angles were connected by square ground plan, the angles were connected by pendentives, whose ingenious and varied combinations are especially remarkable.

¶ 2. Incorrect uses: see PENDANT *sb.* 6.

1845 FORD *Handbk. Spain* I. iii. 374 The honeycomb stalactical pendentives... are all constructed on mathematical principles; they are composed of numerous prisms, united by their contiguous lateral surfaces. 1861 MISS E. A. BEAUFORT *Egypt. Sepulchres* I. ii. 16 The high flat walls are unrelieved by... any architectural ornament, save one invariable line of cornice along the top of the wall, formed of simple pendentives of three bricks in the upper row, two bricks in the second, and one brick below these. 1893 H. G. KEENE *Hist. India* I. ii. §1, So It is now in five storeys, the two lower divided from the one by balconies, supported on rich pendentives going all round the circumference.

B. *adj.* Of or belonging to pendentives; of the form of or having pendentives.

1790 W. WRIGHTE *Grotesque Archit.* 8 The dome was... ornamented with pendentive shell and festoon work. 1823 J. NICHOLSON *Operat. Mechanic* 578 Pendentive cradling, is a core bracketing, springing from the rectangular walls of an apartment upwards to the ceiling, so as to form the horizontal part of the ceiling into a quadrant circle or ellipsis. 1840 *Penny Cycl.* XVII. 402/3 The dome of the hall or principal office of the London and Westminster Bank is a pendentive one. 1879 SCOTT *Lect. Archit.* xvi. II. 242.

**'pendently,** *adv. rare.* Also -antly. [f. PENDENT *a.* + -LY[2].] In a pendent manner; in quot. 1662, in dependence.

1662 GURNALL *Chr. in Arm.* verse 19. iii. §4 (1669) 491/2 If any in the World need walk pendantly upon God, more than others, the Minister is he. 1847 WEBSTER, *Pendently*, in a pendent manner.

**pendice,** obs. var. *pentise*, PENTHOUSE.

**pendicle** ('pendik(ə)l). Chiefly *Sc.* Also 6 -ikle, -ikill, -ekle, -ecule. [f. L. type *pendicul-um*, f. *pendere* to hang + -*culum*, suffix forming names of instruments, also often diminutive. Cf. L. *pendicul-us* (in med.L. *pendiculum*) a cord or rope to hang with.]

1. A hanging ornament, a pendant. Now *rare.*

1488 *Acc. Ld. High Treas. Scot.* I. 85 Item, a ruf and pendicle of the same. 1560 in *Registr. Cart. Ecclesie S. Egidii* (Bann. Cl.) 2 Sanct Gelis coict, and the littill pendikle of reid veluett that hang at his feit. 1641 R. BAILLIE *Lett. & Jrnls.* (1775) I. 251 All casts him out of their thoughts, as a pendicle at the Lieutenant's ear. 1878 H. M. STANLEY *Dark Cont.* 59 The natives dress their hair in long ringlets... adorned with pendicles of copper.

2. Something dependent on or pertaining to something else, as a subordinate part or adjunct; an appurtenance, appendage, dependency.

1633 BELLENDEN *Livy* i. ii. (S.T.S.) 16 Fra he begynnyng of Iavyne to ye begynnyng of Alba ye colony and pendiculis parrof war xxx yeris. 1577-95 *Descr. Isles Scotl.* in Skene *Celtic Scotl.* III. App. 418 The remanent... Iles were reknit but as pertinents and pendiculis of the said four Iles. 1609 *Scots Stat.* V. 1 (1816) IV. 448 The keiping of the saidis signettis sall be a particular pendicle of the said office of secretarie. 1793 *Statist. Acc. Scot.* III. 370 The Parsonage of Stobo... having four churches belonging to it, which were called the Pendicles of Stobo. 1883 STEVENSON *Silverado Sq.* 107 A pendicle of Silverado mine.

b. *spec.* A small piece of ground, a cottage, etc. forming a dependent part of an estate; in later use *esp.* such a part separately suffet.

1546 *Reg. Privy Council Scot.* I. 43 The said castell,... parkis, medowis, pairtis and pendiculis thairof and thair That none of them trouble or molest Mr. William Drummond of Hawthornden his said lands, houssis, biggings, yards, parts, pendicles, and pertinences. 1795 NEWTE *Tour Eng. & Scot.* 129 These feudal vassals let smaller lots... to the husbandmen; and these again sub-let pendicles to the great body of the people. 1824 SCOTT *Wav.* xiii. 1881 in *Edin. Rev.* July 279 To roll into one conveniently-sized farm, several of the small, often scattered, parts, pendicles, and pertinents

**pendicler** ('pendiklə(r)). *Sc.* [f. prec. + -ER.] The holder of a pendicle; an inferior tenant.

1791 NEWTE *Tour Eng. & Scot.* 130 Neither the Crown,... nor that of the husbandman possessed or extensive was... absolute and perpetual. 1790 STATIST. ACC. *Scotl.* II. 257 The parish also abounded with pendiclers or tenants. 1803 J. SKINNER *Autobiog. Metaphys.* 11 The antiquity of the large farmers in this parish, we.

**pendiculation,** obs. form of PANDICULATION.

**† pen'dilpirry,** *a.* Obs. *rare* [f. F. *pendille*, *pendiller* hanging to and fro, *a.* L. type *pendilis*, dim. or freq. of *pendere* to hang: the ending -*atory*: see -ORY[1].] Pendulous.

1653 URQUHART *Rabelais* I. xiii, his dangling and pendilatory swagging [*F. en pendillant*].

**pending** ('pendiŋ), *ppl. a.* and *prep.* [Formed after F. *pendant*, L. *pend-ens* hanging in suspense, suspended, not decided, with Eng. ppl. ending -ING[1]. Cf. PEND E.[1] A. *ppl. a.*]

1. Remaining undecided, awaiting decision or settlement. Orig. of a lawsuit; cf. L. *pendente lite*. So *pending basket*, tray; a basket or tray for correspondence or other papers awaiting attention or decision.

1797 NELSON in *Nicolas Disp.* (1845) II. 371, I have to thank you for your account of Prizes pending in the Admiralty Court. 1818 JAS. MILL *Brit. India* I. ii. §1, 1. (1826) I. iii. 185 To abide the issue of the pending negotiations. 1893 LANG *Wand. India* 381 While the task but interesting, debate was pending between the prosecutors and the prisoners. 1946 R. GRAVES *Poems* 1938-45 30 While the matter's pending; tested in the shops. 1955 E. WAUGH *Officers & Gentlemen* i. viii. 102 Guy turned over the papers in the 'pending' tray. 1957 M. SUMMERSON *Sweet Time* 18, I threw the folder into my pending basket. 1971 T. HINDE *For Good of Company* i. 18 Out-tray to his right, and pending-trays to his left. 1973 J. WAINWRIGHT *Pride of Pigs* 50 The day clerks... booked it in—that avalanche of paper—and... tossed it into a new-out-tray of a pending out-tray. 1975 *Times* 5 Dec. 3/1 An extradition warrant... was in a tray marked 'pending'.

2. a. Hanging, overhanging. *rare.*

1756 AMORY *Buncle* (1770) I. 221 The pending rocks in view inclosed a space of clear acres.

b. Impending, imminent. *rare.*

1806 GIFFORD *Toner* I. 181 A dreadful blow pending over thee. 1833 MRS. BROWNING *Prom. Bound* 51 Innocent of all These pending ills.

B. *prep.* or *quasi-prep.* a. The pres. pple., in Fr. *pendant*, Eng. *pending*, was used in a construction corresp. to the L. ablative absolute; thus L. *pendente lite*, F. *pendant le procès* (= le procès étant pendant), pendent or *pending the suit* (while the suit is pending); see PENDENTE LITE. B. When the pple. stood before the sb., having the same function as a prep., it came gradually to be viewed as such. = During, throughout the continuance of, in the process of. Cf. DURING, NOTWITHSTANDING.

1642 J. M. *Argt. conc. Militia* 18 The King may obtain a Parliament when he pleaseth, but, pending Parliament unadjourned, the King can not retarde their proceedings. 1726 AYLIFFE *Parergon* 583 A person, pending suit with the diocesan, shall be defended in the possession. 1818 CRUISE *Digest* (ed. 2) VI. 104 The daughter... brought a detinue for the recovery of the estate tail; pending which all the proclamations were made. 1855 MOTLEY *Dutch Rep.* I. ii. (1866) 106 Pending the peace negotiations, Philip had been called upon to mourn for his wife and father.

b. While awaiting, until the occurrence of, until.

1838 DICKENS *Nick. Nich.* 102, Pending this inquiry, Kate and her mother were shewn into a dining-room. 1884 T*imes* (weekly ed.) 5 Sept. 13/1 Pending further emigration or clearances. 1864 C. N. ROBINSON *Brit. Fleet* 149 Pending the completion of the new building.

**pendle, -ise, -ize,** obs. var. *pentise,* PENTHOUSE

**pendle**[1] ('pend(ə)l). *Obs.* or *dial.* Also 7 pendill, -all, -el, 9 -il. [From L. *pendere* or F. *pendre* to hang: or sense 1 cf. F. *pendille* 'a thing that hangs danglingly' (Cotgr.), and mod.F. *pendeloque* hanging ornament; cf. also PENDULE]

† 1. A hanging ornament, a pendant. *Obs.*

1605 GERBIER *Counsel* 69 Heads and Pendills four inches Diameter, at four pence a head, in indict Diameter, as pence a head. 1667 PRIMATT *City & C. Build.* 60 Fouts Rails, Bannisters, Pendalls, and Balls for ornament of Stairs ornament. 2 a1670 in W. HUNTER *Biggar & Hous* Flemens xxviii. (1862) 342 The lady geid up the Parliament stairs Wi' pendles in her lug sae bonnie. 1710 RUDDIMAN *Douglas's Æneis* Gloss. s.v. *Pendles,* Pendants... we call them *pendles*

† 2. A screen hanging from the front of an altar; an altarcloth. *Obs.*

1502 *Acc. Ld. High Treas. Scot.* II. 65 For xii elne of... quarterris vellus to be offerus and cruces to the redimand... and pendillis to the altare. 1532 in the redimand and anterpendale of the altar. 1532 *Ibid.* vi. 158 Item, for ane pendill of... quha Pendill twellin, ane pendale to the altar... lit. viij a. iied.

† 3. An overhanging part, natural or artificial. cf. JETTY *sb.* 2. *Obs.*

1581 STYWARD *Mart. Discipl.* ii. 135 Some large river, or some deepe dale, hauing high pendles ouer it, either caus

PE
1625
.O87
1989
v.2

# THE OXFORD ENGLISH DICTIONARY

### SECOND EDITION

*Prepared by*

J. A. SIMPSON *and* E. S. C. WEINER

### VOLUME II

B.B.C.–Chalypsography

CLARENDON PRESS · OXFORD

1989


DEPT. OF JUSTICE

APR 1 1 1990

MAIN LIBRARY

*Oxford University Press, Walton Street, Oxford* OX2 6DP
*Oxford New York Toronto*
*Delhi Bombay Calcutta Madras Karachi*
*Petaling Jaya Singapore Hong Kong Tokyo*
*Nairobi Dar es Salaam Cape Town*
*Melbourne Auckland*
*and associated companies in*
*Berlin Ibadan*

*Oxford is a trade mark of Oxford University Press*

© *Oxford University Press 1989*

*All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
electronic, mechanical, photocopying, recording, or otherwise, without
the prior permission of Oxford University Press*

*British Library Cataloguing in Publication Data*
*Oxford English dictionary.—2nd ed.*
*1. English language—Dictionaries*
*I. Simpson, J. A. (John Andrew), 1953–*
*II. Weiner, Edmund S. C., 1950–*
*423*
*ISBN 0-19-861214-1 (vol. II)*
*ISBN 0-19-861186-2*

*Library of Congress Cataloging-in-Publication Data*
*The Oxford English dictionary.—2nd ed.*
*prepared by J. A. Simpson and E. S. C. Weiner*
*Bibliography: p.*
*ISBN 0-19-861214-1 (vol. II)*
*ISBN 0-19-861186-2 (set)*
*1. English language—Dictionaries. I. Simpson, J. A.*
*II. Weiner, E. S. C. III. Oxford University Press.*
*PE1625.087 1989*
*423—dc19       88–5330*

*Data capture by ICC, Fort Washington, Pa.*
*Text-processing by Oxford University Press*
*Typesetting by Filmtype Services Ltd., Scarborough, N. Yorks.*
*Manufactured in the United States of America by*
*Rand McNally & Company, Taunton, Mass.*



USCA4 Appeal: 24-4665    Doc: 34    Filed: 07/02/2025    Pg: 82 of 91

**+3.** To fit out *with. Obs.*

**1598** BARRET *Theor. Warres* v. ii. 143 A.. horse .. befitted with a saddle, bridle, etc. **1759** STERNE *Tr. Shandy* I. x. He had.. befitted him with just such a bridle and saddle

**befitting** (bi'fitiŋ), *ppl. a.* [f. prec. + -ING⁵.] Fitting, suitable, becoming, due.

**1584** HARINGTON *Tr. Ios. Markham* 8 The lipps [speake] befitting wordes moste kynde. **1875** E. WHITE *Life in Christ* 215 This must be done with a befitting sense of awe.

**be'fittingly,** *adv.* [f. prec. + -LY².] In a befitting manner, suitably, becomingly.

**1638** EARL PEMBROKE in *Verney Papers* 209 A curassier... befitingly horsed. **1821** BYRON *Sardan.* v. i. 347 They are to deem that I reject their terms, And act befittingly.

**be'fittingness.** *Obs.* [f. as prec. + -NESS.] The quality of being fitting; appropriateness.

**1847** W. BROWNE *Pokeander* ii. 9 To discerne what the befittingnesse of her condition permitted.

**be'flake,** *v. Obs. rare.* [f. BE- 6 + FLAKE.] To take off an external layer, to skin in thin flakes.

**1640** BLITHE *Eng. Improv. Impr.* (1652) 92 So to pare off the husk that it [madder] may be .. beflaked or flayed that it may all go one way.

**beflannel, beflap, befleck, befleet:** see BE-.

**beflatter** (bi'flætə(r)), *v.* [f. BE- 2 + FLATTER.] Intensive of FLATTER.

**1340** *Ayenb.* 60 (Roxb.), Huanne hi yzeþ þet he oþer by-þet hy wylþ beulatery [v.r. beuly] habbeþ wel yzed. **1828** SOUTHEY in *Q. Rev.* XXXVIII. 390 Looking to see how far we might be .. beflattered and befooled into a departure, etc.

**be'flay,** *v. Obs.* [OE. *befléan,* f. BE- 1 + *fléan* TO FLAY.] *trans.* To flay, strip.

**1340** *Ayenb.* 38 Kuede lordes .. þet beulayeþ þe poure men. **Ibid.** 218 þet bereþ þe pouere uolk. **1393** GOWER *Conf.* III. 183 Out of his skin he was beflain All quick.

**be'flee,** *v. Obs.* [OE. *befléon,* f. BE- 4 + *fléon* (pa. t. *fléah flugon,* pa. pple. *flogen*) TO FLEE, q.v. for forms.] *trans.* To flee from, flee, avoid, shun.

**c 1000** *Ags. Ps.* lxi. 6 Ne mæg ic hine ahwær befleon. **c 1315** SHOREHAM 36 And þe ferste hys that he by-fle Chypeans of sennes rote.

**beflounce, beflour, beflout, befluster:** see BE-.

**be'flow,** *v. Obs.* [OE. *beflowan* f. BE- 1 + *flówan* to flow, q.v. for forms.] *a.* To flow by, about, or around. *b.* To flow all over, overflow.

**a 1000** *Wife's Lament* 49 Wine weronȝad, wætre beflowen. **c 1250** LAY. 25738 An oþer bulk was þar heh, þe sæ him biflouede [1205 bifloded] swiþe neh. **1387** TREVISA *Higden* (1865) I. 133 After þat he [Nilus] haþ so biflowe and i-watred þe lond .. þe water falleþ into þe chanel aȝe.

**beflower** (bi'flauə(r)), *v.* [f. BE- 6 + FLOWER *sb.*] *trans.* To cover or deck with, or as with, flowers.

**1594** CAREW *Tasso* (1881) 53 She trimmes her selfe and golden bed Beflowres with Roses culd in Paradise. **1628** HOBBES *Thucyd.* (1822) 99 Their bodies .. reddish livid and beflowered with little pimples. **1795** WOLCOTT (P. Pindar) *Pindar. Wks.* 1812 IV. 188 Damask well beflower'd with blue.

**be'fly,** *v. Obs.* [OE. *befléoȝan* f. BE-4 + *fléoȝan* to FLY, q.v. for forms. (Not separated in ME. from BEFLEE, the pa. tenses being identical.)] *trans.* a. To fly about. b. To fly from, shun, escape.

**a 896** K. ÆLFRED *Boeda* III. x. þa spæercan befluȝon þæs huses hrof. **c 1175** *Lamb. Hom.* 169 Wiþ þet þe milte helle pine bi-flien and bi-surien. **1340** *Ayenb.* 77 þe greate filoudes þet þise guodes bevlieþ.

Hence, **be'flying** *vbl. sb.,* shunning, avoiding. **1340** *Ayenb.* 121 Be þe beulynge of kuaede.

**befoam** (bi'fəum), *v.* [f. BE- 6 + FOAM *sb.*] *trans.* To cover with foam.

**a 1618** SYLVESTER *Hundy-Cr.* Wks. 463 Th' angry Steed .. Befoams the path. **1697** DRYDEN *Ovid's Met.* viii. (R.) And part he [the boar] churns and part befoams the ground. **1863** BARNES *Poems Dorset Dial.* 50 The clear brook that did slide .. befoam'd wthe ea snow.

**befog** (bi'fɒg), *v.* [f. BE- 6 + FOG *sb.*] *trans.* To envelope in fog; *fig.* to obscure, confuse.

**1603** HARSNET *Pop. Impost.* 134 What time that popish mist had befogged the eyes of our ancient people. **1890** *Sat. Rev.* 19 July W. Irving *Goldsmith* 249 The wine and wassail .. befogged his senses. **1879** *Cornh. Mag.* Dec. 695 He befogs the whole matter with a cloud of abuse.

**befool** (bi'fuːl), *ppl. a.* **1601** DENT *Patho. Heauen* 254 You are altogether befogd and benighted in this question. **1866** G. MACDONALD *R. Falconer* II. 13 The pale, faintly befogged moon overhead. **1882** *Standard* 6 Oct. 4/1 A benighted or befogged wayfarer.

**be'fold,** *v. Obs.* [OE. *befaldan,* -*fealdan,* f. BE-1 + *f(e)aldan* (pa. t. *feold,* pa. pple. *f(e)alden*) to FOLD.] *trans.* To fold up, wrap up, envelope.

**c 1000** *Rubric Gen.* xxxix. 6 And befeold his handa mid hyra cyccena fellum. **1340** *Ayenb.* 8 Euich werke þing þyse þreyside and byuealde þe cyche, and by-ueaȝe zone ine. **c 1400** LE *Freine* 172 Þerin she leyed the childe, for cold, In the pel as it was bifold.

**+be'fong,** *v. Obs.* Forms: 1–3 befón, 3 fofon, -von; 1–3 be-, bifeng. *Pa. pple.* 1-3 be-, bifongen, 3 biuonge. Cf. *bi- bifæng, befang-, bifangen,* f. *bi-* about + *+famhan, fón* to seize, grasp. Corresp. to mod.G. *befangen,* OHG. *pifâhan,* MHG. *bevahn* to comprehend.]

**1.** *trans.* To lay hold on, seize, grasp, catch.

**c 1000** *Cædmon's Gen.* 374 (Gr.) Habhap me helle clommas fæste befangen. **c 1160** *Hatton Gosp.* Matt. xxi. 15 Hyo wolden þanne Helend on his space befon. **1230** LAY. 830 þer Brutus bi-feng‡ al þat him biuore wes.

**2.** *intr.* To take hold on, begin or commence upon. (Cf. Ger. *anfangen.*)

**c 1200** *Trin. Coll. Hom.* 143 þo þe hadden here sinnes forleten and her, oþer þar-on biuonge.

**3.** *trans.* To encompass, enclose, comprehend.

**971** *Blickl. Hom.* 1 God Fæder Sunu, þone ne magon befón heofon and eorþe. **1205** LAY. 24748 Mid æne hende of golde‡ wel hefde his hefd biuonge. **a 1225** *Ant. R.* 76 þe Louerd, þæt al þe world ne muhte nout biuon.

**befool** (bi'fuːl), *v.* [f. BE- 2 + FOOL *sb.*]

**1.** *trans.* To make a fool of; to dupe, delude.

**1393** GOWER *Conf.* III. 236 Many wise Befoled have ben er this. **1622** HEYLIN *Cosmogr.* III. (1682) 220 Befooling him with as glorious Titles. **1673** H. STUBBE *Furth. Vind. Dutch War* App. 81 The old Rumpers were befould by Cromwel. **1765** WESLEY *Wks.* (1872) XII. 333 St temperate in speaking; else Satan will befool you. **1832** CARLYLE *Sart. Res.* II. iii. 260 One age he is fragridden, bewitched; the next, priestridden, befooled.

**2.** To treat as a fool, call 'fool.'

**1613** W. SCLATER *Sick Souls Salve* 33 That oath censuring and befooling others. **a 1617** HIERON *Wks.* II. 166 Who is hee, whom Salomon doth so often be-foole in his Prouerbs? **1682** BUNYAN *Pilgr.* II. 180 They .. befooled themselves for setting a Foot out of Doors in that Path. **1864** TENNYSON *Aylmer's F.* 330 Being much befoo'd and idioted By the rough amity of the other.

**3.** To squander foolishly, 'fool away.' *rare.*

**1661** SHELLES *Engineer* I. 288 In this way Sir Thomas seems to have befooled his estate; and it shortly after became the property of the Alager family.

Hence, **be'fooled, be'fooling** *ppl. a.;* **be'foolment** *sb.*

**1677** GILPIN *Dæmonol.* (1867) 197 Either of these ways Satan makes use of for the befooling of men. **1681** BAXTER *Search Schism.* iii. 44 A transitory befooling dream. **1842** MIALL *Noncomf.* II. 8 Are wel a befooled people. **1881** *Pall Mall G.* 14 May 11/2 For the general befoolment of those easy souls.

**be'force,** *v. Obs. rare.* [f. BE- 2 + FORCE v.]

**1.** *trans.* To force, ravish.

**c 1375** *Barbour St. Theodora* 156 þe monk Theodorus.. me befocit þe his aynt.

**2.** To impose by force, to enforce.

**1532** *Dice Play* (1850) 33 If there be broad laws beforced aforehand.

**before** (bi'foə(r)), *adv., prep.,* and *conj.* Forms: 1 bi-, beforan, 2–4 bi-, beforen, 4– before. (Also 3 biuore(n, biforen, byuore, biforr; 4–5 bi-, byforne, bifor(e, 4–6 byfore, 4–7 beforn(e, 5 befoore, 5–6 biforn, 8 *arch.* beforne.) [OE. *beforan* (cogn. w. OS. *biforan,* OHG. *bifora,* MHG. *bevor,* also *bevorne, bevorn*), f. *bi-,* BE- by, about + *foran adv.—*O'f‡eut. *+forana* from the front, advb. derivative of *fora,* FOR. Cf. also FORE, AFORE, ATFORE, TOFORE. Primarily an adverb; its relation to a sb. was expressed by putting the latter in the dative, 'in front *as* to a thing,' whence it passed into a preposition (cf. B 2, quot. 977). Illustrative of a relative particle has given it also the force of an adverbial conjunction *e.g.* in 'think before (that) you speak.']

**A.** *adv.* I. Of sequence in space.

**1.** Of motion: Ahead, in advance, in front.

**a 1000** *Beowulf* 2819 He fæara men beforan gengde wiara monna. **c 1175** *Lamb. Hom.* 41 Michal rode biforen and Poul com after. **c 1330** *Will. Palerne* 3193 And biforr went william and afterward þe pater. **1375** BARBOUR *Bruce* x. 245 That that war went furth before .. war before him. **1667** MILTON *P. L.* I. 589 Amidge 322 Euer beraunce by-forn þe pat other atur. **1590** SHAKS. *Mids. N.* v. i. 397, I am sent with broome before, To sweep the dust behinde the door. **1810** HOLLAND *Camden's Brit.* I. 3 Nor Twaine, the horned Bull of Crete, untimely go before. **1740** JOHNSON *Dr. Drake* Wks. IV. 403 Advertised by two Symerons, whom he sent before. **1859** TENNYSON *Enid* 803 Not at my side. I charge thee ride before, Ever a good way on before.

**2.** Of sequence in direction: In front, on or in the anterior or fore side.

**a 1300** *Cursor M.* 16957 þai haileit him be-for, bihind. **1413** LYDG. *Pilgr. Sowle* iv. xxxviii. 64 Full of eyen byfore and behynd. **1420** E. E. *Wills* (1882) 15 A habirgeon of Mylen, opyn be-fore. **1340** *Ayenb.* iv. 107 Þat bereþ sene his signe bifore and byhynde. **1596** SHAKS. *Merch. V.* iii. ii. 308 Bare a starre on his brest and on his mantell before. **1605** —— *Macb.* v. viii. 46 Had he his hurts before? **1850** PAGITT *Christianogr.* i. ii. (1636) 77 His upper garment.. buttoned before. **1722** *Lond. Gaz.* No. 6088/3 Has lost a Tooth before. **1855** OWEN *Teeth* 302 Counting the molars from before backwards.

*fig.* **1821** SHELLEY *Skylark,* We look before and after, And pine for what is not.

**+3.** Before the face of men; openly. *Obs.*

**c 1000** *Andreas* 1213 (Bow.), Wundor on corran he beforan cypde. **c 1175** *Lamb. Hom.* 41 þe pet speked‡ faire biforen and false behinden.

**+4.** In a position of pre-eminence or superiority *to. Obs.*

**1377** LANGL. *P. Pl.* B. xv. 23 For is no vertue by fer‡ to spiritus temperancie [C. text reads by-fore to, to-fore, by yer, by fer, be ver, so fair at]. **1382** WYCLIF *Gen.* i. 26 Before he [man] to the fishis of the sea.

**II.** Of sequence in time or order.

**5. a.** In time previous or anterior to a time in question, previous to that or to this, earlier, sooner; hence *beforehand,* formerly, heretofore, in the past. Often with adverbs or advb. phrases of time, as *long before, three years before, the week before,* etc.

**a 1225** *Ancr. R.* 240 Vor þi, mine leoue sustren, beoð biuoren iwarre. **1258** *Procl. Hen. III,* Alse hit is biforen iseid. **1297** R. GLOUC. 443 Biderd .. les þet he Abouȝte ȝer yet byroure. **c 1300** *Cursor M.* 8523 Dauid .. spac .. O crists birth biforn. **1340** *Ayenb.* 260 Aue ich habbe beuore yzed. **1375** BARBOUR (CAXTON) *Dictes* a Whyche boke I had neuer seen before. **1512** *Act 4 Hen. VIII,* §1, Everything .. byfore rehersed. **1513** BRADSHAW *St. Werburge* (1848) 58 As our mother sayd to the before. **1560** A. SCOTT *Cosmeide Wanton* W, Ye trest to find thame rew That nevir was beforrow. **1579** SPENSER *Sheph. Cal.* May 104 For ought may happen that hath bene before. **1600** SHAKS. *Som.* xl, What hast þou then more thou hadest before? **1710** —— *Temp.* iii. ii. 2 When þe But is out we will drinke water .. not a drop before. **1766** GOLDSM. *Vic. W.* ix. (1861) 44 The conversation at this time was more reserved than before. **1798** COLERIDGE *Anc. Mar.* v. III. 47 The Mariners all return'd to work As before as before. **1848** MACAULAY *Hist.* I. 153 Charles the First, eighteen years before, withdrew from his capital.

**+b.** In Scotch, *of before* = *of aforetime,* formerly.

**1595** DUNBAR *Gold. Targe* xxiv, Scho semyt lustiar of chere .. Than of before. **1513–75** *Diurn. Occur.* (1833) 109 Sho past a byill of befoir to winn that end.

**c.** Used in contrast with *after* in various locutions to designate a set of two contrasting pictures, cartoons, etc., esp. illustrating the efficacy of a remedy, product, etc., alleged to produce a remarkable change for the better. Hence *allusively.*

**1768** W. HOGARTH in *Trusler's Hogarth Moralised* (Index), A List of Prints published by Mr. Hogarth... Before and After. **1840** *Punch* XI. 243/1 (caption) Before. After. *Ibid.,* Here are two portraits, both of myself: the one before, the other after the cold Brandy-and-Water Cure. **1851** *Ibid.* XXV. 45 (title of cartoon representing a difference of opinion between calmen and fiery) Before and after. **1889** RUDY *Judy* 307/1 I'm working a 'before and after' racket for a hair-renewer advertisement. **1902** *Little Folks* II. 432/1 Those restaurants which advertise by means of looking-glasses labelled 'before' and 'after'. As you go in you beheld yourself very thin .. as you got out well-satisfied. **1938** N. MARSH *Artists in Crime* iii. 24 You're not doing a 'before and after', like a strip advertisement.

**B.** *prep.* I. Of sequence in space.

**1. a.** Of motion: In advance of, ahead of.

**c 1000** *Ælfric Ex.* xii. 21 And Drihten for beforan him and sweotolode him þone weg. **c 1175** *Lamb. Hom.* 5 Al þe heibreisce folc þe yode ofter him and biuoren him. **1382** WYCLIF *Ex.* xiii. 21 Forsothe the Lord yede biforn hem to schewe the weie. **1430** *Test. Ebor.* II. (1855) 75 Pore men berned .. torches before my cors. **1526** *Pilgr. Perf.* (W. de W. 1531/4 Thery gyde .. to go before them, and conducte or leade them. **1611** BIBLE *Josh.* viii. 10 And Ioshua .. went vp, he, and the Elders of Israel, before the people to Ai. **1843** MACAULAY *Armada* 20 Behind him march the halbardiers; before him sound the drums.

**b.** Driven in front of, hurried on by; e.g. in the phrase *before the wind:* said of a ship sailing directly with the wind; also *fig.*

**1598** W. PHILLIP *Linschoten's Trav. in Arb. Garner* III. 23 We got before the wind to the Cape of Good Hope. **1697** DRYDEN *Virg. Georg.* III. 822 Tisiphone .. Before her drives Diseases and Affright. **1700** THOMSON *Winter* 171 Before the breath Of full-exerted Heaven they swing their course. **1769** FALCONER *Dict. Marine* (1789) *Arriver,* to bear away before the wind. **1853** KINGSLEY *Hypatia* xvii. He had been only the leaf before the wind. **1860** DICKENS *Mut. Fr.* I. Kept the boat in that direction going before him. *Mod.* A man who carries everything before him.

**c.** *Hence, with distinct causal force.*

**1535** COVERDALE *1 Sam.* xiii. 33 Smytmen before their enemies. **1590** SHAKS. *Mids. N.* III. ii. 423 Thou runst before me. **1593** —— *2 Hen. VI,* IV. ix. 37 Our enemies shall fall before this. **1599** —— *Hen. V,* III. Cho. 34 Downe goes all before them. **1850** MRS. BROWNING *Poems* I. 4 Recoil before that sorrow, if not this sword.

**2. a.** Of position or direction: In front of.

**971** *Blickl. Hom.* 15 [He] gebyrde mycele menie beforan his ansyne to the toronne. **1290** *Metr. Hom.* 133 Þar suld gang ah men be-fore. **1340** *Cursor M.* 11095 (Trin.) Biforn her kyng childes cast braunches broken of bowes. **c 1386** CHAUCER *Knt. T.* 776 He caryed al this harneys him byfore. **1490** *Merlin* xi. 237 He dide after many more chivalries before the casts. **1593** HOOKER *Eccl. Pol.* II. iv. §5 Wks. 1841 I. 242 When many meats are set before me. **1852** MERIVALE *Rom. Emp. (1865) Av. 34 We decree that many statues be Vestibula or Seas lying before his lands. **1766** GOLDSM. *Vic. W.* viii. (1806) 42 On the grass-plot before our door. **1871** BLACK *Dau. Heth* xviii, Ferring over the edge of the rock before him.

*fig.* **1848** MACAULAY *Hist. Eng.* I. 84 Great statesmen who looked far behind them and far before them.

**b.** In front of, at the beginning of (a writing).

**1535** JOYE *Apol. Tindale* 19 Tindale incharitable pistle set before hys newe Testament.

64

**c.** *before the face or eyes:* = 3.

**d.** *before the mast:* a phrase said of the common sailors, who are berthed in the forecastle in front of the fore-mast.

**3.** In front of so as to be in the sight of; under the actual notice or cognizance of; in presence of.

**II.** Of time.

**10.** In precedence of; superior to; in advance of in development.

**11.** In preference to; rather than.

**12.** In comparison with, in respect to.

**C.** *Conj. or conjunction adv.*

**1.** Of time: Previous to the time when.

**b.** *conj. with that:* now arch.

**b.** *without that.*

**†c.** Formerly also *with ere (than), or. Obs.*

**2.** Of preference: Sooner than, rather than.

**D.** Used as *adj.* and *sb.*

**1.** quasi-*adj.* = Anterior; previous.

**2.** quasi-*sb.*

**E.** *Comb.*

**1.** In combination with participles where the hyphen has merely a syntactical value, showing that *before* is an adverbial qualification of the following ppls., with sense of 'previously', formerly'; as *before-created*, -*going*, -*mentioned*, -*named*, -*noticed*, -*recited*, -*told*, -*written*, BEFORE-SAID.

**2.** In anticipation of something so as to be ready for it; in advance.

**b.** The prep. *in comb.* with a sb., used *attrib.*

**c.** The prep. *in comb.* with a sb., as *before-life.*

**†2.** In many obsolete compound verbs and vbl. sbs. etc., esp. in Wyclif, representing L. *præ-* and *ante-*, some of which have mod. representatives with FORE-: as before-bar, to preclude; foreclose; before-casting, forecasting, pre-calculation; before-come, to prevent; before-cut; before-gird; before-gore, a predecessor; before-graithe, to prepare, make ready beforehand; before-had, held previously; before-know; before-passing, excelling; before-ripe, premature; before-runner, before-say, to predict, foretell; before-sayer, -speaker, a prophet; before-see, to promote, set over; before-show; before-sing; before-stretch, to extend forth; before-take, to anticipate; before-taste; before-tell; before-walling, *antemurale*, outer defence; before-warn; before-weave, to fringe, hem in, *prætexere*; before-witting, foreknowledge.

**beforehand** (bifōhænd), *adv.* (and *a.*) Also 3-4 biforen honde, 4-6 before hande, 4 be-, by-, be-forhand, biforand. [Originally two words, *before hand*, also *before the hand*, perhaps from the idea of one working *before the hand* of another, and so in anticipation of his action. Cf. L. *præ manu*, *manibus*, 'at hand, in readiness, in hand,' used in ME. as = 'beforehand.']

**A.** *adv.* **1.** In anticipation of something so as to be ready for it; in advance.

**beforehand** of(bifōhænd), *adv.* (and *a.*) Also 3-4 biforen honde, 4-6 before hande, 4 be-, by-, be-forhand, biforand.

# BLACK'S LAW DICTIONARY

CONTAINING

## DEFINITIONS OF THE TERMS AND PHRASES OF AMERICAN AND ENGLISH JURISPRUDENCE, ANCIENT AND MODERN

AND INCLUDING

THE PRINCIPAL TERMS OF INTERNATIONAL, CONSTITUTIONAL, ECCLESIASTICAL AND COMMERCIAL LAW, AND MEDICAL JURISPRUDENCE, WITH A COLLECTION OF LEGAL MAXIMS, NUMEROUS SELECT TITLES FROM THE ROMAN, MODERN CIVIL, SCOTCH, FRENCH, SPANISH, AND MEXICAN LAW, AND OTHER FOREIGN SYSTEMS, AND A TABLE OF ABBREVIATIONS

BY

### HENRY CAMPBELL BLACK, M.A.

AUTHOR OF TREATISES ON JUDGMENTS, TAX TITLES, INTOXICATING LIQUORS, BANKRUPTCY, MORTGAGES, CONSTITUTIONAL LAW, INTERPRETATION OF LAWS, RESCISSION AND CANCELLATION OF CONTRACTS, ETC.

## THIRD EDITION

BY

THE PUBLISHER'S EDITORIAL STAFF

ST. PAUL, MINN.
WEST PUBLISHING CO.
1933

COPYRIGHT, 1891
BY
WEST PUBLISHING COMPANY

COPYRIGHT, 1910
BY
WEST PUBLISHING COMPANY

COPYRIGHT, 1933
BY
WEST PUBLISHING CO.

(BL.LAW DICT.,3D ED.)

or otherwise is sent down again to the same court, *to be proceeded in* there, where it appears to the superior court that it was removed on insufficient grounds. Cowell; 1 Tidd. Pr. 408, 410; Yates v. People, 6 Johns. (N. Y.) 446; 2 W. Bla. 1060; 6 Term 365.

A writ (*procedendo ad judicium*) which issued out of the common-law jurisdiction of the court of chancery, when judges of any subordinate court delayed the parties for that they would not give judgment either on the one side or on the other, when they ought so to do. In such a case, a writ of *procedendo ad judicium* was awarded, commanding the inferior court in the sovereign's name to proceed to give judgment, but without specifying any particular judgment. Wharton. It was the earliest remedy for the refusal or neglect of justice on the part of the courts. In re Press Printers & Publishers (C. C. A.) 12 F.(2d) 660, 664.

A writ by which the commission of a justice of the peace is revived, after having been suspended. 1 Bl. Comm. 353.

**PROCEDENDO ON AID PRAYER.** If one pray in aid of the crown in real action, and aid be granted, it shall be awarded that he sue to the sovereign in chancery, and the justices in the common pleas shall stay until this writ of *procedendo de loquela* come to them. So, also, on a personal action. New Nat. Brev. 154.

**PROCEDURE.** The mode of proceeding by which a legal right is enforced, as distinguished from the law which gives or defines the right, and which, by means of the proceeding, the court is to administer; the machinery, as distinguished from its product. Per Lush, L. J., in 7 Q. B. Div. 333. That which regulates the formal steps in an action or other judicial proceeding; a form, manner, and order of conducting suits or prosecutions. Mahoning Valley Ry. Co. v. Santoro, 93 Ohio St. 53, 112 N. E. 190, 191; Commonwealth v. Hamilton, 74 Pa. Super. Ct. 419, 423.

This term is commonly opposed to the sum of legal principles constituting the substance of the law, and denotes the body of rules, whether of practice or of pleading, whereby rights are effectuated through the successful application of the proper remedies. It is also generally distinguished from the law of evidence. Brown; Sackheim v. Piqueron, 215 N. Y. 62, 109 N. E. 109, 111. See, also, Kring v. Missouri, 107 U. S. 221, 2 S. Ct. 443, 27 L. Ed. 506; Cochran v. Ward, 5 Ind. App. 89, 29 N. E. 795, 31 N. E. 581, 51 Am. St. Rep. 229.

Procedure is the machinery for carrying on the suit, including pleading, process, evidence, and practice, whether in the trial court or the appellate court, or in the processes by which causes are carried to appellate courts for review, or in laying the foundation for such review. Jones v. Erie R. Co., 106 Ohio St. 408, 140 N. E. 366, 367.

It not only embraces practice in courts, but regulation of the conduct of the court itself wherein such practice takes place. State v. Greenwald, 186 Ind. 321, 116 N. E. 296, 297.

The law of procedure is what is now commonly termed by jurists "adjective law." (*q. v.*).

**PROCEDURE ACTS.** Three acts of parliament passed in 1852, 1854, and 1860, for the amendment of procedure at common law. Moz. & W. They have been largely superseded by the Judicature Acts of 1873 and 1875. See Judicature Acts.

**PROCEED.** To carry on some series of actions and to set oneself to work and go on in a certain way and for some particular purpose. Hodson v. O'Keeffe, 71 Mont. 322, 229 P. 722, 724.

To sue. Brabon v. Gladwin Light & Power Co., 201 Mich. 697, 167 N. W. 1024, 1028; Planters' Bank v. Houser, 57 Ga. 140; Iliff v. Weymouth, 40 Ohio St. 101.

**PROCEEDING.** In a general sense, the form and manner of conducting juridical business before a court or judicial officer; regular and orderly progress in form of law; including all possible steps in an action from its commencement to the execution of judgment. Erwin v. U. S. (D. C.) 37 F. 488, 2 L. R. A. 229; Morewood v. Hollister, 6 N. Y. 309; Uhe v. Railway Co., 3 S. D. 563, 54 N. W. 601; Greenleaf v. Minneapolis, St. P. & S. S. M. Ry. Co., 30 N. D. 112, 151 N. W. 879, 881, Ann. Cas. 1917D, 908; Hyattsville Building Ass'n v. Bouic, 44 App. D. C. 408, 413; State v. People's Savings Bank & Trust Co., 23 N. M. 282, 168 P. 526, 527. Friel v. Alewel, 318 Mo. 1, 298 S. W. 762, 764; Gila Land & Cattle Co. v. Eads, 23 Ariz. 282, 203 P. 549, 550; Burger v. State Female Normal School, 114 Va. 491, 77 S. E. 489, 490. Sometimes, merely the record history of a case. See Uhe v. Railway Co., 3 S. D. 563, 54 N. W. 601.

An act which is done by the authority or direction of the court, express or implied; an act necessary to be done in order to obtain a given end; a prescribed mode of action for carrying into effect a legal right. Green v. Board of Com'rs of Lincoln County, 126 Okl. 300, 259 P. 635, 637; City of St. Louis v. Cooper Carriage Woodwork Co. (Mo. Sup.) 216 S. W. 944, 947; Marblehead Land Co. v. Superior Court in and for Los Angeles County, 60 Cal. App. 644, 213 P. 718, 723.

Any step taken or measure adopted in the prosecution or defense of an action; Claussen v. Chapin, 69 Mont. 205, 221 P. 1073, 1075; New York, N. H. & H. R. Co. v. Superior Court for Kent County, 39 R. I. 560, 99 A. 582, 583; except an order of continuance; Millar v. Whittington, 87 W. Va. 46, 106 S. E. 907, 908.

The word may be used synonymously with "action" or "suit" to describe the entire course of an action at law or suit in equity from the issuance of the writ or filing of the bill until the entry of a final judgment, or may be used to describe any act done by authority of a court of law and every step required to be taken in any cause by either party.

Gonzales v. Gonzales, 240 Mass. 159, 133 N. E. 853, 856.

The proceedings of a suit embrace *all* matters that occur in its progress judicially. Morewood v. Hollister, 6 N. Y. 320. For illustrative cases, see Venator v. Edwards, 126 Okl. 296, 259 P. 596, 599; Dixie Guano Co. v. Alpha Process Co., 5 Boyce (Del.) 277, 92 A. 1013, 1014; State v. Kerr, 117 Me. 254, 103 A. 585, 587.

In a more particular sense, any application to a court of justice, however made, for aid in the enforcement of rights, for relief, for redress of injuries, for damages, or for any remedial object. See Coca-Cola Co. v. City of Atlanta, 152 Ga. 558, 110 S. E. 730, 732, 23 A. L. R. 1339; Ruch v. State, 111 Ohio St. 580, 146 N. E. 67, 71; People v. Raymond, 186 Ill. 407, 57 N. E. 1066; State v. Gordon, 8 Wash. 488, 36 P. 498.

The term is properly applicable, in a legal sense, only to judicial acts before some judicial tribunal. Nelson v. Dunn, 56 Ind. App. 645, 104 N. E. 45. See, also, Leit v. Sears, 226 Mass. 119, 115 N. E. 247, 248; State v. Chandler, 105 Ohio St. 499, 138 N. E. 67, 69. Nevertheless, the word may be so used, as in Revenue Act 1921, § 250 (d), 42 Stat. 265, providing that no proceeding for the collection of taxes shall be begun after a specified time that it applies to an executive action by warrant for distraint, or otherwise, and is not limited to an action or suit in court. Seaman v. Bowers (C. C. A.) 297 F. 371, 373.

### Collateral Proceeding

One in which the particular question may arise or be involved incidentally, but which is not instituted for the very purpose of deciding such question; as in the rule that a judgment cannot be attacked, or a corporation's right to exist be questioned, in any collateral proceeding. Peyton v. Peyton, 28 Wash. 278, 68 P. 757; Peoria & P. U. R. Co. v. Peoria & F. R. Co., 105 Ill. 116.

### Executory Proceeding

In the law of Louisiana, a proceeding which is resorted to in the following cases: When the creditor's right arises from an act importing a confession of judgment, and which contains a privilege or mortgage in his favor; or when the creditor demands the execution of a judgment which has been rendered by a tribunal different from that within whose jurisdiction the execution is sought. Code Prac. La. art. 732.

### Legal Proceedings

This term includes all proceedings authorized or sanctioned by law, and brought or instituted in a court of justice or legal tribunal, for the acquiring of a right or the enforcement of a remedy. Griem v. Fidelity & Casualty Co., 99 Wis. 530, 75 N. W. 67; In re Emslie (D. C.) 98 F. 720; Id., 102 F. 293, 42 C. C. A. 350; Mack v. Campau, 69 Vt. 558, 38 A. 149, 69 Am. St. Rep. 948.

### Ordinary Proceedings

Those founded on the regular and usual mode of carrying on a suit by due course at common law.

### Proceedings in Bankruptcy

As used in Bankr. Act July 1, 1898, c. 541, §§ 23–25, 30 Stat. 552, 553 (11 USCA §§ 46–48), this term covers questions between the alleged bankrupt or the receiver or trustee on the one hand and the general creditors as such on the other, commencing with the petition for adjudication and ending with the discharge, including matters of administration generally, and is distinguished from "controversies, at law and in equity arising in the course of bankruptcy proceedings," which involve questions between the receiver or trustee, representing the bankrupt and his general creditors as such, on the one hand, and adverse claimants, on the other, concerning property in the possession of the receiver or trustee or of the claimants, to be litigated in appropriate plenary suits, and not affecting directly administrative orders and judgments, but only the extent of the estate to be distributed ultimately among general creditors. In re Breyer Printing Co. (C. C. A.) 216 F. 878, 880; In re Prudential Lithograph Co. (C. C. A.) 270 F. 469, 471. The phrase "controversy arising in bankruptcy proceedings" includes those matters arising in the course of a bankruptcy proceeding which are not mere steps in the ordinary administration of the bankrupt estate, but present distinct and separable issues between the trustee and adverse claimants concerning the right and title to the bankrupt's estate. Taylor v. Voss, 271 U. S. 176, 46 S. Ct. 461, 463, 70 L. Ed. 889; Harrison v. Chamberlin, 271 U. S. 191, 46 S. Ct. 467, 468, 70 L. Ed. 897; Gibbons v. Goldsmith, 222 F. 826, 828, 138 C. C. A. 252.

### Proceeding in Error

One by way of writ of error. State v. Scott, 34 Wyo. 163, 242 P. 322, 324.

### Special Proceeding

This phrase has been used in the New York and other codes of procedure as a generic term for all civil remedies which are not ordinary actions. Under Code Proc. N. Y. § 3 (Civil Practice Act, § 5), an action is an ordinary proceeding in a court of justice, by which one party prosecutes another party for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offence. Every other remedy is a special proceeding. See, also, State v. Rosenwald Bros. Co., 23 N. M. 578, 170 P. 42, 44; Code Civ. Proc. Cal. §§ 22, 23; St. Wis. 1917, § 2594 (St. 1931, § 260.02); State v. Steeley, 21 Ohio App. 396, 153 N. E. 285.

### Summary Proceeding

Any proceeding by which a controversy is settled, case disposed of, or trial conducted, in a prompt and simple manner, without the aid of a jury, without presentment or indictment, or in other respects out of the regular course of the common law. In procedure, proceedings are said to be summary when

## PROCEEDING

they are short and simple in comparison with regular proceedings; *i. e.*, in comparison with the proceedings which alone would have been applicable, either in the same or analogous cases, if summary proceedings had not been available. Sweet. And see Phillips v. Phillips, 8 N. J. Law, 122; Govan v. Jackson, 32 Ark. 557; Western & A. R. Co. v. Atlanta, 113 Ga. 537, 38 S. E. 996, 54 L. R. A. 802.

### Supplementary Proceeding

A separate proceeding in an original action, in which the court where the action is pending is called upon to exercise its jurisdiction in aid of the judgment in the action. Bryant v. Bank of California (Cal.) 7 Pac. 130. In a more particular sense, a proceeding in aid of execution, authorized by statute in some states in cases where no leviable property of the judgment debtor is found. It is a statutory equivalent in actions at law of the creditor's bill in equity, and in states where law and equity are blended, is provided as a substitute therefor. In this proceeding the judgment debtor is summoned to appear before the court (or a referee or examiner) and submit to an oral examination touching all his property and effects, and if property subject to execution and in his possession or control is thus discovered, he is ordered to deliver it up, or a receiver may be appointed. See In re Burrows, 33 Kan. 675, 7 P. 148; Eikerberry v. Edwards, 67 Iowa, 619, 25 N. W. 832, 56 Am. Rep. 360.

**PROCEEDS.** Issues; income; yield; receipts; produce; money or articles or other thing of value arising or obtained by the sale of property; the sum, amount, or value of property sold or converted into money or into other property. Wharton; Hunt v. Williams, 126 Ind. 493, 26 N. E. 177; Andrews v. Johns, 59 Ohio St. 65, 51 N. E. 880; Belmont v. Ponvert, 35 N. Y. Super. Ct. 212; Fisk v. Carpenter, 195 Ky. 155, 242 S. W. 30, 31; In re Von der Lindte's Estate, 249 Pa. 220, 94 A. 828, 829; Gibbs v. Barkley (Tex. Com. App.) 242 S. W. 462, 465; Blackford v. Boak, 73 Or. 61, 143 P. 1136, 1137. Thus, goods purchased with money arising from the sale of other goods, or obtained on their credit, are proceeds of such goods. 2 Pars. Marit. L. 201; Bened. Adm. 290. Proceeds does not necessarily mean cash or money. Phelps v. Gordon-Watts Grain Co., 216 Mo. App. 607, 260 S. W. 513, 514. And see Shields v. Rancho Buena Ventura, 38 Cal. App. 696, 177 P. 499, 501; Carpenter v. Dummit, 221 Ky. 67, 297 S. W. 695, 700; Kingsbury v. Riverton Wyoming Refining Co., 68 Colo. 581, 192 P. 503, 504.

The word when applied to the income to be derived from real estate embraces the idea of issues, rents, profits, or produce. Gorin Sav. Bank v. Early (Mo. App.) 260 S. W. 480, 483. It is synonymous with avails, use, and profits. In re Coughlin's Estate, 53 N. D. 188, 205 N. W. 14, 16.

**PROCERES.** Nobles; lords. The house of lords in England is called, in Latin, "*Domus Procerum.*"

Formerly, the chief magistrates in cities. St. Armand, Hist. Eq. 88.

**PROCÈS-VERBAL.** In French law. A true relation in writing in due form of law, of what has been done and said verbally in the presence of a public officer, and what he himself does upon the occasion. It is a species of inquisition of office, and must be signed by the officer. Dalloz, Dict.; Hall v. Hall, 11 Tex. 526, 539.

A written report, which is signed, setting forth a statement of facts. This term is applied to the report proving the meeting and the resolutions passed at a meeting of shareholders, or to the report of a commission to take testimony. It can also be applied to the statement drawn up by a *huissier* in relation to any facts which one of the parties to a suit can be interested in proving; for instance, the sale of a counterfeited object. Statements, drawn up by other competent authorities, of misdemeanors or other criminal acts, are also called by this name. Arg. Fr. Merc. Law, 570.

**PROCESS.** A series of actions, motions, or occurrences; progressive act or transaction; continuous operation; normal or actual course of procedure; regular proceeding, as, the process of vegetation or decomposition; a chemical process; processes of nature. Sokol v. Stein Fur Dyeing Co., 216 N. Y. S. 167, 169, 216 App. Div. 573.

### In Practice

This word is generally defined to be the means of compelling the defendant in an action to appear in court; Gondas v. Gondas, 99 N. J. Eq. 473, 134 A. 615, 618; or a means whereby a court compels a compliance with its demands; Frank Adam Electric Co. v. Witman, 16 Ga. App. 574, 85 S. E. 819, 820. And when actions were commenced by original writ, instead of, as at present, by writ of summons, the method of compelling the defendant to appear was by what was termed "original process," being founded on the original writ, and so called also to distinguish it from "mesne" or "intermediate" process, which was some writ or process which issued during the progress of the suit. The word "process," however, as now commonly understood, signifies those formal instruments called "writs." The word "process" is in common-law practice frequently applied to the writ of summons, which is the instrument now in use for commencing personal actions. (Love v. National Liberty Ins. Co., 157 Ga. 259, 121 S. E. 648, 649; Farmers Implement Co. of Hallock, Minn., v. Sandberg, 132 Minn. 389, 157 N. W. 642.) But in its more comprehensive signification it includes not only the writ of summons, but all other writs which may be issued during the

# BLACK'S
# LAW DICTIONARY®

Definitions of the Terms and Phrases of
American and English Jurisprudence,
Ancient and Modern

By

HENRY CAMPBELL BLACK, M. A.

## SIXTH EDITION

### BY

### THE PUBLISHER'S EDITORIAL STAFF

Coauthors

**JOSEPH R. NOLAN**

Associate Justice, Massachusetts Supreme Judicial Court

and

**JACQUELINE M. NOLAN–HALEY**

Associate Clinical Professor,
Fordham University School of Law

Contributing Authors

**M. J. CONNOLLY**
Associate Professor (Linguistics),
College of Arts & Sciences, Boston College

**STEPHEN C. HICKS**
Professor of Law, Suffolk University
Law School, Boston, MA

**MARTINA N. ALIBRANDI**
Certified Public Accountant, Bolton, MA

ST. PAUL, MINN.
WEST PUBLISHING CO.
1990

Dic

m
s
c

"BLACK'S LAW DICTIONARY" is a registered trademark of West
Publishing Co. Registered in U.S. Patent and Trademark Office.

COPYRIGHT © 1891, 1910, 1933, 1951, 1957, 1968, 1979 WEST PUBLISHING CO.
COPYRIGHT © 1990 By WEST PUBLISHING CO.
            50 West Kellogg Boulevard
            P.O. Box 64526
            St. Paul, Mn 55164—0526

All rights reserved
Printed in the United States of America

Library of Congress Cataloging-in-Publication Data

Black, Henry Campbell, 1850–1927.
    [Law dictionary]
    Black's law dictionary / by Henry Campbell Black. — 6th ed. / by
the publisher's editorial staff ; contributing authors, Joseph R.
Nolan ... [et al.]
        p.    cm.
    ISBN 0-314-76271-X
    1. Law—United States—Dictionaries.  2. Law—Dictionaries.
I. Nolan, Joseph R.  II. Title.
KF156.B53  1990
340'.03—dc20                                    90—36225
                                                 CIP


ISBN 0-314-76271-X

ISBN 0-314-77165-4 deluxe


Black's Law Dictionary 6th Ed.
3rd Reprint—1991

# PROCEDURE

means of the proceeding, the court is to administer; the machinery, as distinguished from its product. That which regulates the formal steps in an action or other judicial proceeding; a form, manner, and order of conducting suits or prosecutions; *e.g.* Rules of Civil or Criminal Procedure. The judicial process for enforcing rights and duties recognized by substantive law and for justly administering redress for infraction of them. Sims v. United Pacific Ins. Co., D.C.Idaho, 51 F.Supp. 433, 435.

Procedure is machinery for carrying on lawsuit including pleading, process, evidence and practice, whether in trial court or appellate court. Brooks v. Texas Emp. Ins. Ass'n, Tex.Civ.App., 358 S.W.2d 412, 414.

The law of procedure is what is commonly termed by jurists "adjective law" *(q.v.)*.

*See also* Civil procedure; Criminal procedure; Procedural law; Rules of court. *Compare* Substantive law.

**Proceeding.** In a general sense, the form and manner of conducting juridical business before a court or judicial officer. Regular and orderly progress in form of law, including all possible steps in an action from its commencement to the execution of judgment. Term also refers to administrative proceedings before agencies, tribunals, bureaus, or the like.

An act which is done by the authority or direction of the court, agency, or tribunal, express or implied; an act necessary to be done in order to obtain a given end; a prescribed mode of action for carrying into effect a legal right. All the steps or measures adopted in the prosecution or defense of an action. Statter v. United States, C.C.A.Alaska, 66 F.2d 819, 822. The word may be used synonymously with "action" or "suit" to describe the entire course of an action at law or suit in equity from the issuance of the writ or filing of the complaint until the entry of a final judgment, or may be used to describe any act done by authority of a court of law and every step required to be taken in any cause by either party. The proceedings of a suit embrace *all* matters that occur in its progress judicially.

Term "proceeding" may refer not only to a complete remedy but also to a mere procedural step that is part of a larger action or special proceeding. Rooney v. Vermont Investment Corp., 10 Cal.3d 351, 110 Cal.Rptr. 353, 365, 515 P.2d 297. A "proceeding" includes action and special proceedings before judicial tribunals as well as proceedings pending before quasi-judicial officers and boards. State ex rel. Johnson v. Independent School Dist. No. 810, Wabasha County, 260 Minn. 237, 109 N.W.2d 596, 602. In a more particular sense, any application to a court of justice, however made, for aid in the enforcement of rights, for relief, for redress of injuries, for damages, or for any remedial object.

"Proceeding" means any action, hearing, investigation, inquest, or inquiry (whether conducted by a court, administrative agency, hearing officer, arbitrator, legislative body, or any other person authorized by law) in which, pursuant to law, testimony can be compelled to be given. Calif.Evid.Code § 901.

*Collateral proceeding.* One in which the particular question may arise or be involved incidentally, but which is not instituted for the very purpose of deciding such question; as in the rule that a judgment cannot be attacked, or a corporation's right to exist be questioned in any collateral proceeding. *See* Collateral estoppel doctrine.

*Legal proceedings. See* Legal proceedings.

*Ordinary proceedings.* Those founded on the regular and usual mode of carrying on a suit by due course at common law.

*Special proceeding.* Generic term for remedies or proceedings which are not ordinary actions; *e.g.* condemnation (Fed.R.Civil P. 71A); vesting title (Rule 70).

A "special proceeding" has reference to such proceedings as may be commenced independently of a pending action by petition or motion upon notice in order to obtain special relief, and, generally speaking, a special proceeding is confined to type of case which was not, under the common-law or equity practice, either an action at law or a suit in equity. Church v. Humboldt County, 248 C.A.2d 855, 57 Cal.Rptr. 79, 81.

*Summary proceeding.* Any proceeding by which a controversy is settled, case disposed of, or trial conducted, in a prompt and simple manner, without the aid of a jury, without presentment or indictment, or in other respects out of the regular course of the common law. In procedure, proceedings are said to be summary when they are short and simple in comparison with regular proceedings; *e.g.* conciliation or small claims court proceedings as contrasted with usual civil trial.

*Supplementary proceeding.* A separate proceeding in an original action, in which the court where the action is pending is called upon to exercise its jurisdiction in aid of execution of the judgment in the action. It is a statutory equivalent in actions at law of the creditor's bill in equity, and in the majority of states where law and equity are merged, is provided as a substitute therefor. *See e.g.* Fed.R.Civil P. 69. In this proceeding the judgment debtor is summoned to appear before the court (or a referee or examiner) and submit to an oral examination touching all his property and effects, and if property subject to execution and in his possession or control is thus discovered, he is ordered to deliver it up, or a receiver may be appointed. *See* Execution; Supplementary proceedings.

**Proceeds.** Issues; income; yield; receipts; produce; money or articles or other thing of value arising or obtained by the sale of property; the sum, amount, or value of property sold or converted into money or into other property. Proceeds does not necessarily mean only cash or money. Phelps v. Harris, 101 U.S. 370, 25 L.Ed. 855. That which results, proceeds, or accrues from some possession or transaction. State Highway Commission v. Spainhower, Mo., 504 S.W.2d 121, 125. The funds received from disposition of assets or from the issue of securities (after deduction of all costs and fees).