**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 24-4665**

———————

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

    v.

DENNIS ZELEDON HERNANDEZ,

        Defendant – Appellant.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  Roderick Charles Young, District Judge.  (3:23-cr-00122-RCY-1)

———————

Argued:  January 30, 2026                           Decided:  April 16, 2026

———————

Before WILKINSON, GREGORY, and QUATTLEBAUM, Circuit Judges.

———————

Reversed, vacated, and remanded by published opinion.  Judge Gregory wrote the opinion, in which Judge Quattlebaum joined.  Judge Wilkinson wrote a dissenting opinion.

———————

**ARGUED:**  Isabel Maria Marin, GOODWIN PROCTER LLP, Washington, D.C., for Appellant.  Robert Sunderland Day, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.  **ON BRIEF:**  Geremy C. Kamens, Federal Public Defender, Patrick L. Bryant, Assistant Federal Public Defender, Joseph S. Camden, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia; Brian T. Burgess, Washington, D.C., Jonathan E. Rankin, GOODWIN PROCTER LLP, Boston, Massachusetts, for Appellant.  Erik S. Siebert, United States Attorney, Robert S. Day, Assistant United States Attorney, Daniel J. Honold, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

———————

GREGORY, Circuit Judge:

Dennis Zeledon Hernandez ("Zeledon"), a noncitizen, was the subject of an order of removal issued by the Executive Office for Immigration Review ("EOIR") in 2019.[1] However, a warrant for his removal was not issued by the Department of Homeland Security ("DHS") until 2023, when he was arrested on unrelated charges. Soon after DHS issued the warrant of removal, Zeledon was taken into Immigration and Customs Enforcement ("ICE") custody. He escaped soon after. Upon being recaptured, he was indicted for obstructing immigration proceedings under 18 U.S.C. § 1505, which makes it a criminal offense to obstruct a "pending proceeding . . . being had before [a] department or agency of the United States." 18 U.S.C. § 1505. The Government argued that he had obstructed two pending proceedings: the EOIR's adjudication of his status, and ICE's execution of a warrant of removal. The district court determined that Zeledon had obstructed a pending proceeding before EOIR when he escaped ICE custody.

Zeledon appealed. On appeal, he argues that ICE's execution of a warrant of removal after an EOIR final order has already been issued is not a "pending proceeding being had before" EOIR under 18 U.S.C. § 1505.

We agree. For the reasons that follow, we reverse the determination of the district court, vacate Zeledon's conviction, and remand for further proceedings.

---

[1] The briefing submitted refers to Appellant as "Zeledon."

I.

In July 2016, Zeledon—who is from El Salvador—was crossing the southern border near Hidalgo, Texas when he encountered Border Patrol officials. At that time, he expressed a fear of returning to El Salvador due to gang violence to an asylum officer, and the officer determined that he had demonstrated a credible fear of persecution in El Salvador. He was accordingly released from ICE custody on bond, and an immigration judge ordered him to appear for future hearings to address his asylum claim.

Removal proceedings are conducted by EOIR, the agency responsible for administering immigration courts. If a noncitizen fails to appear at a hearing, he may be ordered removed "in absentia." 8 C.F.R. § 1003.26. Congress specified that an immigration judge issues an order of removal "[a]t the conclusion of the [removal] proceeding." 8 U.S.C. § 1229a(c)(1)(A). The order of removal became "final . . . immediately upon entry." 8 C.F.R. § 1241.1. Zeledon did not appear for a December 2019 immigration court hearing in his case, so he was ordered removed in absentia.

After EOIR issues a final administrative removal order, DHS—and, by extension, ICE—may issue a warrant of removal, which authorized agents can then execute. 8 C.F.R. § 241.2. Zeledon's warrant of removal was not issued for over three years. In May 2023, after Virginia police arrested Zeledon for a DUI-related offense, ICE issued the warrant for Zeledon's removal. Zeledon was then transferred to ICE's Caroline Detention Facility. He retained an immigration attorney who filed a motion to reopen his case and rescind the removal order because Zeledon had not received proper notice of his hearing. The immigration judge denied this motion to reopen on June 13, 2023.

3

ICE scheduled Zeledon's deportation for July 12, 2023. Because Zeledon sincerely believed he would be murdered if he returned to El Salvador, he escaped the ICE detention facility on July 2, 2023, and ran into the woods nearby. On July 7, 2023, he was apprehended and arrested by U.S. Marshals in North Carolina.

Federal prosecutors charged Zeledon with violating 18 U.S.C. § 751(a) by "knowingly and intentionally escap[ing] from the custody of an officer and employee of the United States pursuant to a lawful arrest." J.A. 14. They also charged him with violating 8 U.S.C. § 1253(a)(1)(C) by acting to prevent his departure from the United States despite an outstanding "final order of removal." J.A. 14. A grand jury indicted Zeledon on two counts: (1) escape under 18 U.S.C. § 751(a), as charged in the criminal complaint; and (2) "corruptly" obstructing a pending proceeding when he escaped ICE custody "to prevent, evade, or hamper DHS's and ICE's compliance with an order of removal issued by EOIR," in violation of § 1505. J.A. 19. The Government did not pursue its charge for a violation of 8 U.S.C. § 1253(a)(1)(c).

Zeledon moved to dismiss the 18 U.S.C. § 1505 count for failure to state an offense because no immigration court proceeding was "pending" at the time of Zeledon's escape from ICE custody. J.A. 21–22. The Government countered that EOIR proceedings remain pending until the immigration judge's order is satisfied or executed. J.A. 34–35.

The district court denied Zeledon's motion. It determined that, because "proceeding" should be "construed broadly to effectuate the statute's purpose," J.A. 108, "the execution of an EOIR-issued removal order" was a "'proceeding' of an EOIR Immigration Court action." J.A. 109. Under the district court's broad reading of the

4

statute, because removal is "an act done by the authority or direction of the EOIR court," it fit within the dictionary definition of "proceeding." J.A. 108–11. The court accordingly concluded that ICE's execution of a warrant of removal is part of the EOIR's proceeding.

At the bench trial, after the close of the Government's case, Zeledon moved for acquittal on both counts. The court acquitted Zeledon on the § 751 count because the execution of a final order of removal is not part of the "exclusion and expulsion proceedings" specified in the statute. J.A. 372–79. But the court denied his motion for acquittal on the § 1505 count and entered a judgment of guilty. Zeledon was sentenced to 18 months imprisonment.

## II.

Our review of the district court's denial of Zeledon's motion for acquittal presents a question of statutory interpretation—which we review de novo. *South Carolina v. U.S. Army Corps of Eng'rs*, 66 F.4th 189, 193 (4th Cir. 2023); *see also United States v. Said*, 798 F.3d 182, 193 (4th Cir. 2015) (reviewing denial of motion for judgment of acquittal de novo).

On appeal, Zeledon argues that he did not obstruct a pending proceeding because the immigration court had already entered its judgment at the time of his escape. He claims that the plain text of § 1505 makes clear that the term "proceeding" only includes the steps leading to the conclusion of an agency's decision-making process. As a result, the district court erroneously extended the meaning of § 1505 to include ICE enforcement actions. The Government responds that the term "proceeding" in § 1505 extends to agency enforcement operations, so it encompasses ICE's enforcement of EOIR's order of removal.

The Government also puts forth two additional arguments that did not provide the basis for the district court's decision. First, it argues that ICE's execution of a removal warrant is itself a "pending proceeding" under § 1505. Second, the Government argues for the first time on appeal that Zeledon's motion to reopen constitutes a "pending proceeding" because the time to appeal the district court's denial of his motion had not yet elapsed.

The plain text of § 1505 supports Zeledon's reading of the statute. We therefore reverse the district court's determination, vacate Zeledon's conviction, and remand for further proceedings.

## A.

As always, we begin with the text of the statute. *Bufkin v. Collins*, 604 U.S. 369, 379 (2025). "Unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Hurlburt v. Black*, 925 F.3d 154, 158 (4th Cir. 2019) (citation omitted). Interpreting the plain language of a statute requires looking to both the "the specific context in which the language is used, and the broader context of the statute as a whole." *United States v. Chaudhri*, 134 F.4th 166, 177 (4th Cir. 2025), *cert. denied*, 146 S.Ct. 208 (U.S. Oct. 6, 2025) (No. 25-146) (citation omitted).

18 U.S.C. § 1505 reads, in relevant part:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which *any pending proceeding* is *being had before any department or agency of the United States*, or the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress—[s]hall be fined under this title, imprisoned not more than 5 years or, if the offense

involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both.

(emphasis added).

This is a matter of first impression:  no Circuit has determined whether § 1505 encompasses immigration removal proceedings.  And our caselaw provides limited guidance regarding how to read "proceeding" in § 1505.  We have recognized the breadth of § 1505.  *See, e.g.*, *United States v. Mitchell*, 877 F.2d 294, 300 (4th Cir. 1989).  But we have not applied § 1505 to an individual's obstruction of an enforcement proceeding.

Black's Law Dictionary includes several definitions for "proceeding":  (1) "the regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment"; (2) "[a]ny procedural means for seeking redress from a tribunal or agency"; (3) "[a]n act or step that is part of a larger action"; and (4) "[t]he business conducted by a court or other official body; a hearing." *Proceeding*, Black's Law Dictionary (12th ed. 2024).[2]  These definitions do not conclusively resolve our question.  The third definition could arguably bring ICE's execution of a warrant within the scope of the broader EOIR proceedings.  By contrast, the first definition forecloses the Government's interpretation of "proceeding."  The second and fourth do not meaningfully support one view over the other.[3]

---

[2] This Court looks to Black's Law Dictionary to establish the plain meaning of terms.  *See, e.g.*, *Towers Watson & Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 138 F.4th 786, 793 (4th Cir. 2025).

[3] Dictionary definitions from around the time when Congress enacted § 1505 provide no more clarity.  *See Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020) (reviewing (Continued)

But our precedent also requires that we consider the context of the statutory text in question. *McDonnell v. United States*, 579 U.S. 550, 568–79 (2016) (recognizing that "[t]o choose . . . between competing definitions, we look to the context in which the words appear" because "the familiar interpretive canon *noscitur a sociis*" counsels that "a word is known by the company it keeps") (citation omitted). So, unlike the district court, we do not stop at the dictionary definition of "proceeding."

The verbiage surrounding "proceeding" makes clear that the statute contemplates an *administrative* proceeding: § 1505 specifies that it concerns a "pending" proceeding "being had before" a "department or agency of the United States." *See Mitchell*, 877 F.2d at 300 (recognizing § 1505 governs "administrative proceeding[s]").[4] Black's Law Dictionary defines "administrative proceeding" as "[a] hearing, inquiry, investigation, or trial before an administrative agency, usu[ally] adjudicatory in nature but sometimes quasi-

---

dictionary definitions to determine a "phrase's plain meaning at the time of enactment"). Congress originally enacted the operative language of § 1505 in 1948. *See* 62 Stat. 770 (1948) (current version at 18 U.S.C. § 1505). Earlier versions of Black's Law Dictionary published closer to the time of enactment defined "proceeding" specifically in the context of the judiciary, rather than in an administrative context. *See Proceeding*, Black's Law Dictionary (4th ed. 1951). Indeed, the Fourth Edition defines "proceeding" "[i]n a general sense, [as] the form and manner of conducting judicial business before a court or judicial officer; regular and orderly progress in form of law; including all possible steps in an action from its commencement to the execution of judgment." *Id.* And it states that "[t]he term is properly applicable, in a legal sense, only to judicial acts before some judicial tribunal." *Id.* Thus, this definition does not help us determine the meaning of a "pending proceeding [that] is being had before any *department or agency* of the United States." § 1505 (emphasis added).

[4] The dissent agrees, Dis. Op. at 19, so it's not clear from where its quandary with our reliance on the plain meaning of "administrative proceeding" arises.

8

legislative." *Administrative Proceeding*, Black's Law Dictionary (12th ed. 2024).[5]  This definition accords with our caselaw interpreting "proceeding" in § 1505 to include agency investigations.  *See Mitchell*, 877 F.2d at 300 (holding that § 1505 governs investigations).

The term "before" in § 1505 further limits the scope of a "pending proceeding." "Before" is defined, in relevant part, as "[i]n front of; ahead of" or "[i]n presence or sight of; face to face with; as, to stand *before* the judge." *Before*, Webster's Collegiate Dictionary (5th ed. 1948).  A proceeding cannot be "before" an agency when that agency's role has concluded.  And the adjective "pending"—defined as "[b]egun, but not yet completed"— likewise modifies "proceeding." *Pending*, Black's Law Dictionary (4th ed. 1951); *see also Pending*, Webster's Collegiate Dictionary (5th ed. 1948) (defining "pending" as "[h]anging; overhanging, hence imminent" and "[n]ot yet decided").

Read together, ICE's execution of the immigration court's judgment cannot be part of the proceedings before the immigration court because the hearing before the immigration court had concluded—Zeledon was no longer "awaiting decision" from the immigration judge.  Indeed, a reading of "proceeding" that ignores the surrounding verbiage would render those terms meaningless, and courts rely on the "common sense intuition that Congress would not ordinarily introduce a general term that renders

---

[5] Editions of Black's Law Dictionary published around the time Congress enacted § 1505 did not define "Administrative Proceeding" as a stand-alone term.  The Seventh Edition, which was published in 1999, was the first edition to do so, and the definition it offers is identical to that found in the most recent edition cited above. *Compare Administrative Proceeding*, Black's Law Dictionary (7th ed. 1999), *with Administrative Proceeding*, Black's Law Dictionary (12th ed. 2024).

meaningless the specific text that accompanies it." *Fischer v. United States*, 603 U.S. 480, 487 (2024).

What constitutes a "pending proceeding . . . before" an agency also hinges on how Congress defined that particular agency's proceedings. The Immigration and Nationality Act and its corresponding regulations, which govern EOIR proceedings, support our reading. EOIR ordered Zeledon removed in 2019, and an order of removal is issued "[a]t the conclusion of the [removal] proceeding." 8 U.S.C. § 1229a(c)(1)(A)). EOIR's order of removal became "final . . . immediately upon entry." 8 C.F.R. § 1241.1. Thus, the applicable law specifies that EOIR's "proceeding" terminated at the time EOIR issued Zeledon's order of removal. That is why Zeledon had to move to reopen the immigration court's proceedings to rescind his removal order. Immigration Court Practice Manual § 4.17(a) (2017). It is difficult to see how EOIR's proceedings were "pending" at the time of Zeledon's escape.

No doubt, "any . . . proceeding" in § 1505 "should be construed broadly." *Mitchell*, 877 F.2d at 300. But that breadth alone does not permit us to extend "proceeding" to the enforcement action in this case, as our dissenting colleague suggests. Dis. Op. at 19–20. As discussed above, the words bordering "proceeding" play as significant a role in our interpretation of "proceeding" as the term itself. The "proceeding" must be "pending," and it must be "had before an agency or department of the United States." We find it hard to say that EOIR's proceeding remained "pending" long after the governing statute tells us that the "proceeding" had "conclu[ded]." 8 U.S.C. § 1229a(c)(1)(A)). Section 1505 applies to the vast majority of agency activities, but it does not apply to all of them.

10

The dissent also glosses over a long-established exception to § 1505: It does not extend to "mere police" activity. *See Rice v. United States*, 356 F.2d 709, 712 (8th Cir. 1966); *United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994); *United States v. Senffner*, 280 F.3d 755, 761 (7th Cir. 2002); *United States v. Kirst*, 54 F.4th 610, 621 (9th Cir. 2022). And ICE's actions in this case mirror traditional law enforcement activity.

Though the dissent insists that ICE's involvement is not "the stuff of rote police work," our sister circuits don't cabin the inquiry so narrowly. Dis. Op. at 29. In *Kelley*, the D.C. Circuit recognized that part of what distinguishes mere police activity from a "proceeding" is what powers the agency wielded when acting. 36 F.3d at 1127. For example, the fact that the Federal Bureau of Investigation ("FBI") did not possess rulemaking or adjudicative power related to the subject of an indictment was enough to take its "investigation" out of § 1505's purview. *Id.* (citing *United States v. Higgins*, 511 F.Supp. 453 (W.D. Ky. 1981)). Like the FBI, ICE lacks rulemaking or adjudicative power with respect to noncitizens. That fact strengthens our conclusion that § 1505 does not reach ICE's enforcement of a judgment it did not have the power to enter, akin to a police officer effectuating an arrest upon a magistrate's warrant.[6]

---

[6] Our dissenting friend misconstrues our discussion on this point. Dis. Op. at 26–27. Like the Ninth Circuit, we do not believe an agency *must* have rulemaking or adjudicative powers for its actions to constitute a proceeding. *Kirst*, 54 F.4th at 621. Instead, if an agency possesses such powers with respect to the subject of an agency action, that may support a colorable argument that its actions amount to more than "mere police" activity. *Kelley*, 36 F.3d at 1127. ICE, however, lacks both powers, bolstering our conclusion that its enforcement of a judgment it did not issue comprises routine law enforcement activity.

11

We may also look to the broader structure of the criminal code to assess whether Congress intended § 1505 to encompass ICE removal proceedings. Doing so further elucidates the limits Congress placed on § 1505.[7] For one, Congress has already enacted a statute that would criminalize Zeledon's behavior. 8 U.S.C. § 1253 criminalizes preventing or hampering the departure from the United States of an alien "against whom a final order of removal is outstanding." Though the Government initially charged Zeledon under § 1253, Zeledon was not ultimately indicted for violating § 1253 for reasons unclear from the record.

The Government attempts to distinguish § 1253 by claiming that the statutes require distinct *mentes reae*—"willful" for § 1253, as opposed to "corruptly" for § 1505— therefore allowing § 1253 to "capture[] a broader range of culpable mental states." Resp. Br. at 32. But the Supreme Court has rejected a similar argument. *Fischer*, 603 U.S. at 494 (noting that a statute with a "lesser *mens rea* than 'corruptly'" did not "convincing[ly]" defeat the argument that the Government's reading of statute would render another provision in the statute superfluous). Moreover, the Government conceded at argument that Zeledon could have been properly charged under § 1253. Oral Arg. 38:20-39:09.

We also reject the Government's argument that *Senffner*, 280 F.3d at 761, and *United States v. Hopper*, 177 F.3d 824, 829 (9th Cir. 1999), support their broad reading of § 1505. In both cases, the agency engaging in enforcement action was the agency charged

---

[7] While the canon against surplusage is "strongest" when an interpretation would render another part of the same statute superfluous, its application here, though of "diminished" force, bolsters our interpretation of § 1505 text. *Marx v. General Revenue Corp.*, 568 U.S. 371, 376, 386 (2013).

with investigating the violations of law at issue. *Senffner*, 280 F.3d at 760, concerned the Securities Exchange Commission's ("SEC") prosecution of securities law violations in federal court, while, in *Hopper*, the relevant action was the Internal Revenue Service's ("IRS") investigation and collection of delinquent taxes. 177 F.3d at 828–29. Neither agency was engaged in isolated enforcement activity; instead, both agencies sought enforcement based on that same agency's investigation of legal violations. *See Senffner*, 280 F.3d at 760 (holding that, by obstructing the SEC's prosecution, Senffner had also obstructed "the SEC's initial investigation and enforcement of securities law violations (an SEC proceeding), which sought the return of the funds").

Put another way, the agency's enforcement action in both cases facilitated an *existing* proceeding: the agency's effort to determine if individuals had violated federal law. Neither case permits us to find that ICE's execution of a warrant, which occurred *after* EOIR determined that Zeledon should be removed, was part of a pending proceeding before EOIR. Though the dissent insists that ICE's involvement began when it issued Zeledon's Notice to Appear, Dis. Op. at 26, that was not the Government's argument below or on appeal. *See* Resp. Br. at 41 (stating that ICE's involvement began after entry of the EOIR's judgment); J.A. 33 (describing the relevant "removal proceedings" as commencing when ICE issued the warrant of removal in 2023).

Finally, contrary to the Government's argument, the mere use of "any" in § 1505 does not permit us to hold that it applies to essentially *any* agency action. Indeed, the Supreme Court has repeatedly rejected arguments that permit such broad readings. *See Fischer*, 603 U.S. at 496 (declining to adopt the Government's "catchall" approach to a

statutory provision); *Marinello v. United States*, 584 U.S. 1, 8 (2018) (rejecting interpretation of statute that would create an overly broad "catchall" provision). This is in part motivated by the lenity we accord to federal criminal statutes. *See United States v. Aguilar*, 515 U.S. 593, 600 (1995) ("We have traditionally exercised restraint in assessing the reach of a federal criminal statute.").

The plain text of § 1505 forecloses us from adopting the Government's reading of the statute, and Zeledon's conviction under § 1505 must be vacated.

B.

The Government also argues that ICE's execution of a removal warrant is *itself* a pending proceeding Zeledon obstructed when he escaped ICE custody. It asks us to read § 1505 broadly to encompass "any step or series of steps" taken by an agency to accomplish "a targeted event or objective." Resp. Br. 12, 15. Zeledon counters that ICE enforcement qualifies as "mere police" activity, which courts have long held fall outside § 1505's scope. *See Kelley*, 36 F.3d at 1127 (holding that a proceeding "must be more than a mere police investigation") (citations omitted).

Though the district court did not consider this argument, we hold that ICE enforcement proceedings are not "pending proceeding[s] . . . being had before" ICE under § 1505.[8] While other circuits have recognized the breadth of § 1505, those same circuits

---

[8] We do not, however, reach the Government's argument that Zeledon obstructed his motion to reopen when he escaped ICE custody. The Government did not raise this argument before the district court, and we decline to reach it today. *See Richardson v. Clarke*, 52 F.4th 614, 625 (4th Cir. 2022) ("Generally, parties may not raise new arguments on appeal that were not first presented to the district court below, absent exceptional circumstances.").

do not deem the power to be unlimited.  For example, in *United States v. Leo*, 941 F.2d 181, 199 (3d Cir. 1991) (citing *United States v. Browning, Inc.*, 572 F.2d 720, 724 (10th Cir. 1978)), on which the Government relies, the Third Circuit recognized that the term "'proceeding'" is "'more inclusive'" and "'no longer limits itself to formal activities in a court of law.'"  As a result, the court noted that an agency's "'investigation or search for the true facts'" qualifies as a "'proceeding'" under § 1505.  *Id.* (quoting *Browning*, 572 F.2d at 724).

That makes sense:  factual investigations generally enable the adjudicative process. And the recognition that "proceedings" encompass "investigations" bears out in the plain definition of "administrative proceeding" as "[a] hearing, inquiry, investigation, or trial before an administrative agency, usu[ally] adjudicatory in nature but sometimes quasi-legislative."  *Administrative Proceeding*, Black's Law Dictionary (12th ed. 2024)). Notably absent from these definitions, however, is isolated enforcement action.

The Government argues that ICE's enforcement of a warrant of a removal constitutes a "proceeding," rather than "mere police investigation," because ICE has the power to take oaths and issue subpoenas. *Kelley*, 36 F.3d at 1127.  We are not convinced. An agency's engagement with the facts—whether it involves an agency's "investigation or search for the true facts" or its application of law to facts—falls within the plain meaning of the term "proceeding" in § 1505.  *Leo*, 941 F.2d at 199 (citations omitted).  But an agency's possession of these powers does not turn any action by that agency into a "proceeding."

15

Take, for instance, *Kirst*, 54 F.4th at 610, which the Government discusses at length in its briefing.  The Ninth Circuit in *Kirst* recognized that the agency investigating a plane crash, the National Transportation Safety Board ("NTSB"), was charged by statute with "establish[ing] the facts, circumstances, and cause or probable cause" of aircraft accidents. *Id.* at 614 (alteration in original) (citing 49 U.S.C. § 1131).  As part of this investigatory authority, NTSB maintains the power to administer oaths and issue subpoenas.  *Id.* at 621. NTSB investigations may inform the FAA's revocation of a pilot's airman certification, which the NTSB reviews on appeal.  *Id.* at 614 (citing 49 C.F.R. § 831.21).  Such investigations may also assist law enforcement agencies seeking to determine if a plane crash implicates intentional criminal activity.  49 U.S.C. § 1131(2)(B)–(C).

In *Kirst*, the power to administer oaths and issue subpoenas "enhance[d] [NTSB's] investigations" by allowing the agency to develop a factual record to enable potential adjudicative processes.  *Kelley*, 36 F.3d at 1127.  This distinguished the NTSB's investigative actions from "mere police investigation."  *Kirst*, 54 F.4th at 621 (citing *Kelley*, 36 F.3d at 1127).  But, contrary to the Government's argument, the Ninth Circuit never stated that such powers make *any* action an agency takes a "proceeding."  Instead, it recognized that NTSB's ability to "issue subpoenas and to compel testimony under oath" pursuant to its investigatory authority rendered NTSB's investigation a "proceeding" under § 1505.  *Id*.

So, while the Government argues that ICE's power to swear out subpoenas and issue warrants in an investigation turns its enforcement actions into a "proceeding," possessing such powers alone is not enough.  Instead, what matters is the context in which the agency

16

exercises such powers and how those powers assist the agency in the relevant functions. *See Senffner*, 280 F.3d at 761 (noting the authority to "issue subpoenas and administer oaths" was relevant in the investigatory context). Here, ICE was tasked with executing a warrant of removal. And when enforcing a warrant of removal, ICE wields neither power to further an adjudicative process. That difference distinguishes the case before us from *Kirst*.

Here, too, we find the Government's reliance on *Senffner* and *Hopper* unpersuasive. As discussed above, neither case concerns an agency's pure enforcement action. The enforcement actions taken in those cases extended from the agency's investigations. In contrast, ICE was merely executing a warrant of removal pursuant to an EOIR judgment. The Government has not pointed to—and we could not identify—a case where an agency's execution of a decision already issued by a different agency constituted a proceeding under § 1505. Neither case empowers us to read § 1505 to encompass isolated ICE's execution of a warrant of removal.

## III.

For the foregoing reasons, the judgment of the district court is

*REVERSED, VACATED, AND REMANDED.*

WILKINSON, Circuit Judge, dissenting:

I would affirm the conviction of Dennis Zeledon Hernandez ("Zeledon"). After an Immigration Judge ordered his removal to El Salvador, Zeledon stayed in the United States for three-and-a-half years as a fugitive. Immigration and Customs Enforcement ("ICE") then detained him—in due execution of this order—upon his arrests for driving under the influence, carrying a concealed weapon, and child neglect. Just days before his planned deportation, however, Zeledon scaled a fence using bedsheets tied as a rope, climbed onto a building, and ran into the nearby woods. It took a five-day search involving over one hundred local, state, and federal officials to find him almost two hundred miles away.

This egregious conduct plainly violates 18 U.S.C. § 1505. That is, by interfering with ICE's enforcement of a court order, Zeledon obstructed "any pending proceeding . . . being had before any department or agency of the United States." 18 U.S.C. § 1505. Congress drafted the statute in capacious terms, and courts must honor them.

Holding otherwise, the majority consults technical definitions and recasts case law across the country to conclude that a "proceeding" artificially ends at the close of some ill-defined decisionmaking process. But the word's ordinary meaning captures a continuum of targeted actions spanning investigations, adjudications, and enforcement alike. Indeed, enforcement of legal decisions is often part and parcel of the legal decisionmaking process itself. *See United States v. Barnett*, 376 U.S. 681, 700 (1964). My friends in the majority propose various tests, lines, distinctions, and qualifications, which, were I able to figure them out, find no support in the actual text of the statute. I thus respectfully dissent.

I.

Section 1505 criminalizes in relevant part "corruptly . . . obstruct[ing] . . . the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States." 18 U.S.C. § 1505. As confirmed by longstanding precedent, the ordinary meaning of these words encompasses enforcement efforts.

A.

Consider first the core of § 1505: "proceeding." Lay and law dictionaries alike consistently describe it in the broadest of terms. *See, e.g.*, *Proceeding*, 12 Oxford English Dictionary 545 (2d ed. 1989) ("The carrying on of an action or series of actions; action, course of action; conduct, behaviour."); *Proceeding*, Black's Law Dictionary 1459 (12th ed. 2024) ("As applied to actions, the term 'proceeding' may include . . . the enforcement of the judgment . . . ." (quoting Edwin E. Bryant, *The Law of Pleading Under the Codes of Civil Procedure* 3–4 (2d ed. 1899))). In the context of § 1505, then, "proceeding" refers to a continuum of agency actions encompassing not just adjudications, but also enforcement.

This observation is not controversial. Many "decisions have uniformly held that th[e] term ['proceeding'] should be construed broadly." *United States v. Mitchell*, 877 F.2d 294, 300 (4th Cir. 1989). Such precedent dates back at least six decades, when the Eighth Circuit explained that "proceeding" in § 1505 "simply mean[s] proceeding in the manner and form prescribed for conducting business before the department or agency, including all steps and stages in such an action from its inception to its conclusion." *Rice v. United States*, 356 F.2d 709, 712 (8th Cir. 1966).

19

Since then, every other circuit that has spoken on the matter agrees with giving the term its familiar broad reach. The Second. *United States v. Schwartz*, 924 F.2d 410, 423 (2d Cir. 1991) (describing how "'any proceeding' as used in § 1505 has been defined broadly"). The Third. *United States v. Leo*, 941 F.2d 181, 199 (3d Cir. 1991) (referring to "the broad meaning of the word 'proceeding'" in § 1505). The Sixth. *United States v. Fruchtman*, 421 F.2d 1019, 1021 (6th Cir. 1970) (agreeing that "proceeding" in § 1505 "is a term of broad scope"). The Seventh. *United States v. Senffner*, 280 F.3d 755, 761 (7th Cir. 2002) (recounting how the term "proceeding" in § 1505 "is defined rather broadly"). The Ninth. *United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir. 1976) (clarifying that "[a]n administrative investigation is a 'proceeding' within the meaning of [§ 1505]"). And the Tenth. *United States v. Browning, Inc.*, 572 F.2d 720, 724 (10th Cir. 1978) (explaining how "[t]he growth and expansion of agency activities have resulted in a meaning being given to 'proceeding' which is much more inclusive and which no longer limits itself to formal activities in a court of law").

We would be wise to stay true to our precedent and remain in this plentiful company.

B.

Yet the majority chooses to stand alone. Congress envisioned a "proceeding" as a continuing sequence of investigation, adjudication, and enforcement, which it wished to "proceed" seamlessly and unobstructed. The majority, by contrast, would chop this whole process into little pieces, demarcated by court decisions which will take years to play out. As it sees things, "proceeding" refers only to the steps leading up to an agency's decision and thus excludes any subsequent enforcement. Maj. Op. at 5–6. To get there, the majority

20

shirks all the case law above, and in so doing shrivels Congress's intention to have those like Zeledon, who seek to frustrate the implementation of court removal orders, liable under § 1505.

Of course, "we usually assume statutory terms bear their ordinary meaning 'until and unless someone points to evidence suggesting otherwise.'" *Monsalvo Velázquez v. Bondi*, 145 S. Ct. 1232, 1241 (2025) (quoting *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1481–82 (2021)). And we have no good basis to reject this presumption here. In fact, the preceding "any" in § 1505 confirms that Congress intended "proceeding" to wield its broader ordinary definition. To take the "repeated[] expla[nation]" of the Supreme Court, "'any' has an expansive meaning." *Babb v. Wilkie*, 140 S. Ct. 1168, 1173 n.2 (2020) (quoting *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008)). The majority's narrow interpretation of "proceeding," by contrast, effectively deletes this term. In so doing, it violates "our duty 'to give effect, if possible, to every clause and word of a statute.'" *United States v. Menasche*, 348 U.S. 528, 538–39 (1955) (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883)).

To be sure, § 1505 still has text-based limits. Recall that the provision criminalizes "obstruct[ing] . . . the due and proper administration of the law." 18 U.S.C. § 1505. As the Supreme Court explained in the context of a statute with analogous wording, this language refers only to "specific interference with targeted governmental . . . proceedings, such as a particular investigation." *Marinello v. United States*, 138 S. Ct. 1101, 1104 (2018). Accordingly, a § 1505 "proceeding" does not encompass "routine, day-to-day work carried out in the ordinary course" of an agency's business. *Id.* at 1110. But the term *does*

21

encompass agency enforcement efforts intertwined with an adjudication. For example, when ICE triggers an Immigration Court hearing by issuing a Notice to Appear (as here), submits evidence to the Immigration Court establishing the truth of that Notice (as here), and then enforces the Immigration Court's resulting order of removal (as here), it is engaging in a "targeted governmental . . . proceeding[]." *Id.* at 1104.

In substance, ICE "acted as an arm of the" Immigration Court such that the two entities' actions cannot be separated for purposes of § 1505. *United States v. Aguilar*, 515 U.S. 593, 600 (1995); *see also id.* (indicating a defendant can criminally obstruct a grand jury by lying to FBI agents acting at the grand jury's behest). Instead of formalistically viewing ICE's actions in a vacuum, we must remember the broader context of the court removal order that ICE both instigated and sought to enforce. This context makes clear that Zeledon "obstruct[ed] . . . the due and proper administration of the law." 18 U.S.C. § 1505.

The majority overlooks this textual limitation in § 1505 by baking an even stronger constraint into the meaning of "proceeding." But this raises many red flags, starting with the claim that "our caselaw provides limited guidance regarding how to read 'proceeding' in § 1505." Maj. Op. at 7. As just explained, our court and many others have long elucidated a broad definition for "proceeding." *See, e.g.*, *Mitchell*, 877 F.2d at 300. Framing this well-understood matter as one of first impression, however, the majority lists four legal definitions for "proceeding" before throwing its hands up and suggesting that any one of them could apply to § 1505.

The majority's unusual approach taints its view out of the gate; the first definition that it lists speaks of "lawsuit[s]"—the fodder of courts. Maj. Op. at 7. Section 1505, by

22

contrast, is directed at administrative agencies, whose powers are "different" than and generally "far exceed[]" those of "conventional judicial modes." *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 142 (1940). These powers bring an obvious potential for agency abuse. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 499 (2010). But crucially, Zeledon has not alleged any such abuse by ICE. The fact remains that courts are largely adjudicative bodies whereas agencies often wield significant investigative and enforcement powers—frequently in aid of courts, but which courts themselves cannot replicate. *See City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013). To blindly equate the meaning of "proceeding" across the judicial and administrative domains ignores the basic reality that they differ from each other in numerous ways.

That in mind, consider next the majority's use of the phrase "pending proceeding . . . being had before any department or agency of the United States." Once more, the majority shrinks the realm of applicable proceedings to only those awaiting decision in front of some tribunal. Maj. Op. at 8–9. To do so, the majority again draws narrow definitions suited more for the judicial setting. To repeat, federal agencies usually wield more than just adjudicative powers, so it makes little sense to invoke such narrow definitions in the context of § 1505. As before, we must follow the ordinary meaning of "pending" and "being had before." The former simply means "during" or "throughout the continuance of," *Pending*, 11 Oxford English Dictionary, *supra*, at 468, while the latter refers to "[c]laiming [one's] attention," *Before*, 2 Oxford English Dictionary, *supra*, at 64.

Taking everything together, § 1505 proscribes specific interference with any ongoing series of actions, conducted in a manner prescribed by law, that an agency

23

performs to accomplish a targeted objective. This captures Zeledon's conduct to a T: his attempted escape from an ICE facility obstructed the agency's then-ongoing operation to enforce his outstanding removal order. That there was no formal adjudication active at the time does not matter. Congress wrote the open-ended phrase "any pending proceeding" in § 1505 to encompass wide swaths of activities within the power of federal agencies, and appellate courts have consistently honored this ordinary meaning. Until now.

C.

Trying nevertheless to harmonize its interpretation with case law, the majority alleges that courts of appeals have interpreted the statute to cover only adjudications and investigations. Maj. Op. at 15. According to it, enforcement occurring after an adjudication, such as ICE's execution of a removal order, misses the cut.

This framing of appellate case law, assuming arguendo its truth, undermines the majority's whole ordinary-meaning argument. In one breath, the majority says that "pending" and "being had before" require some ongoing decisionmaking process before a tribunal, *see* Maj. Op. at 8–9—effectively adjudications and nothing more. Yet in the next, it concedes that investigations qualify as "proceeding[s]." Maj. Op. at 9, 15. Doing so, to its credit, avoids a direct conflict with our own precedent and the many courts that have recognized "Congress clearly intended [§ 1505] to punish any obstruction of the administrative process . . . at any stage of the proceedings, be it adjudicative or investigative." *Rice*, 356 F.2d at 712. But it comes at the expense of a coherent statutory construction. Section 1505 either criminalizes obstruction of more than just adjudications, or it does not. The majority cannot have it both ways.

24

The more faithful and administrable reading of § 1505, as many sister circuits have recognized, is that "[a]gency investigative activities are 'proceedings' within the meaning of § 1505." *United States v. Sutton*, 732 F.2d 1483, 1490 (10th Cir. 1984); *see also United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (collecting cases). This is particularly true when an agency wields certain powerful investigative tools, such as the authority to subpoena and compel testimony under oath, that signal Congress's desire for the agency to engage in targeted actions. *See, e.g.*, *United States v. Kirst*, 54 F.4th 610, 619, 621 (9th Cir. 2022); *Kelley*, 36 F.3d at 1127. Of course, ICE wields these very tools in its removal operations. *See* 8 U.S.C. § 1225(d)(3)–(4)(A).

Making matters worse for the majority, at least two sister circuits have already applied § 1505 not only to investigations, but also to enforcement. First came *United States v. Hopper*, 177 F.3d 824 (9th Cir. 1999). In that case, the defendants were convicted under § 1505 for trying to use a fraudulent monetary instrument to satisfy a judgment that a federal court had awarded to the IRS. *Id.* at 828–29. On appeal, they argued that their conduct at most obstructed the court's judgment, not an agency's proceeding, and thus fell out of § 1505. *Id.* at 830. But the Ninth Circuit did not bite. *Id.* Instead, it deemed § 1505 in play because the defendants' fraud, had it worked, "would have precluded collection of the tax debt and the enforcement of the IRS tax liens." *Id.* The court added that "[u]ntil the debt behind those liens was satisfied, the collection proceeding before the IRS continued." *Id.*

Then came parallel reasoning in *United States v. Senffner*, 280 F.3d 755. There, the defendant hid assets from the SEC that were subject to a district court's temporary

restraining order. *Id.* at 759. Appealing his § 1505 conviction, the defendant "argue[d] that he only obstructed the district court, not the SEC" because the agency "had no independent authority to freeze or distribute assets, or to impose civil penalties." *Id.* at 760. As above, the panel disagreed. *Id.* at 766. The Seventh Circuit wrote that the SEC's "proceeding did not end by virtue of the filing of the lawsuit" and that the defendant's attempted obfuscation "obstructed the district court and, as a consequence, the SEC's initial investigation and enforcement of securities law violations (an SEC proceeding)." *Id.* at 760.

Just as a defendant runs afoul of § 1505 by interfering with the IRS's enforcement of a judgment or the SEC's enforcement of a temporary restraining order, so too does Zeledon by interfering with ICE's enforcement of an Immigration Judge's removal order. To try to skirt around these cases, the majority points out how the enforcement activity in each "facilitated an *existing* proceeding." Maj. Op. at 13. Well, so did the one here. At every stage in Zeledon's removal, ICE was there: the agency issued his Notice to Appear, "submitted documentary evidence" to the Immigration Court that "established the truth of the [Notice's] factual allegations," and executed the ensuing removal order. J.A. 248. Indeed, ICE "represent[s] [itself] in all . . . removal proceedings before the Executive Office for Immigration Review." 6 U.S.C. § 252(c). That makes the § 1505 proceeding here even more obvious than one where, say, the IRS passes its case off to the Department of Justice for adjudication before federal courts, returning only for enforcement as needed. *See Hopper*, 177 F.3d at 828–29.

The majority emphasizes how "ICE lacks rulemaking or adjudicative power with respect to noncitizens." Maj. Op. at 11. But as our sister circuits have recognized, § 1505

26

is simply not so confined. *E.g.*, *Kirst*, 54 F.4th at 620 (rejecting the "argu[ment] that § 1505 applies only to agencies with adjudicatory or rulemaking authority"). The statute speaks of "any" pending proceeding, not some small subset of proceedings that the majority envisions. Moreover, a proceeding remains pending when the very order of the proceeding lies idle and unenforced. Courts not infrequently rely on agencies of one sort or another to enforce their orders, and obstruction of the agency's efforts fits right in with the language of § 1505. *See Hopper*, 177 F.3d at 830–31; *Senffner*, 280 F.3d at 760–61. Lacking any basis to distinguish these cases, then, the majority departs in substance from them. Worse still, it does so without even giving these courts the respect to acknowledge the circuit split it has made.

## II.

In addition to defending its narrow version of § 1505, the majority spills a lot of ink explaining why a broader reading supposedly cannot be right. Its concerns are overstated.

## A.

Consulting the canon against surplusage, the majority reminds us that the "usual approach in obstruction cases has been to 'resist reading' particular sub-provisions 'to create a coverall' statute." *Fischer v. United States*, 144 S. Ct. 2176, 2189 (2024) (quoting *Yates v. United States*, 574 U.S. 528, 549 (2015) (plurality opinion)). As it sees things, the narrow interpretation of § 1505 makes the most sense because it avoids overlap with other obstruction crimes. Maj. Op. at 12.

But this canon is not some hard-and-fast edict dictating every matter of statutory interpretation. Rather, the Supreme Court has repeatedly declined to depart from a statute's

27

ordinary meaning just because it criminalizes the same conduct as other laws. *See, e.g., Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014) ("No doubt, the overlap between the two clauses is substantial on our reading, but that is not uncommon in criminal statutes.").

True, we generally refrain from constructing "coverall" laws. But nothing prohibits Congress from passing multiple criminal statutes that, *in some circumstances*, cross paths with each other. Indeed, this belt-and-suspenders approach makes sense in the context of obstruction; Congress understandably wants to be thorough in mitigating interference with the laws it passes. To contort the scope of statutes under the idealistic façade that Congress wanted each one to cover wholly distinct conduct, as the majority does, undermines any attempt at comprehensive policymaking and curtails legislative power.

## B.

The majority also emphasizes that a § 1505 "proceeding" does not include routine law enforcement activities. Maj. Op. at 11, 14–15. On this point, I agree. As many sister courts have explained, a "proceeding" must be "more than a mere police investigation," *Rice*, 356 F.2d at 715 (quoting *United States v. Batten*, 226 F. Supp. 492, 494 (D.D.C. 1964)), lest the statute criminalize an array of day-to-day interactions between officials and law-abiding citizens.

But this lamented outcome does not follow from giving § 1505 the weight it is due, nor does it remotely describe Zeledon's interference with ICE. To reiterate, "proceeding" and "the due and proper administration of the law" refer to a continuum of targeted agency actions, not, say, the one-off decisions of an officer (or indeed an ICE agent) on the beat.

28

Here, such targeted action began at the latest when ICE—pursuant to a removal order—detained Zeledon. This targeted action persisted across ICE's preparations to remove him, such as when it examined his health and transferred him between facilities. And the targeted action remained active when Zeledon, only a few days before his scheduled removal, escaped custody. None of ICE's involvement was the stuff of rote police work. Rather, it applied a host of laws laden with agency discretion to effectuate the order of an Immigration Court. In the process, the agency operated under "any pending proceeding."

Put more broadly, an agency's execution of a court order is intrinsically tied to the adjudication such that both set the backdrop for § 1505. Enforcing a judgment is "necessary to achieve [the] goal" of an adjudication, after all. *Senffner*, 280 F.3d at 760. Law enforcement officers making on-the-spot judgment calls detached from a court order, by contrast, fall beyond the ordinary meaning of "proceeding." The word still has guardrails—just less restrictive ones than what Zeledon and the majority purport. We accordingly need not distort our reading of the statute under some mistaken fear that its ordinary meaning criminalizes innocent behavior.

## III.

"When terms used in a statute are undefined, we give them their ordinary meaning." *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995). As virtually every circuit has confirmed, this bedrock presumption requires that we read § 1505 as a statute of some breadth. Doing so makes this an easy case: by escaping custody and hiding for five days while ICE was in the middle of executing his court-ordered removal, Zeledon obstructed "any pending proceeding . . . being had before any . . . agency." 18 U.S.C. § 1505.

29

Making much ado about a jumble of hairsplitting nuances, the majority rejects this ready conclusion. In the process, it loses sight of the big and obvious picture. Congress drafted and amended § 1505 to criminalize *any* obstruction of *any* agency's proceedings, and those proceedings often take the form of enforcement of a court order. The majority mysteriously believes that Congress in enacting a broad obstruction law cared not one whit about the obstruction of judicial orders in what was from the get-go a targeted agency enforcement action. Because the statute means what it says, I would affirm Zeledon's conviction.

30